**E-FILED**
Monday, 16 April, 2007  03:54:39 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| JOSEPH E. POSEY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  06-2114 |
| | ) | |
| CHAMPAIGN PARK DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CHAMPAIGN PARK DISTRICT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The issue in this case is whether Plaintiff, Joseph E. Posey, Sr. ("Plaintiff"), a former employee of the Champaign Park District ("Defendant" or "Park District"), can prove that the Park District terminated him because of his race (African-American), when Plaintiff admitted to the Park District that he had purchased alcohol on work time, which violated the Park District's work rules, and Plaintiff failed to name a single non-African-American employee whom the Park District honestly believed had purchased alcohol on work time and was not terminated, and, in fact, the Park District terminated a non-African-American employee for serious misconduct shortly after it terminated Plaintiff.

For the reasons set forth below, Plaintiff cannot prove race discrimination through the direct or indirect methods of proof, and the District is entitled to judgment as a matter of law.

II.    **UNDISPUTED MATERIAL FACTS**

A.    **Background**

The Park District is a unit of local government which provides numerous high-quality recreational opportunities to the public.  (McGrew Aff. at ¶3.  A copy of Mary McGrew's Affidavit with supporting Exhibits is attached to this Memorandum as Exhibit A.)

Plaintiff worked for the Park District as a Seasonal Landscaper, meaning a member of the Trash Collection Crew.  (Posey Dep. Tr. 10-13.  A copy of the transcript of the deposition of Joseph E. Posey, Sr. is attached to this Memorandum as Exhibit B.)

The Trash Collection Crew is responsible for ensuring the effective maintenance and appearance of the Park District's parks by performing litter pickup and custodial care.  (Posey Dep. Tr. 13; McGrew Aff. at ¶4.)

Plaintiff was terminated on August 24, 2004 because he admitted -- and the Park District honestly believed -- that Plaintiff purchased alcohol while in a Park District uniform, on Park District time and driving a Park District vehicle with a Park District logo on both sides and municipal license plates on the front and back of the vehicle.  (Posey Dep. Tr. 13, 59; Posey Dep. Exh. 1, p. 6; McGrew Aff. at ¶5.  A copy of Posey Deposition Exhibit 1 is attached to this Memorandum as Exhibit C.)

Plaintiff's lawsuit against the District claims that he was terminated because of his race (African-American).  (Posey Dep. Tr. 13, 23; Posey Dep. Exh. 1, p. 6.)

B.    **The Circumstances Leading To Plaintiff's Termination**

On August 24, 2004, Plaintiff's shift began at 7:30 a.m., and his first scheduled break was at 10:00 a.m.  (Posey Dep. Tr. 13-14.)

That day, the Park District received a phone call from a woman who said she saw an individual in a Park District uniform purchase alcohol at a Circle K convenience store at approximately 8:30 a.m. that morning.  (McGrew Aff. at ¶6.)

The woman said she called because it bothered her that a Park District employee had bought liquor so early in the morning.  (McGrew Aff. at ¶7.)

The Circle K store is located approximately two blocks from one of the facilities where Plaintiff and his co-worker, Clinton Andrews ("Andrews"), also African-American, were scheduled to perform trash removal.  (Posey Dep. Tr. 23; McGrew Aff. at ¶8.)

As a result, at about 9:30 a.m., the Park District radioed for Plaintiff and Andrews to come to the Park District's offices.  (Posey Dep. Tr. 24; McGrew Aff. at ¶9.)

When they arrived at the Park District's offices, Plaintiff and Andrews met with David Schneider, Maintenance Supervisor and acting department head, Mary McGrew, the Park District's Human Resources Manager, and Dennis Shiley, Plaintiff's and Andrews' immediate supervisor.  (Posey Dep. Tr. 25; Posey Dep. Exh. 1, p. 6; McGrew Aff. at ¶10.)

Schneider was an acting department head on August 24, 2004 because Plaintiff's regular department head was on vacation.  (McGrew Aff. at ¶11.)

Plaintiff told the Park District at the meeting and admitted in his Complaint that he stopped the garbage truck he was driving (which contained markings that identified the vehicle as belonging to the Park District) at the Circle K at approximately 8:30 a.m.  (Posey Dep. Tr. 14-16; Posey Dep. Exh. 1, p. 4; McGrew Aff. at ¶12.)

This was during Plaintiff's work time.  (Posey Dep. Tr. 13-14, 22.)

Plaintiff told the Park District at the meeting and admitted in his Complaint that he was approached by someone outside the store who gave him money to buy alcohol. (Posey Dep. Tr. 20; Posey Dep. Exh. 1, p. 4; McGrew Aff. at ¶13.)

Plaintiff <u>admitted</u> both at that meeting and in the Complaint that he bought alcohol for an acquaintance who was not allowed to enter the Circle K.[1] (Posey Dep. Tr. 25; Posey Dep. Exh. 1, p. 6; McGrew Aff. at ¶14.)

Plaintiff also <u>admitted</u> both at that meeting and in his Complaint that he gave the alcohol to the individual once he exited the store. (Posey Dep. Tr. 25-26; Posey Dep. Exh. 1, p. 6; McGrew Aff. at ¶15.)

Andrews, who stayed in the vehicle, corroborated the fact that Plaintiff exited the Circle K store and gave a paper bag to the individual sitting outside of the store. (Posey Dep. Tr. 15-16; McGrew Aff. at ¶16.)

### C.     The Policies Which Plaintiff's Conduct Violated

Plaintiff's actions directly violated several Park District policies. (McGrew Aff. at ¶17.)

The Park District's Personnel Manual, which Plaintiff received, requires employees to act and conduct themselves at all times in the best interests of the Park District. (Posey Dep. Tr. 35; Posey Dep. Exhs. 2-3; McGrew Aff. at ¶18. Copies of Posey Deposition Exhibits 2 and 3 are attached to this Memorandum as Exhibits D and E, respectively.)

The Manual states in several separate places that possession of alcohol during work time is <u>prohibited</u>. (McGrew Aff. at ¶19; Posey Dep. Tr. 35-36; Posey Dep. Exh. 4, p. 51, Exh. 5, p.

---

[1]     At his deposition, Plaintiff claimed he only admitted buying the alcohol when McGrew asked him three or four times and did not seem to believe his denials. (<u>See e.g.</u>, Posey Dep. Tr. 19-20, 31, 34.) However, this testimony contradicted the assertions he made in his Complaint. (Posey Dep. Exh. 1, p. 6.) Moreover, Plaintiff stated at his deposition that he admitted on subsequent applications for employment that he was fired from the Park District for buying alcohol on the job. (Posey Dep. Tr. 61.)

59, Exh. 6, pp. A, D, and Exh. 7, Rule 14.  Copies of Posey Deposition Exhibits 4, 5, 6, and 7 are attached to this Memorandum as Exhibits F, G, H, and I, respectively.)

For example, the Alcohol and Drug Abuse policy states, "The unlawful manufacture, distribution, dispensation, <u>possession</u>, or use of a controlled substance, including cannabis and <u>alcohol</u>, is prohibited on Park District property or while acting on behalf of the Park District." (Emphasis added)  (Posey Dep. Exh. 6, p. A; McGrew Aff. at ¶20.)

The Manual's work rules further warn that employees may be terminated if they possess intoxicants while on duty or on Park District property.  (Posey Dep. Exh. 7, Rule 14; McGrew Aff. at ¶21.)

Additionally, the rules notify employees that they may be terminated for leaving the job during working hours without permission.  (Posey Dep. Exh. 7, Rule 4; McGrew Aff. at ¶22.)

Based on Plaintiff's conduct which violated the above-mentioned policies and rules and which hurt the Park District's image in the eyes of the public, Schneider made the decision to terminate Plaintiff after consulting with McGrew and Shiley.  (Posey Dep. Tr. 40; Posey Dep. Exh. 1, p. 6; Posey Dep. Exh. 8; McGrew Aff. at ¶23.  A copy of Posey Deposition Exhibit 8 is attached to this Memorandum as Exhibit J.)

Shiley is also the individual who hired Plaintiff.  (Posey Dep. Tr. 12; McGrew Aff. at ¶24.)

When informed of his termination, Plaintiff did <u>not</u> complain to anyone in management that the decision was based on his race, despite the Park District's Equal Employment Opportunity policy, which prohibits discrimination based on race and provides for a complaint mechanism.[2]  (McGrew Aff. at ¶26; McGrew Aff., Exh. 1.)

---

[2]     The Park District did not terminate Andrews because he did not go into the store and was never in possession of the alcohol.  (McGrew Aff. at ¶25.)

Further, although McGrew informed Plaintiff of the appeal procedure contained in the Personnel Manual to contest his discharge, Plaintiff failed to request such a review. (Posey Dep. Tr. 42-43; Posey Dep. Exh. 9; McGrew Aff. at ¶27. A copy of Posey Deposition Exhibit 9 is attached to this Memorandum as Exhibit K.)

### D.    The Park District Terminated A White Employee Following Plaintiff's Termination

There is <u>no</u> documented evidence of any employee caught purchasing alcohol on work time before. (McGrew Aff. at ¶28.)

Plaintiff testified at his deposition that he did not know of any Park District employees who bought alcohol on Park District time and were not fired. (Posey Dep. Tr. 54.)

It is clear that the Park District treated the Plaintiff the same way it treats all employees who commit serious misconduct -- the employee is terminated, regardless of race. (McGrew Aff. at ¶29.)

Only several months after Plaintiff was discharged, the Park District terminated Bill Staley (white) on January 24, 2005 for the repeated failure to perform his job properly. (McGrew Aff. at ¶30.)

Specifically, Staley displayed a negative and uncaring attitude toward other employees (<u>e.g.</u>, failing to fix maintenance issues brought to his attention until specifically asked to by his supervisor) and toward the public (<u>e.g.</u>, offending a member of the public by not addressing his complaint promptly, thus showing a lack of concern for this issue). (McGrew Aff. at ¶31; McGrew Aff., Exh. 2.)

This misconduct resembles Plaintiff's misconduct in that both caused a member of the public to view an employee of the Park District in a negative light. (McGrew Aff. at ¶32.)

### E. **Plaintiff's EEOC Charge Was Dismissed**

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 11, 2005. (Posey Dep. Tr. 51; Posey Dep. Exh. 1, pp. 1-2.)

The EEOC issued Plaintiff a "Dismissal and Notice of Rights" on March 31, 2006, which stated that the EEOC was closing its file on the Charge because it was "unable to conclude that the information obtained establishes violations of the statutes." (Posey Dep. Exh. 1, p. 2; McGrew Aff. at ¶33.)

### F. **Plaintiff's Lawsuit**

Notwithstanding his admissions at the meeting with the Park District and in his Complaint that he purchased the alcohol on work time and gave it to the person located outside of the Circle K store, Plaintiff's lawsuit essentially boils down to a claim that he did not buy the alcohol and only claimed to have bought the alcohol when McGrew persisted in questioning him. (See e.g., Posey Dep. Tr. 19-20, 31, 34; Posey Dep. Exh. 1, p. 6.)

## III. ARGUMENT

### A. **Standard of Review**

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 709 (7th Cir. 2002); Fed. R. Civ.Pro. 56(c). If the nonmoving party fails to make a sufficient showing on an essential element of his case, the moving party is entitled to judgment as a matter of law because a complete failure of proof concerning an essential element of the non-movant's case necessarily renders all other facts immaterial. Id.

**B.    Plaintiff Cannot Prove That The Park District Discriminated Against Him Based On His Race**

    1.    Plaintiff Cannot Prove Discrimination Through The Direct Method

To establish discrimination through the direct method, Plaintiff must prove an admission by the Park District or some sort of "smoking gun" that points to discrimination.  Isbell v. Allstate Ins. Co., 418 F.3d 788, 794 (7th Cir. 2005).  Alternatively, Plaintiff must present circumstantial evidence of intentional discrimination, such as: (1) suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, whether or not rigorously statistical, that employees similarly situated to Plaintiff other than in the protected class received systematically better treatment; or (3) evidence that Plaintiff was qualified for the job in question but passed over in favor of a person not having the forbidden characteristic and that the Park District's stated reason for its decision is unworthy of belief -- a mere pretext for discrimination.  Troupe v. The May Department Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

Here, Plaintiff has failed to offer any statements by the decision-makers that the Park District fired him because he is African-American.  Thus, he cannot present direct evidence of discrimination under the direct method of proof.  Likewise, no circumstantial evidence of discrimination exists.  The Park District did not make any ambiguous comments to Plaintiff.  Rather, it made it clear that possession of alcohol on work time was grounds for termination.  There is no suspicious timing because the Park District fired Plaintiff shortly after his admission that he bought the alcohol.  The decision not to fire Andrews, also African-American, is behavior disproving any discriminatory intent.  In addition, it is clear that non-African-American employees were not treated better than Plaintiff.  Plaintiff failed to name a single non-African-

American employee who purchased alcohol on work time and was not terminated.  In fact, the evidence shows that the Park District treated Plaintiff the same as a non-African-American employee who committed serious misconduct -- the Park District fired both employees.  Finally, the Park District's reason for firing Plaintiff was not pretextual because it was based on Plaintiff's own admissions that he purchased the alcohol on work time.  Thus, Plaintiff cannot prove discrimination under the direct method of proof.

        2.        Plaintiff Cannot Prove Discrimination Under The Indirect Method

        a.        Plaintiff Cannot Set Forth A *Prima Facie* Case

The indirect method of proof first requires that Plaintiff establish a *prima facie* case of discrimination.  Grube v. Lau Industries, 257 F.3d 723, 728 (7th Cir. 2001).  If he can prove a *prima facie* case, the Park District must articulate a legitimate non-discriminatory reason for the termination, and Plaintiff must prove that the Park District's articulated reason is a pretext for unlawful discrimination.  Id.

To establish a *prima facie* case of race discrimination, Plaintiff must prove:  (1) he is a member of the protected class; (2) his job performance met the employer's legitimate expectations; (3) he was terminated; and (4) similarly situated employees outside of the protected class were treated more favorably than him.  Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1036 (7th Cir. 1999).  For the reasons set forth below, Plaintiff cannot establish the second and fourth elements of a *prima facie* case of race discrimination.

Plaintiff cannot establish the second element, that he met the Park District's legitimate expectations, because:

- The Personnel Manual warns in several different places that possession of alcohol while on duty is prohibited.  (Undisputed Material Facts, ¶¶21-23.)  Plaintiff admitted at the meeting with the District and in the Complaint that he purchased the alcohol, thus failing to meet this legitimate expectation.  (Undisputed Material Facts, ¶16.)

- The Personnel Manual also warns that employees are supposed to work while on duty and not leave their job without permission. (Undisputed Material Facts, ¶24.) Plaintiff bought the liquor when he should have been performing trash removal, thus failing to meet this additional legitimate expectation.

- The Personnel Manual states that employees should project a positive image of the Park District. (Undisputed Material Facts, ¶20.) Plaintiff bought liquor at 8:30 a.m. (during the workday) and caused a member of the public to call and complain, thus failing to meet this additional legitimate expectation. (Undisputed Material Facts, ¶¶6-8, 15-16.)

Therefore, Plaintiff cannot prove the second necessary element of a *prima facie* case, and he cannot prove a *prima facie* case of discrimination.

Plaintiff also cannot prove the fourth element of a *prima facie* case because he has failed to name a <u>single</u> non-African-American employee directly comparable to him in all material respects, <u>i.e.</u>, an employee who purchased alcohol on work time and was not terminated. <u>Patterson v. Avery Denison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002) (similarly situated means directly comparable in <u>all</u> material respects). As stated above, the Park District treated Plaintiff the same as a non-African-American employee who committed misconduct. Thus, Plaintiff cannot prove a *prima facie* case on this additional ground.

Therefore, Plaintiff cannot prove discrimination under both the direct and indirect methods of proof, and the Park District is entitled to judgment as a matter of law.

b.     <u>Plaintiff Cannot Prove Pretext</u>

As shown above, Plaintiff cannot possibly prove a *prima facie* case of discrimination. Even if he could, the Park District has articulated a legitimate non-discriminatory reason for its action. Namely, Plaintiff told the District that he bought alcohol on work time.

Thus, summary judgment must be entered for Defendant unless Plaintiff can prove that the legitimate non-discriminatory reason is a pretext for race discrimination. <u>See</u> <u>Grube v. Lau</u> <u>Industries</u>, 257 F.3d at 730 (pretext means a dishonest explanation or a lie); <u>Forrester v. Rauland-</u>

<u>Borg Corp.</u>, 453 F.3d 416, 419 (7th Cir. 2006) (the only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs).

The case of <u>Allen v. Dominick's Finer Foods, Inc.</u>, 1999 U.S. Dist. LEXIS 18630 (N.D. Ill. Nov. 26, 1999) (attached as Exhibit L), is authority directly on point and unequivocally supports the Park District's position that Plaintiff cannot prove pretext and intentional discrimination in this case.  In <u>Allen</u>, the employer terminated the employee because it believed that he purchased alcohol for another individual while on company time.  <u>Id</u>. at *1-2.  The employer's handbook prohibited the possession of alcohol at any time on company property.  <u>Id</u>. at *9.  The employee admitted buying the alcohol during company time.  <u>Id</u>.  The Court rejected the employee's argument that the purchase was at best a minor infraction.  <u>Id</u>. at *10.  Because the employee failed to offer evidence that the employer treated similarly situated white employees more favorably or that the employer's stated reason was pretextual, the Court found that the employee had not proven discrimination.  <u>Id</u>.

Here, like the employee in <u>Allen</u>, Plaintiff admitted to the Park District that he bought the alcohol and gave it to the person who was not allowed to enter the Circle K store.  Moreover, Plaintiff purchased the alcohol on work time because he admitted that he stopped at the Circle K at approximately 8:30 a.m. and his workday started at 7:30 a.m. without a scheduled break until 10:00 a.m.  Thus, Plaintiff is precluded from proving that the District's reasons for termination were lies because he admitted engaging in the very conduct upon which the Park District relied to terminate him.

Plaintiff may claim that he testified at his deposition that he initially denied buying the alcohol and only admitted to buying the alcohol after McGrew would not accept his repeated denials.  However, Plaintiff's deposition testimony contradicted the allegations in his Complaint

and does not create a fact issue requiring Plaintiff's claim to go to trial.  The Seventh Circuit has held that formal concessions in pleadings are judicial admissions which are binding upon the party making them.  Keller v. United States, 58 F.3d 1194, 1199 fn. 8 (7th Cir. 1995).  They may not be controverted and are not evidence at all but rather have the effect of withdrawing a fact from contention.  Id.

Even if the Court considers Plaintiff's contradictory deposition testimony, he still cannot prove that the Park District did not honestly believe that Plaintiff had purchased the alcohol on work time, thus violating its work rules.  Plaintiff admitted at the meeting that he did purchase the alcohol.

Finally, further evidence that Plaintiff cannot prove pretext is that the same individual who hired him gave input on the decision to terminate him.  See EEOC v. Our Lady of the Resurrection Medical Center, 77 F.3d 145, 152 (7th Cir. 1996) (same actor inference -- the same individual who hires and fires an employee -- creates an inference of no discrimination).  Thus, Plaintiff still cannot prove pretext.

Accordingly, because Plaintiff cannot prove pretext or point to any material facts in dispute, the Park District is entitled to summary judgment on this additional basis.

## IV.    CONCLUSION

There is not one single concrete fact in this case which supports Plaintiff's claim of discrimination.  This is because the Plaintiff admitted to the very misconduct which caused his termination in his Complaint, and he admitted the same misconduct in his meeting with Park District's officials.  He should not have bought the alcohol.  He should not have bought the alcohol on work time.  He should not have bought the alcohol while wearing a uniform that identified him as a representative of the Park District.  Even if the Court credits Plaintiff's testimony at his deposition that he denied buying the alcohol, which conflicts with the

Complaint, Plaintiff still cannot prove that the Park District did not honestly believe that he had

bought the alcohol.  Therefore, the Park District is entitled to summary judgment with respect to

Plaintiff's race discrimination claim.

Dated:  April 16, 2007                                    Respectfully submitted,


                                                         s/ Gregory R. James, Jr.
                                                         Gregory R. James, Jr. (06198667)
                                                         Joshua A. Dombrow (06255857)
                                                         Laner, Muchin, Dombrow, Becker,
                                                           Levin and Tominberg, Ltd.
                                                         515 North State Street, Suite 2800
                                                         Chicago, Illinois 60610
                                                         (312) 467-9800
                                                         (312) 467-9479 (fax)
                                                         gjames@lanermuchin.com
                                                         Attorneys for Defendant Champaign Park
                                                         District

## <u>CERTIFICATE OF SERVICE</u>

Gregory R. James, Jr., an attorney, hereby certifies that he caused **Defendant's Motion for Summary Judgment, Memorandum in Support Of and supporting exhibits** in the above-captioned matter to be filed with the Court through application of the Court's electronic filing system and that he caused the above-mentioned documents to be served on the party listed below, by placing same in the U.S. Mail located at 515 North State Street, Suite 2800, Chicago, Illinois 60610, postage prepaid, before the hour of 5:00 p.m. on this 16th day of April, 2007, addressed to:

> Mr. Joseph E. Posey, Sr.
> 117 East Roper
> Champaign, Illinois  61820


> s/ Gregory R. James, Jr.
> Gregory R. James, Jr.

.

E-FILED
Monday, 16 April, 2007  03:55:17 PM
Clerk, U.S. District Court, ILCD

## INDEX OF EXHIBITS

A.     Affidavit of Mary McGrew

      1.     Employment Policies and Procedures

      2.     January 24, 2005 Memo

B.     Posey Deposition Minuscript

C.     Complaint

D.     Training Acknowledgement form signed by Posey

E.     Policy – Acting in Park District's Interest

F.     Policy – Sobriety and Substance Abuse

G.     Policy – General Safety

H.     Policy – Alcohol and Drug Abuse

I.     Policy – Reasons for Disciplinary Action

J.     Termination letter

K.     Policy – Review of  Dismissal

L.     Allen v. Dominick's Finer Foods, 1999 U.S. District LEXIS 18630 (N.D.IL 1999)

**E-FILED**
Monday, 16 April, 2007  03:55:56 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| JOSEPH E. POSEY, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No : 06-2114 |
| | ) |
| CHAMPAIGN PARK DISTRICT, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF MARY MCGREW

I, Mary McGrew, upon oath, state as follows:

1.    I am the Champaign Park District's Human Resources Manager.

2.    I have been employed by the Park District since January 3, 2001 and have been the Human Resources Manager since January 3, 2001.

3.    The Park District is a unit of local government which provides numerous high-quality recreational opportunities to the public.

4.    The Park District's Trash Collection Crew is responsible for ensuring the effective maintenance and appearance of the Park District's parks by performing litter pickup and custodial care.

5.    Plaintiff Joseph E. Posey, Sr. was terminated on August 24, 2004 because he admitted that he purchased alcohol while in a Park District uniform, on Park District time and driving a Park District vehicle with a Park District logo on both sides and municipal license plates on the front and back of the vehicle.

6.    On August 24, 2004, the Park District received a phone call from a woman who said she saw an individual in a Park District uniform purchase alcohol at a Circle K convenience store at approximately 8:30 a.m. that morning.

7.    The woman said she called because it bothered her that a Park District employee had bought liquor so early in the morning.

8.    The Circle K store is located approximately two blocks from one of the facilities where Plaintiff and his co-worker Clinton Andrews were scheduled to perform trash removal.

9.    As a result, the Park District radioed for Plaintiff and Andrews to come to the Park District's offices.

10.    When Plaintiff and Andrews arrived at the Park District's offices, they met with David Schneider, Maintenance Supervisor and acting department head, Dennis Shiley, Plaintiff's and Andrews' immediate supervisor, and me.

11.    Schneider was an acting department head on August 24, 2004 because Plaintiff's regular department head was on vacation.

12.    Plaintiff said that he stopped the garbage truck he was driving at the Circle K (which contained markings that identified the vehicle as belonging to the Park District) at approximately 8:30 a.m.

13.    Plaintiff admitted at the meeting that he was approached by someone outside the store who gave him money to buy alcohol.

14.    Plaintiff admitted that he bought alcohol for an acquaintance who was not allowed to enter the Circle K.

15.    Plaintiff admitted that he gave the alcohol to the individual once he exited the store.

16.    Andrews, who stayed in the vehicle, corroborated the fact that Plaintiff exited the Circle K and gave a paper bag to the individual sitting outside of the store.

17.    Plaintiff's actions directly violated several Park District policies.

2

18.    The Park District's Personnel Manual, which Plaintiff received, requires employees to act and conduct themselves at all times in the best interests of the Park District.

19    The Manual essentially states in several separate places that possession of alcohol during work time is prohibited.

20.    For example, the Alcohol and Drug Abuse policy states, "The unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance, including cannabis and alcohol, is prohibited on Park District property or while acting on behalf of the Park District.

21.    The Manual's work rules further warn that employees may be terminated if they possess intoxicants while on duty or on Park District property.

22.    Additionally, the rules notify employees that they may be terminated for leaving the job during working hours without permission.

23.    Based on Plaintiff's conduct which violated the above-mentioned policies and rules and which hurt the Park District's image in the eyes of the public, Schneider made the decision to terminate Plaintiff after consulting with Shiley and me.

24.    Shiley is also the individual who hired Plaintiff.

25.    The Park District did not terminate Andrews because he did not go into the store and was never in possession of the alcohol.

26.    When informed of his termination, Plaintiff did not complain to anyone in management that the decision was based on his race.

27.    Further, although I informed Plaintiff of the appeal procedure contained in the Personnel Manual to contest his discharge, Plaintiff failed to request such a review.

3

28.    There is no documented evidence of any employee caught purchasing alcohol on work time before.

29.    The Park District treated Plaintiff the same way it treats all employees who commit serious misconduct -- the employee is terminated, regardless of race.

30.    Only several months after Plaintiff was discharged, the Park District terminated Bill Staley (white) on January 24, 2005 for the repeated failure to perform his job properly.

31.    Specifically, Staley displayed a negative and uncaring attitude toward other employees (e.g., failing to fix maintenance issues brought to his attention until specifically asked to by his supervisor) and toward the public (e.g., offending a member of the public by not addressing his complaint promptly, thus showing a lack of concern for this issue).

32.    This misconduct resembles Plaintiff's misconduct in that both caused a member of the public to view an employee of the Park District in a negative light.

33.    On March 31, 2006, the EEOC issued Plaintiff a "Dismissal and Notice of Rights" on his EEOC Charge, which stated that the EEOC was closing its file because it was "unable to conclude that the information obtained establishes violations of the statutes."

Further Affiant Sayeth Naught.

*Mary M. McGrew*

Mary McGrew

Subscribed and sworn to before me
this _12th_ day of April, 2007.

*Thomas E. Gilbert*

Notary Public

OFFICIAL SEAL
THOMAS E GILBERT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/28/09

4

**E-FILED**
Monday, 16 April, 2007  03:56:18 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

## EMPLOYMENT POLICIES AND PROCEDURES

### 1-1    EQUAL EMPLOYMENT OPPORTUNITY POLICY

Equal Employment Opportunity has been, and will continue to be, a fundamental principle at the Champaign Park District, where employment is based upon personal capabilities and qualifications without discrimination because of race, color, religion, sex, age, national origin, marital status, veteran status, disability, or any other protected characteristic as established by law.

In accordance with federal, state and local laws, it is the policy of the Park District to provide equal employment opportunities to all qualified persons. All of our personnel policies, procedures and decisions pertaining to hire, promotion, transfer, layoff, rates of pay, discipline, discharge and other terms and conditions of employment are made and executed without regard to race, color, religion, sex, national origin, citizenship status, ancestry, age, marital status, physical or mental disability unrelated to an individual's ability to perform the essential functions of the job, association with a person with a disability, unfavorable discharge from military service or military status or any other category protected by state or federal law.

We make reasonable accommodations when necessary for all employees and/or applicants with disabilities, provided the individual is otherwise qualified to perform the essential functions of the job. Such individuals are encouraged to discuss their need for a reasonable accommodation with the Human Resources Manager (See Section 1-3).

The Human Resources Office has overall responsibility for this policy and maintains reporting and monitoring procedures. Employees' questions or concerns should be referred to the Human Resources Manager. If the employee is uncomfortable reporting to the Human Resources Manager, the employee should report to his Department Head or Executive Director.

**E-FILED**
Monday, 16 April, 2007  03:56:30 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2

 **Champaign Park District**

Bresnan Meeting Center · 706 Kenwood Road · Champaign, Illinois 61821

## MEMORANDUM

**DATE:**    **January 24, 2005**

**TO:**    **Bill Staley, Tennis Center Facility Coordinator**

**FROM:**    **Joe DeLuce, Director of Recreation**

After having given the topic much consideration, we are terminating your employment with the Champaign Park District effective immediately. This decision is in accordance with Section 8-2, #18 of the Champaign Park District Personnel Manual ("Incompetent, inefficient, or negligent performance of duties; inability or failure to perform duties properly").

This decision is the result of a variety of problems. As the Facility Coordinator for the Tennis Center, you are primarily responsible for supervising the front desk staff and for overseeing the maintenance and upkeep of the facility. We have received numerous complaints from patrons regarding both of these areas. You often display a negative and uncaring attitude when working with customers. Patrons have voiced their concerns to you on a number of occasions, but you have continuously failed to address these complaints. For example, prior to the end of last season, numerous complaints were brought to your attention regarding the cleanliness of the courts, and the locker rooms, burned out light bulbs, and various broken fixtures throughout the facility. Although you were aware of these problems, you failed to address them during the summer months, which was a huge disappointment to our patrons (see attached letter).

The lack of attention to maintenance issues seems to be an ongoing problem. You fail to address any maintenance issues at the Tennis Center unless you are specifically directed to do so by Joe DeLuce or Kristi Bolton. As the Facility Coordinator for the Tennis Center, you must be proactive in your decisions and must see that the facility is presentable to the public at all times. On one occasion after we had received the letter of complaint (see above), Joe walked through the facility, only to find the locker rooms dirty, two sinks that needed repair, and a missing soap dispenser, in addition to other problems. Although these problems had been brought to your attention by patrons previously, they were not corrected until Joe specifically pointed them out. While you often claim that you are unaware of these problems, many other staff members have been present as the patrons have expressed their concerns to you directly. Regardless, as the Facility Coordinator, you are responsible for being aware of issues such as those mentioned here, and should act to correct these problems before they have a negative impact on the patrons who utilize our facility.

We have also received numerous complaints, both from staff and patrons, that you have a negative attitude toward the Park District, and display poor customer service when working with the public. Although you have been reminded to maintain a positive attitude when working with customers, you continue to fail in this area. For example, on Thursday, January 13, 2005 Joe received a complaint from a patron regarding your poor customer service. Although you had received a note indicating that the Tennis Center was in need of hot chocolate, tea, and coffee supplies, you failed to replace any of these items. When it was pointed out that you had been given a note regarding this matter four days prior, you replied that it was probably all of the other notes you hadn't had time to look at. At this point, you walked out of the facility, failing to appropriately address the problem. Upon arriving at the facility on Friday, January 14, 2005, we again found that the replacement items had not been purchased, meaning that the problem had still not been corrected. These items were not actually purchased until Monday, January 17th, four days after the confrontation occurred. Not only did you display a lack of initiative in failing to purchase the supplies, but you also displayed a negative and uncaring attitude toward the customer, who was extremely offended. This is not the type of customer service we aim to provide at the Champaign Park District.

Due to the reasons addressed above, we feel it is important that we relieve you of all of your duties at the Champaign Park District Tennis Center. We feel your lack of initiative and your poor attitude are having a negative impact on the patronage of the facility, and are a detriment to the entire organization. We would like to offer you the opportunity to resign your positions as the Facility Coordinator, tennis instructor, and tumbling instructor, but will remove you from the positions if you choose not to resign. If you choose to resign, we would be willing to provide references for future employment opportunities.

*By signing this document, I agree that I have received and read this memo, and understand the content contained within. I understand that I have the right to a review of dismissal according to Section 8-4 of the Champaign Park District personnel manual.*

| | |
|---|---|
| Bill Staley | 1/25/05 |
| | Date |

cc:    **Bobbie Herakovich, Executive Director**
       **Mary McGrew, Human Resources Manager**
       **Kristi Bolton, Special Events and Facilities Manager**

**E-FILED**
Monday, 16 April, 2007  03:57:04 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

JOSEPH E. POSEY, SR., )
                      )
        Plaintiff,    )
                      )
    vs.               )   Case No. 06-2114
                      )
CHAMPAIGN PARK DISTRICT, )  Judge Michael P. McCuskey
                      )   Magistrate Judge David G. Bernthal
        Defendant     )


THE DEPOSITION of JOSEPH E. POSEY, SR., the plaintiff herein,

called by the defendant for examination pursuant to notice and

pursuant to the Federal Rules of Civil Procedure, taken before me,

Gale G. Everhart, CSR-RPR, a Notary Public in and for the State of

Illinois, at 201 South Vine Street, Room 350, in the City of Urbana,

County of Champaign, and State of Illinois, on the 15th day of

December, A.D 2006, commencing at 10:00 a.m.


L.A. REPORTING
(800) 419-3376

## Page 2

APPEARANCES:
JOSEPH E. POSEY. SR.
117 East Roper
Champaign, Illinois 61820
    Pro Se

LANER, MUCHIN, DOMBROW, BECKER, LEVIN & TOMINBERG, LTD
BY: GREGORY R. JAMES JR., ESQUIRE
Attorney at Law
515 North State Street, Suite 2800
Chicago, Illinois 60610
(312) 467-9800
    On Behalf of the Defendant

ALSO PRESENT:

MARY McGREW
GWENETTA POSEY
        I N D E X
                            Page
WITNESS:
    JOSEPH E. POSEY, SR.
    Direct Examination by Mr. James.            3

EXHIBITS:

POSEY NUMBER 1                     13
    Copy of Complaint
POSEY NUMBER 2                     35
    Park District Document
POSEY NUMBER 3                     35
    Park District Policy
POSEY NUMBER 4                     35
    Park District Policy
POSEY NUMBER 5                     36
    General Safety Policy and Rules Document
POSEY NUMBER 6.                    36
    Alcohol and Drug Abuse Policy
POSEY NUMBER 7                     36
    Examples of Reasons for Disciplinary Action
POSEY NUMBER 8                     40
    8/24/04 Letter
POSEY NUMBER 9                     42
    Review of Dismissal

            L.A. REPORTING
            (800) 419-3376

## Page 3

1          (Witness sworn)
2          MR. JAMES: Mr. Posey, hopefully you remember me. My
3    name is Greg James, and I represent the Champaign Park District in a
4    lawsuit that was filed against them. Let the record reflect that
5    this is the deposition of Mr. Joseph Posey, Senior. It's being
6    taken pursuant to notice and the Federal Rules of Civil Procedure.
7              JOSEPH E. POSEY, SR.,
8    called as a witness, after being first duly sworn, was examined and
9    testified upon his oath as follows:
10            DIRECT EXAMINATION
11            BY MR. JAMES:
12   Q    Mr. Posey, what is your date of birth?
13   A    10/28/54
14   Q    What is your Social Security number?
15   A    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
16   Q    And your address?
17   A    117 East Roper, R-o-p-e-r
18   Q    Your current phone numbers?
19   A    217-355-9311
20   Q    Is that your home number?
21   A    Yes, sir.
22   Q    Do you also have a cell phone?
23   A    Yes, sir
24   Q    What is that?

## Page 4

1    A    217-390-1550.
2    Q    Mr. Posey, please don't be insulted by this question. I
3    don't mean any offense. I ask this question at every deposition
4    that I go to. Are you taking any medications or anything that would
5    interfere with your ability to remember things or to testify?
6    A    No.
7    Q    Okay. Sometimes people are taking medications that
8    interferes with their memory.
9    A    Well, I take medication, but it don't interfere with my
10   memory.
11   Q    Okay. Perfect. Mr. Posey, have you ever been deposed
12   before?
13   A    Yes
14   Q    How many times?
15   A    Probably one
16   Q    What kind of a case was it?
17   A    This was back in -- I think it was a car accident,
18   something like that, back in the early '90s, something like that, I
19   guess.
20   Q    Were you a witness in the case, or were you a party to
21   the lawsuit?
22   A    A party
23   Q    Were you the plaintiff in the case? The person who filed
24   the lawsuit?

## Page 5

1    A    I'm the one that filed.
2    Q    I'm sorry?
3    A    I'm the one that filed the lawsuit
4    Q    Did that case go to trial?
5    A    No
6    Q    Did it settle?
7    A    Yes, it did
8    Q    Do you remember the name of the other side in the
9    lawsuit?
10   A    This was a teenager driving with a permit. I can't think
11   of her name. This was back, like I said, in the '90s
12   Q    Where was the lawsuit pending?
13   A    Well, we just -- I filed it, and then they just settled.
14   They made a settlement.
15   Q    Was it in the Champaign County Courthouse?
16   A    Champaign County Courthouse, yes
17   Q    I have some instructions for how all of us should conduct
18   ourselves at the deposition, and they are pretty standard.
19   A    Okay
20   Q    I'm going to be asking you questions about the facts
21   involved in the lawsuit that you filed in this case
22   A    Okay
23   Q    I'm kind of soft-spoken or at least I try to be. So if I
24   ask you a question and you don't hear it, if you tell me I'll repeat

**Page 6**

1  it Okay?

2    A   Okay

3    Q   If I ask a question and it doesn't make sense, and that

4  is probably going to happen sometime today because even lawyers who

5  think they are really smart ask dumb questions sometimes, and they

6  ask questions that don't make sense  So if I ask a question and it

7  doesn't make sense, will you tell me so I can rephrase it?

8    A   Yes

9    Q   Also, as we go along, nobody is perfect  If you realize

10  that you have given an answer and it's not complete or you need to

11  correct it, just tell me and you will be permitted to correct your

12  answer  Okay?

13    A   Okay

14    Q   If you need to take a break sometime today to stretch

15  your legs or to get a drink of water, use the restroom, something

16  like that, just let me know and we will take a break

17    A   Okay.

18    Q   The only time when it's really not permissible to take a

19  break is when there is a question that's still pending that hasn't

20  been answered yet  All right?

21    A   Okay

22    Q   If you don't know the answer to a question, just tell me

23  If you do answer a question, I'm going to assume that you understood

24  the question and you heard it and you have given me your best

**Page 7**

1  answer  Okay?

2    A   Okay

3    Q   The court reporter -- as you can probably tell there is

4  a tape recorder running, and the court reporter is trying to take

5  down everything that we say  So it's important for her sake that we

6  not talk at the same time  So I'm going to try to wait until you

7  finish your answer before I ask another question that way we are not

8  talking at the same time  And, also, as I ask my questions, very

9  often you are going to know exactly where I'm going and what the

10  next logical question is  If you can just let me finish it before

11  you start your answer, it will be a lot easier on the court

12  reporter.

13    A   (Witness nodded head up and down )

14    Q   Do you understand these instructions?

15    A   Yes

16    Q   And are they agreeable to you?

17    A   Yes

18    Q   Prior to coming here today, did you speak with anyone to

19  prepare for your deposition?

20    A   No

21    Q   Did you review any documents to prepare for your

22  deposition?

23    A   Yes  I did.

24    Q   You received a notice of deposition in the mail, right?

**Page 8**

1    A   Yes, I did

2    Q   And attached to the notice of deposition was a rider; is

3  that correct?

4    A   Right

5    Q   Did you bring with you any documents that are responsive

6  to that rider?

7    A   Yes, I did

8    Q   Can I see those documents?

9       (Pause in proceedings )

10    MRS POSEY:  You asked for -- I'm sorry  Never mind

11    MR JAMES:  And I appreciate that. Mrs Posey  I know

12  that you will remember when we were in court last time the judge

13  reminded everybody that because you are not an attorney you have to

14  let your husband do the talking

15       If you could just hand to me whatever documents you

16  brought with you

17       (Pause in proceedings )

18    Q   Do you have extra copies of these, or are these the only

19  copies you have?

20    A   I have several copies, but not the same one

21    Q   Okay  So you don't have copies of these documents with

22  you today?  You just have the originals?

23    A   Which one are you talking about?  All of them or just the

24  one in your hand?

**Page 9**

1    Q   I guess I will take them one at a time so that it will be

2  clear

3    A   Okay.

4    Q   Because I don't think it's fair to ask you about a whole

5  group

6    A   That's okay

7       (Pause in proceedings )

8    A   That's it

9    Q   I'm just going to identify for the record what these are

10  One  I have a State of Illinois Department of Employment Security

11  Work Search record, which appears to be from March of '04; is that

12  correct?

13    A   Yes  It is both sides, too

14    Q   Mr Posey, do you have any copies of this document with

15  you today or just this original?

16    A   Original

17    Q   Okay  After we are done with the deposition today, are

18  you willing to make a copy of this and mail it to me if I reimburse

19  you for your copying expenses?

20    A   Sure

21    Q   Also I have been handed what appears to be a tax return

22  for 2005 and some related tax documents  Sir, do you have copies of

23  those documents?

24    A   Yes

## Page 10

```
 1   Q   Do you have any extra copies?
 2   A   No
 3   Q   And also you have brought with you today and shared with
 4   me tax returns from 2003, correct?
 5   A   Yes
 6   Q   Do you have 2004 tax returns?
 7   A   No
 8   Q   And then also you have brought with you a document in a
 9   frame that says "Outstanding Employee Award" from October of 2003,
10   correct?
11   A   Yes
12   Q   And, Mr Posey, for all of those documents that we have
13   just identified, as long as I reimburse you for whatever the copying
14   costs are, you will send me copies of those?
15   A   Sure
16   Q   Can you try to do that within the next couple of weeks?
17   A   Yes, sir
18   Q   Thank you  Mr Posey, when were you hired by the Park
19   District?
20   A   2001 of July 31st
21   Q   What were you hired to do?
22   A   My job position was landscaping mostly, you know, garbage
23   route and keeping the parks clean, planting trees, you know,
24   whatever, landscaping, you know
```

## Page 11

```
 1   Q   Was that a seasonal position?
 2   A   Yes  Uh-huh
 3   Q   Which years did you work for the Park District as a
 4   seasonal landscaping person?
 5   A   We usually start out between March to October, somewhere
 6   around October
 7   Q   And which years did you work for the Park District?  You
 8   worked there in 2001  What other seasons did you work?
 9   A   2, 3
10   Q   2002 and 2003?  Yes?
11   A   Yes
12   Q   And I apologize. I don't want to appear rude --
13   A   That's okay
14   Q   -- but you have to answer "yes" or "no "
15   A   I understand
16   Q   Because the court reporter can't interpret
17   A   Okay
18   Q   Who hired you to work at the Champaign Park District?
19   A   I was hired by Mary McGrew, probably, I guess
20   Q   You don't know?
21   A   Well  Champaign Park District hired me  But, you know,
22   she was the one that instructed us when we got hired
23   Q   I probably better make this clear  Because you are
24   testifying under oath today --
```

## Page 12

```
 1   A   Uh-huh.
 2   Q   -- it's important that you not guess at things, that you
 3   give testimony.
 4   A   That's not guessing. that's the truth.
 5   Q   I understand  And I'm not saying it's untrue  You are
 6   the one that said "I guess," that's why I'm saying this right now
 7   If you are guessing about something, just tell us that you are
 8   guessing so we know that. But, otherwise, if you could stick to
 9   what you know or what you believe
10   A   Okay  Champaign Park District hired me
11   Q   Do you know who the person was at the Champaign Park
12   District who made the decision to hire you?
13   A   Dennis Shiley.
14   Q   Shiley, S-h-i-l-e-y?
15   A   Yes, sir
16   Q   If I misstate your testimony as we go along, correct me
17   Okay?
18   A   Okay.
19   Q   Because you get to testify today. I don't  I think you
20   said that one of your duties when you worked as a seasonal employee
21   for the Park District was to work in landscaping, correct?
22   A   Yes
23   Q   And also duties that you would perform would be working
24   on a garbage route or a trash route; is that true?
```

## Page 13

```
 1   A   Yes
 2   Q   And part of your duties when you would do that would be
 3   to help to keep the parks clean. right?
 4   A   Yes
 5   Q   Can you describe for me what your duties and
 6   responsibilities were when you worked on the garbage route?
 7   A   Make sure all the garbage was taken up and make sure the
 8   parks was cleaned up. all the paper and -- you know, nice and neat.
 9   Q   Okay  Mr Posey, I am showing you what has been marked
10   as Defendant's Exhibit Number 1 for identification, and that
11   document is in front of you  This is a copy of the complaint that
12   you filed in this case, true?
13   A   Yes
14   Q   On August 24th, 2004, you were employed by the Park
15   District. true?
16   A   Repeat it
17   Q   On August 24th, 2004, you were an employee of the Park
18   District, true?
19   A   Yes, sir
20   Q   And that is also the last date that you worked at the
21   Park District, true?
22   A   Yes
23   Q   On August 24th, 2004, did your shift begin at 7:30 a.m.?
24   A   Yes
```

| | |
|---|---|
| 1   Q   And on that date and at that time you were working as a | 1   A   Yes. |
| 2   seasonal landscaper assigned as a member of the trash collection | 2   Q   Who was driving the truck that day? |
| 3   crew, true? | 3   A   I was |
| 4   A   Yes | 4   Q   So you parked the garbage truck close to the Circle K |
| 5   Q   Your first -- well, your coworker that day was it Clinton | 5   store? |
| 6   Andrews? | 6   A   Right in front of the store |
| 7   A   Yes, sir | 7   Q   Okay  And what kind of store is the Circle K store? |
| 8   Q   Your first break that day was scheduled for 10 a m . | 8   A   It's a grocery store |
| 9   correct? | 9   Q   Is alcohol sold in that store? |
| 10  A   Yes. | 10  A   Yes, it is |
| 11  Q   Did you and Mr Andrews to do your duties that day were | 11  Q   As you were walking from the garbage truck to the Circle |
| 12  you using a Park District vehicle? | 12  K store, did you talk to anybody that you knew? |
| 13  A   Yes. | 13  A   No, I didn't |
| 14  Q   Can you describe the vehicle for me? | 14  Q   Did you run into anybody? |
| 15  A   It's green, a green garbage truck  It was green | 15  A   No, I didn't |
| 16  Q   Okay  Did it have markings on it? | 16  Q   You didn't run into somebody who had -- |
| 17  A   Yes | 17  A   No |
| 18  Q   What kind of markings? | 18  Q   Stop  Let me finish the question. |
| 19  A   Champaign Park District was on the side of it, you know | 19  A   Go ahead |
| 20  Q   Was it on the doors of the vehicle or the sides of the | 20  Q   You didn't run into somebody who asked you to buy alcohol |
| 21  vehicle? | 21  for them? |
| 22  A   I can't remember | 22  A   No, I didn't. |
| 23  Q   Was it a clear marking so that people could see it? | 23  Q   Well, let's look at your complaint  It says, "I was |
| 24  A   I can't remember  I haven't seen it for about three | 24  approached by someone outside the store  He gave me money to buy |
| Page 14 | Page 16 |

| | |
|---|---|
| 1   years so I don't remember | 1   alcohol for him "  Do you see that? |
| 2   Q   Okay  Could you turn to page 6 of your complaint? | 2   A   Yes  I see it |
| 3   A   (Witness complies ) | 3   Q   Is that a true statement? |
| 4   Q   On page 6 of your complaint I know it says several | 4   A   No  It's not |
| 5   things, but there are just a few I want to talk to you about | 5   Q   Who wrote this down in your complaint? |
| 6   A   Uh-huh | 6   A   She wrote it down |
| 7   Q   It says that you and Clinton Andrews stopped at the | 7   Q   Your wife wrote this down? |
| 8   Circle K store on Neil Street, true? | 8   A   No  She wrote this down  I told her what I wanted to |
| 9   A   Uh-huh | 9   say, but this was what she had asked me that I had written down. |
| 10  Q   Is that a "yes"? | 10  Q   We are talking about Exhibit 1 which is your lawsuit, |
| 11  A   Yes, sir | 11  right? |
| 12  Q   And that was on August 24th, 2004, at 8:30 a m ? | 12  A   I know it, yeah. |
| 13  A   About that time | 13  Q   And who printed those words on page 6? Whose handwriting |
| 14  Q   And your purpose in going there was to buy a newspaper? | 14  is that on page 6? |
| 15  A   Use the restroom, and I bought a newspaper | 15  A   This is what I had written down  Yeah, this. |
| 16  Q   So the reason that you went there was to use the | 16  Q   You wrote that down? |
| 17  restroom? | 17  A   I had my wife write it down for me. |
| 18  A   Yes  Uh-huh | 18  Q   Okay  And she wrote down what you told her to write? |
| 19  Q   Did you travel to the Circle K store in the Park District | 19  A   Yes, I did |
| 20  garbage truck? | 20  Q   So where it says, "I was approached by someone outside |
| 21  A   Yes | 21  the store  He gave me money to buy alcohol for him," that's false? |
| 22  Q   Did you go into the Circle K store? | 22  A   I was telling her what I told her |
| 23  A   Yes, sir  Uh-huh | 23  Q   You were telling -- |
| 24  Q   Did Mr Andrews stay in the truck? | 24  A   My wife what I told her |
| Page 15 | Page 17 |

**Page 18**

```
1    Q   When you say "her," who are you --
2    A   Mary McGrew
3    Q   Okay
4    A   Yeah
5        (Pause in proceedings )
6    Q   Okay  So just to make sure I understand it, you told
7    your wife to write down what you had told to Mary --
8    A   Everything I had told --
9    Q   Sir, you have got to let me finish  And don't get mad at
10   me because that's not fair
11   A   I'm not mad at you  But I already explained to you once
12   You can't trick me into saying something else
13   Q   I'm not trying to trick you
14   A   Okay  I told you what I told her  That's what I told
15   her to write down
16   Q   Okay  But when you are saying, I told her and I told her
17   and you are pointing here in the deposition, when somebody reads the
18   transcript, they are not going to know who "her" is
19   A   Yes, sir  I wrote this down  My wife wrote this down
20   Q   And I'm just trying to clarify  I'm not trying to trick
21   you or get you to change your answers  You testify to what you
22   believe is true
23       All right  So you asked your wife to write down on page
24   6 of your complaint what you had said to Mary McGrew; is that
```

**Page 19**

```
1    correct?
2    A   Yes
3    Q   When you went into the Circle K store on August 24th,
4    2004, did you buy any alcohol?
5    A   No
6    Q   Did you tell anyone that you had bought alcohol when you
7    walked into the store?
8    A   No
9    Q   You didn't tell Mary McGrew that you bought alcohol in
10   the store?
11   A   After she kept asking me over and over, and she didn't
12   believe me  I told her, Go for it  I told her, Yeah  She didn't
13   believe me the first time  I told her three times  She didn't
14   believe me  She kept asking me  She wanted to act stupid  I told
15   her, I bought it  If I got alcohol in my system  What happens?  Do
16   I lose my job or do I stay here?
17       She said, You will stay here
18       And I told her, Take me to the hospital.
19   Q   So just to be clear --
20   A   Yeah
21   Q   And, again, I'm not trying to trick you  Take your time
22   A   Okay
23   Q   You did tell Mary McGrew that you did buy alcohol in the
24   store, true?
```

**Page 20**

```
1    A   After she kept asking me several times and I gave her the
2    answer no  And she would not take that answer no  So I told her
3    yes
4    Q   All right  I just want to make sure --
5    A   I told her yes.
6    Q   You told her yes  Did you also tell her that you had
7    been approached by someone outside the store who gave you money to
8    buy alcohol?
9    A   Yes  I did tell her that
10   Q   Who else was present when you told her that?
11   A   Clinton Andrews, Dennis Shiley and David --
12   Q   Schneider?
13   A   Yeah  Schneider
14   Q   Is it true that the Circle K store is located
15   approximately two blocks from where you were collecting trash?
16   A   You have got several places around the store to collect
17   trash  I think, a couple of places  About -- less than about two
18   blocks to collect trash if I wanted to, yeah
19   Q   That wasn't a very good question  Let me try again
20   A   Okay  Try it again
21   Q   Just before you drove to the Circle K store --
22   A   Uh-huh
23   Q   -- where were you?
24   A   Traveling
```

**Page 21**

```
1    Q   Okay  Which Park District facility were you at before
2    you went to the Circle K store?  Were you in one of the parks
3    collecting trash before you drove to the Circle K?
4    A   Well, I pick up trash before I leave the building so, you
5    know, that's the first stop I do  I do the building all around,
6    surrounding it where the building is at first
7    Q   So which building did you leave to go to the Circle K
8    store?  I'm just trying to figure out where you were before --
9    A   I might have stopped -- we usually stop at a couple of
10   places before we -- we do the job first  We might go and stop at
11   this place and this place, or we might stop and pick some paper up
12   We might stop here and stop here  So it's hard to say where we had
13   stopped at before we stopped here  But I know once I got probably
14   close I had to use the bathroom, you know  We was going somewhere
15   to do something, pick up something  I can't remember where  We had
16   seen something the day before that we said, We will get it the next
17   day or something like this and something like that happened  I
18   don't remember where, but something we had seen  We always see
19   something when we are coming in to clock out we didn't get  We
20   might see some paper or some trash or a can turned over  We might
21   see something, and we are running late  We said, We will get it
22   tomorrow, something like that  So I don't really know where I was,
23   what building I was at  I might not have been in the building  I
24   might have been in the park picking up trash somewhere  I don't
```

**Page 22**

1  know
2  Q   You were on the clock for about an hour before you
3  stopped at the Circle K?
4  A   Yes  Uh-huh
5  Q   You've got to let me finish the question, please  Are
6  you okay?
7  A   Yeah  Go ahead
8  Q   During that hour, did you go to more than one park or
9  more than one facility to pick up trash?
10  A   I can't remember
11  Q   Okay  At the park facilities where you stopped before
12  you went to the Circle K store, were there bathroom facilities at
13  any of those?
14  A   No  I don't remember on that
15  Q   Did your duties take you past the Circle K store to go
16  from one park location to another park location?
17  A   Sir, I don't remember that, no  Three years ago that was
18  pretty long when we picked trash up at -- trash be all over the
19  parks and all over -- most of the parks we go to don't have
20  restrooms at  and, you know  So wherever we can use the restroom at
21  we will stop  We are told we can stop and grab a sandwich if we
22  want to go for lunch or we can do this  We was told this before we
23  started the garbage route because we were on the garbage truck  So,
24  you know, by the garbage truck being nasty, well, we can usually

**Page 23**

1  stop and grab us a sandwich if we want to somewhere
2  MRS  POSEY: Can we take a break?
3  MR  JAMES: You can take a break, but I need to let you
4  know he is currently testifying under oath, and you are not allowed
5  to discuss his testimony with him while we are taking a break  Do
6  you understand?
7  MRS  POSEY: Uh-huh
8  MR  JAMES: You are not allowed to discuss this case with
9  him at all  He has to testify from his memory and his recollection
10  He cannot be coached
11  THE WITNESS: Yes, sir
12  MR  JAMES: Okay  Let's take a break
13  THE WITNESS: Go ahead
14  Q   Is Clinton Andrews African American?
15  A   Yes, he is
16  Q   And you, sir, are African American, true?
17  A   Yes  sir
18  Q   While you were in the Circle K store, did you buy
19  anything?
20  A   Newspaper  I think I bought a newspaper, and I think it
21  was a Gatorade or something like that  orange juice, or something
22  like that  I don't remember  It was an orange drink or something
23  Q   In August 2003 was alcohol sold at the Circle K store?
24  A   Sold it every year  They sell it every day

**Page 24**

1  Q   On August 24th was there a way for the Park District to
2  communicate with you by radio?
3  A   Yes
4  Q   Was it a radio that was in your truck or a radio that you
5  carried?
6  A   One was in the truck and usually I carried one and
7  Clinton would carry one  It depends
8  Q   After you visited the Circle K store, where did you go
9  next?
10  A   Sir, I can't remember what park it was
11  Q   Okay  After you left the Circle K store, did you get a
12  call on the radio to come and meet with anyone?
13  A   Yes
14  Q   Now we know that you were at the Circle K store at about
15  8:30  What time did you get the radio call?
16  A   I think I got the call around about 9:30
17  Q   Okay  And who called you on the radio?
18  A   I think it was my boss, Dennis Shiley
19  Q   What did he tell you?
20  A   He told a lie  And he said that they had some broken
21  glass out there at Centennial Park
22  Q   What else did he say during the radio call?
23  A   He wants us to come over and get it, clean it up
24  Q   What did you do then?

**Page 25**

1  A   Went over to the park where he was
2  Q   On that date was David Schneider the acting department
3  head for your department?
4  A   Yes, sir
5  Q   And was Mary McGrew the Park District's human resources
6  manager?
7  A   Yes, sir
8  Q   Was Dennis Shiley your and Clinton Andrews' supervisor
9  that day?
10  A   Yes, sir
11  Q   At the meeting with David Schneider, Mary McGrew and
12  Dennis Shiley, was anyone else present?
13  A   Clinton Andrews
14  Q   Did you tell them first at that meeting that you went
15  there to buy a newspaper?
16  A   I told them I had to use the restroom and then I bought a
17  newspaper  That's what I told them
18  Q   Okay  You didn't say that you went there to buy a
19  newspaper?
20  A   And use the restroom, too
21  Q   At the meeting did you admit that you had bought alcohol
22  for someone at the Circle K store?
23  A   Yes  Uh-huh
24  Q   Did you also admit that you gave this alcohol to a person

**Page 26**

1    who asked you to buy it for them?

2    A    Yes.

3    Q    And is it true that Clinton Andrews, who stayed in the

4    vehicle. told Mary McGrew, David Schneider and Dennis Shiley that

5    when you left the Circle K store you gave a paper bag to a person

6    that you had bought alcohol for?

7    A    First time I heard this is when I seen it on the paper

8    when I got it in the mail.

9    Q    Do you know if that's true or not?

10    A    That's not true

11    Q    Do you know for a fact that that's not true?

12    A    I know for a fact that's not true

13    Q    How do you know that?

14    A    Well, because he told me -- as a matter of fact, he is my

15    friend  I'm the one that got him the job, and we had talked about

16    it  And he told me -- he told me what happened  He told me he was

17    scared and he didn't want to lose his job and he had to say

18    something

19    Q    And so did he say what he had actually said?  You said

20    that he had to say something --

21    A    He told me that  He said he maybe said something wrong

22    But, you know, he said he was wrong for saying that  He told me

23    this

24    Q    What did he tell you he said?

**Page 27**

1    A    He told me when I questioned him that he telled (sic)

2    something about me buying some liquor  And I was scared. and I

3    said something  And this was about a couple of months ago, maybe

4    I didn't -- I had talked to him once about it, but I never

5    questioned him because he always said no  But like I say, when the

6    paper came in the mail and I seen his name on the paper, then I

7    questioned him about it then he told me what happened

8    Q    Who did Mr Andrews say that he had told you that you bought

9    alcohol?

10    A    There was about seven people sitting there when he said

11    this, about seven or eight peoples (sic)

12    Q    Who did Andrews say that he had made that statement to?

13    Did he say he told that to Mary McGrew?

14    A    He said that he had signed some papers  That's all he

15    said. That's what he told me  He said the reason why he signed

16    those papers he said because he took a drug test and was not

17    supposed to take a drug test  He had took a drug test from Christie

18    Clinic, and it came back nasty  And they kept it under the table

19    So he didn't have to lose his job  And I didn't know about this

20    until one of the guys on the job came back and told the truth  And

21    he told me about this  Seasonal people  if we got drugs in our

22    system, we are automatically fired  Alcohol or liquor, we are

23    automatically fired  He told me he had took a test, and it was

24    nasty  And they put it up under the table  So he had to do

**Page 28**

1    something, you know, to save his head  So it got back to me what

2    happened. why he did this  But I sees (sic) this guy every weekend,

3    you know  So he told me, you know -- and said he would come and

4    testify that this happened  He knows that I didn't buy liquor, he

5    said

6    Q    But Mr. Andrews did tell someone at the park district

7    that you had bought liquor, right?

8    A    I don't know because I wasn't there  The day we had came

9    back to the office, I had to turn my keys in the next day  And I

10    don't know -- I didn't hear him tell nobody  But the people told

11    me, you know, that he was the one that probably said something about

12    it

13    Q    Who said that he had made those statements about you?

14    A    I got about -- probably about six or seven people that

15    work on the job, you know, yeah  So --

16    Q    You were telling me how Mr  Andrews had to take a

17    urinalysis test --

18    A    Yes

19    Q    -- and that he was nasty  Explain to me what you mean by

20    that

21    A    He had drugs in his system or something  The guy said he

22    had drugs in his system  They took him to take a test  And it was

23    nasty, and they kept it under the table and they didn't say anything

24    about it

**Page 29**

1    Q    So he had a urinalysis test, and he was --

2    A    Yes

3    Q    Let me finish the question  I let you finish your

4    answers  Let me finish the question  So Mr  Andrews had to urinate

5    into a bottle and then that test came back positive for drugs; is

6    that right?

7    A    That's what was told to me

8    Q    Who told you that?

9    A    I don't want his job jeopardized because that's the way

10    things work at the park district  If somebody say the wrong thing.

11    Mary would -- she wouldn't like it  So I don't want to make them

12    lose their job

13    Q    I understand  Nobody is going to be fired for giving

14    truthful testimony

15    A    I was

16    Q    Sir, let me finish the questions

17    A    Go ahead

18    Q    No one is going to be fired for giving truthful testimony

19    in a federal court case  I give you my word as an officer of the

20    court

21    I'll give you and the judge the name, the names of the

22    person, but not her because I don't want him to lose his job

23    Q    If we have to. I will call the judge, and the judge is

24    going to order you to tell me right now

**Page 30**

1　A　Well, that's okay. You can say what you want to say. and
2　I can say what I want to say
3　　　MR. JAMES: Okay. Mary. can you step out of the room
4　while he says this on the record?
5　　　(Whereupon, Ms. McGrew left the deposition room.)
6　A　Because I don't want them to lose their job. Do you know
7　what I mean? You understand me. don't you?
8　Q　I understand
9　A　See. it can come back to me
10　Q　Mary McGrew is out of the room now. Can you tell me who
11　it was that told me that Mr. Andrews had a positive urinalysis
12　test?
13　A　One of the guys that been there for 20 years. over 20
14　years. His first name is Lester. I can't think of his last name.
15　but his first name is Lester. He's been there for 20 years. He
16　worked for the swimming pool park. They got swimming pool parks and
17　everything. I talked to him. and he told me about this
18　Q　Do you know Lester's last name?
19　A　She do, but I don't. But like I say. she is the type of
20　person if things don't go her way --
21　Q　You are talking about Mary McGrew?
22　A　Yes. If it don't go her way. she will get rid of him
23　And I know she will. So what you need to do is you need to get the
24　records from Christie Clinic from that year -- from the year they

**Page 31**

1　discharged him for getting fired for drugs in his system again and
2　see how many times they took drugs out of his system
3　Q　Okay
4　A　I'm not the one that had nothing in my system at all
5　　　MR. JAMES: Give me one minute. I will bring Mary back
6　in
7　　　(Ms. McGrew returned to the deposition room.)
8　Q　Why did you tell Mary McGrew that you had bought alcohol
9　when you were in the Circle K store that day?
10　A　Because she should have believed me the first three times
11　when I told her I didn't buy any. She made me feel like I wasn't
12　nothing when she kept asking me. So I said. Whatever you want to
13　think. if you think I bought it; I bought it. I said. Now if you
14　want to test me for alcohol or whatever, go ahead and go for it. I
15　said. If I got it in my system, do I lose my job? If I don't, do
16　whatever. That's what happened. I didn't even drink
17　Q　When you met with Mary McGrew that day with Mr. Shiley
18　and Mr. Schneider present, tell me as best you can remember what was
19　said at that meeting
20　A　When they called us over there. we pulled up. And we
21　seen them standing out there. I said, Oh, Lord, I said. I wonder
22　what happened. Somebody is going to say we did something. She
23　don't understand. The store we went to --
24　Q　Who is "she"?

**Page 32**

1　A　Mary McGrew. The store we went to that's in the black
2　neighborhood. and that's where mostly all the blacks come and this
3　and this. Peoples constantly, when you go to that store. beg you,
4　"Give me a quarter. Buy me a drink. Give me a dime." This is
5　every day with every people -- every customer coming in the store
6　When we got there, she thought that we were drinking.
7　Q　When you say "she," you are talking about Mary?
8　A　Thought that we was drinking because the way I was
9　bringing up the subject. I was saying, Well, what if I got some
10　liquor in my system; what would happen? Just saying -- look at
11　things to make her mad so she really thought that we was drinking
12　Garbage truck was searched. No bottles were found. No alcohol was
13　found. She should have believed me. I don't know why she didn't
14　She didn't never like me no way, you know. So she didn't believe me
15　those three times, I just told her anything she wanted to know. And
16　then when she found out the liquor wasn't in my system, my boss took
17　me home; Clinton rode back with her
18　　　My boss is good. He said, What happened? We got back to
19　the building. I showed him the paper. He seen zero. Dennis said,
20　Good. He said. Damn, good. He said. I'm glad this didn't happen.
21　I said, I tried to tell her Dennis. but. hell, like I don't
22　want to listen to me. I told her I didn't have any liquor in my
23　system or bought nothing
24　　　He said, Good. Next morning they called me told me to

**Page 33**

1　bring the keys back
2　Q　Was anything else said during those conversations besides
3　what you have already told me?
4　A　I had asked her. I said, Now if liquor is found in my
5　system, what would happen?
6　　　She said, Well. we would put this in your file, and you
7　will not lose your job and that will be it
8　　　I said, What if liquor is found in my system?
9　　　Well, we will have to terminate you. We would get rid of
10　you. If liquor was in my system. I wouldn't have said nothing. She
11　would have fired me. But liquor was not in my system. She told me
12　this. She lied to me. I tried to tell her the truth from the job;
13　she lied to me
14　Q　Your complaint says that, As Mary McGrew was driving to
15　Christie Clinic to get a urine test that she stated that as long as
16　you did not have any alcohol in your urine that you would not lose
17　your job?
18　A　She said it in front of Dennis, Clinton and David and me
19　out of her mouth in the parking lot. Why would she go to take the
20　test?
21　Q　I think you said earlier that Mary McGrew never really
22　liked you?
23　A　She never did like me.
24　Q　Why do you believe that?

**Page 34**

```
 1    A   Because she told a lie on me one day  She said she
 2  thought -- she said I was speeding in the park, about 30 in the
 3  park  And that was a lie
 4    Q   Do you have any other reason to believe that Mary McGrew
 5  did not like you?
 6    A   I just know that she never did like me, already knew it
 7  I'm not the only one
 8    Q   Besides what you have told me, do you have any other
 9  reason to believe that Mary did not like you?
10    A   I don't know  I don't understand  I mean, I did the
11  job. I kept the park to the best that I could  But like I tried to
12  explain to her that I didn't do it, and she should have took my word
13  right then
14    Q   So just to sum up, when you met with Mr Shiley and
15  Mr Schneider and Ms McGrew, Ms McGrew asked you more than once
16  whether or not you had purchased the alcohol at the Circle K, true?
17    A   Yes  True  She asked me about three or four times then
18  she said, Well, if you like, we can go to the store and, you know,
19  get the tape and get the information from the store  I said.
20  Well -- you know, she asked me that  She told me that
21    Q   And initially you denied to Mary that you had bought
22  alcohol, but later you admitted that you did buy alcohol, true?
23    A   After I told her about three or four times I didn't buy
24  it and she kept asking me  I just finally went on and said yeah
```

**Page 35**

```
 1    Q   While you were employed by the Park District, did you get
 2  a copy of the Park District's Safety Policy and Rules?
 3    A   Before I started, yes, I did
 4    Q   I'm going to go to another exhibit for a minute
 5        (Pause in proceedings )
 6    Q   Showing you what has been marked as Exhibit Number 2
 7  That's your signature on that document  correct?
 8    A   Yes  Uh-huh
 9    Q   And in this document you acknowledge that you had gotten
10  training on Park District policies including their personnel
11  policies and vehicle use, true?
12    A   True
13    Q   Mr. Posey, I'm going to show you what has been marked as
14  Exhibit Number 3  That is one of the Park District's policies,
15  correct?
16    A   I don't know  I haven't seen that policy in over four
17  years  Sir, I couldn't tell you if that's a policy or not  I can't
18  tell about this
19    Q   Okay  Fair enough  Mr Posey, I am going to show you
20  what has been marked as Exhibit Number 4
21    A   Okay
22    Q   Can you take a look at that?  Have you seen that policy
23  before?
24    A   Okay  Yes
```

**Page 36**

```
 1    Q   Mr Posey, showing you what has been marked as Exhibit
 2  Number 5  It says at the top 7-2, General Safety Policy and Rules
 3  Take a moment to look at the document  Have you seen that policy
 4  before?
 5    A   I don't remember this, sir  Like I said, a couple of
 6  them I might remember, but some of these I can't remember these
 7  because that's been a long time
 8    Q   Understood
 9    A   Yeah  So --
10    Q   Mr Posey, showing you what has been marked as Exhibit
11  Number 6  If you could take a minute just to look at that  Do you
12  remember seeing this policy while you were employed at the Park
13  District?
14    A   No. sir
15    Q   You just don't remember?
16    A   No  I don't remember seeing it
17        (Pause in proceedings )
18    Q   Mr Posey, showing you what has been marked as Exhibit
19  Number 7, policy 8-2  Do you remember seeing this policy while you
20  were employed at the Park District?
21    A   No
22    Q   You don't remember one way or the other?
23    A   No
24        (Pause in proceedings )
```

**Page 37**

```
 1    Q   Mr Posey, you just wrote a note to your wife  What note
 2  did you write to her?
 3    A   Do you want to see it?
 4    Q   If you could, just tell me what it says
 5        (Pause in proceedings )
 6    A   This is just a scribble  I wrote it  You can see it if
 7  you like  I don't ask you what you are writing down when you write
 8  something on there  So why should I show you what I write down?  I
 9  don't think that's fair
10        (Pause in proceedings )
11    A   I can't look at your copies  I don't think you should
12  look at my copies  I didn't take nothing from him and look at it
13  Did I, Ma'am?  You can't take my copy over here  I might have
14  something about you I don't want you to see
15    Q   Okay  Whenever you are done, let me know
16    A   Yeah  I don't have to show you what I wrote down on
17  here, sir  The judge will tell you that  This is my copy  If you
18  want me to tell you what I said, I said I would tell you  I told
19  you to ask and I would tell you what I said  Just ask me, and I
20  will tell you what I said  I haven't asked you nothing you have
21  written down in your files  That's not none of my business  So you
22  shouldn't have the right to ask me what I have written down in my
23  files  This is my file
24    Q   I'm going to wait until you are done speaking so I don't
```

**Page 38**

1 interrupt you  Are you done?

2    A   I want her to know what was going on so the judge will

3 know what you did  You cannot look at my -- what I'm writing down

4 That's not fair. I don't think that's fair

5    Q    Whenever you are done let me know because I don't want to

6 interrupt you

7    A   Well, are you done asking me what I'm writing down?

8    Q   No. I'm not  I'm going to wait for you to finish

9    A   Okay  I'm finished

10    Q   Okay  I want the record to reflect that during the

11 deposition his spouse has been taking notes on a yellow legal pad,

12 that within the last couple of minutes Mr. Posey wrote on the pad

13 and then passed it back to his wife  Then I asked Mr. Posey what he

14 had written  And he didn't answer  Instead he said --

15    A   She scribbled it out  Do you want me to tell you what I

16 have written down? "I got to shit"  Now  I have to shit  Do you

17 want me to tell you in front of her?  That's what I had written

18 down

19    Q   Where is that written down?  I don't see it

20    A   She scribbled it out  That's why she started laughing

21 and scribbled it out like that  She did that and scribbled it out

22    Q   Do you want to take a break so you can use the restroom?

23    A   Thank you

24    Q   I'm just asking, sir  I'm not being rude to you

**Page 39**

1    A   Well, I want to let her know --

2    Q   Wait a minute  I'm not being rude to you

3    A   You was being nosy.

4    Q   And I would appreciate it --

5    A   You was being nosy.

6    Q   Sir, you are on a tape recorder so don't think that this

7 is not something that can't be heard

8    A   You are wrong for going in my records  You can't go in

9 my records like that  That's wrong.

10    Q   Sir, the notes you write during this deposition --

11    A   I have to use the restroom.

12    Q   And we are going to stop so you can use the restroom

13    A   You said if I have to be excused, wait until the sentence

14 is over and then ask you  That's exactly what you said

15    Q   Let's take a break so you can use the restroom, and I

16 will show you where it is

17       (Whereupon, a recess was taken in the proceedings

18       at 10:52 a.m.)

19       (Back on the record at 10:55 a.m.)

20    Q   I want to wait until -- here comes Mary now  I just want

21 to repeat for the record that I am asking that during this

22 deposition that you not consult with your wife or discuss your

23 testimony or this case in any way

24    A   Sir, I only discussed when I had to use the restroom

**Page 40**

1 That wasn't concerning the case  I'm sure you didn't want me to use

2 the restroom in here

3    Q   No. I didn't.

4    A   I didn't want to use it on myself.

5    Q   Sir, nobody asked you to

6       Mr. Posey, I'm going to show you what has been marked as

7 Exhibit Number 8  Have you seen that document before?

8       (Pause in proceedings.)

9    A   On this I didn't have a uniform  I remember that, but I

10 didn't have a uniform on  I didn't have a uniform

11    Q   On August 24th, 2004, when you went into the Circle K

12 store, were you wearing any kind of a uniform?

13    A   No. sir

14    Q   Were you wearing any kind of clothing that would identify

15 you as an employee of the Park District?

16    A   No. I didn't have a Park District shirt on or a uniform

17    Q   Ordinarily when you worked at the Park District, did you

18 wear some sort of Park District uniform?

19    A   Just a T-shirt

20    Q   Did the T-shirt identify you as an employee of the Park

21 District?

22    A   Up in the left-hand corner

23    Q   What did it say?

24    A   Champaign Park District.

**Page 41**

1    Q   Why didn't you have a uniform shirt on that day?

2    A   We didn't have no power on in our house, and she didn't

3 have any clean shirts for me  So I just threw on a shirt and put a

4 jacket over it

5    Q   Are you absolutely certain that you did not have a

6 uniform shirt on that day?

7    A   I don't think I had a shirt on that day

8    Q   You don't remember for sure, do you?

9    A   I know I didn't

10    Q   Well, sir, you said, I don't think I did, and then you

11 said, I don't know.

12    A   I told you from the first, I said I didn't have a shirt

13 on  I said we didn't have any power in our house then -- I

14 remember -- on the weekend  And we didn't have any clean shirts

15 that day with me so I just slipped on, you know, a shirt that looked

16 like I had put on a green shirt  I had a green shirt on and a

17 jacket

18    Q   Was it the same color as the Park District --

19    A   Same color

20    Q   Let me finish the question  The shirt you were wearing

21 was the same color as the Champaign Park District shirt?

22    A   Yes

23    Q   And you were wearing a jacket over it?

24    A   I just had a jacket on like this (indicating )

1  Q  Okay  And so the jacket would have covered up where the
2  logo was; is that correct?
3  A  Yes, sir
4  Q  So somebody just looking at you wearing the green shirt
5  and the jacket, they could reasonably believe it was a Park District
6  shirt, true?
7  A  On the job they wouldn't know it  They would think it
8  would be if they know the colors
9  Q  Okay  And the reason you wore the green shirt is so that
10  it would look like a Park District --
11  A  Yeah
12  Q  -- shirt, true?
13  A  True
14  Q  That letter that I marked as Exhibit 8, that letter was
15  sent to you, correct?
16  A  Correct
17  Q  I'm going to show you what has been marked as Exhibit
18  Number 9 where it says 8-4, Review of Dismissal  While you were an
19  employee of the Park District, there was a policy that permitted you
20  to have your dismissal reviewed if you wanted it reviewed, correct?
21  A  I didn't hear anything about that
22  Q  So you don't remember seeing this policy?
23  A  Not this one
24  Q  You don't remember all the policies that were contained

Page 42

1  in the District's handbook, do you?
2  A  No, sir
3  Q  So you can't say under oath whether this policy was in
4  the handbook or not, correct?
5  A  I cannot say yes or no
6  Q  All right  You did not ask the Park District to review
7  your dismissal, did you?
8  A  No  I did not
9  Q  At the time that your employment was terminated by the
10  Park District, you did not claim that your termination was based on
11  your race, did you?
12  A  I thought it was
13  Q  You thought it was, but you didn't claim that to the Park
14  District, did you?
15  A  Yes, I did
16  Q  Who did you tell that to?
17  A  Maybe four or five peoples that worked there
18  Q  Who?
19  A  The names?
20  Q  Yes
21  A  I don't know a lot of those guys' last names  A lot of
22  them who I worked with I didn't know their first names
23  Q  Can you identify for me any of the people that you told
24  that you thought you were fired because of your race?

Page 43

1  A  Yeah  I could identify them if I see them, yeah
2  Q  Can you tell me today any of their names, first or last?
3  A  Clinton Andrews  You know, I just said this earlier, and
4  I don't think you got the message when I told you this  I don't
5  want to jeopardize nobody else's job on this by giving names so they
6  can lose their jobs or get rolled up or get messed with because this
7  tends to be going on on the job now I was told  I don't want to get
8  nobody fired  Okay?  Because I don't want nobody coming to me
9  threatening me and my family  Okay?  So that's why --
10  Q  And I'm going to tell you again that I am an officer of
11  the court and that I'm not allowed to break the law  I would be
12  putting my law license in jeopardy  This court that we were in
13  front of won't allow me to break the law  And I am telling you that
14  I would not allow anyone to be terminated for giving truthful
15  testimony in a federal court case  Mary, can you excuse us for a
16  minute, please?
17  A  Now let me tell you something
18  Q  Let's wait until Mary is gone
19  A  Okay.
20  (Whereupon, Ms  McGrew left the deposition room )
21  Q  Go ahead, sir
22  A  Now let me tell you something  You can stand out there
23  and whisper to her and tell her this and this, but I'm not going to
24  give you these peoples' names' in front of her so she can fire them

Page 44

1  or be on them or they come looking for me because you ain't the one
2  that live here  You live in Chicago  You don't live in Champaign
3  You ain't the one to protect me from getting killed  So I'm not
4  going to give somebody -- their names to her so I can get myself
5  killed because they lost their job because she fired them
6  Q  Are you done?
7  A  Yes, sir
8  Q  Okay  Mary McGrew is not in this room now  Will you
9  tell me the names of anyone that you have told that you think you
10  were fired because of your race?
11  A  I told -- sir. it can be -- I told maybe 50 peoples  At
12  least 50, 60 peoples
13  Q  Okay  Let's narrow it down then  Can you tell me the
14  names of anybody at the Park District or who works for the Park
15  District that you believe you were fired because of your race?
16  A  Yes  I don't know their names, but one of the guys used
17  to drive the buses  His name was -- he had a case, too  It got
18  dismissed because of her.  I guess  His name was -- what
19  was -- what's his name? I can't think of his name  But he came by
20  the house a couple of times and told me about this  And we talked
21  about the same thing because he had a suit on them, too  They
22  dismissed it or something  I can't think of his name  Clinton
23  Andrews and Jeff Kenzris (phonetic)  What was his name? Sir, I
24  have to just sit and -- some of these peoples, like I say, I worked

Page 45

12 (Pages 42 to 45)

**Page 46**

1  with  And I just can't think of their names because I don't know
2  their names  But I'm sure I can -- if I sit down and take a little
3  time and see these peoples on the streets or see them again this
4  weekend, I can get their names and write it down and e-mail you or
5  fax you or something  But as far as their names, I had two or three
6  guys on the Park District, you know, because of my race and
7  this and this
8  Q  Were those coworkers of yours that said that?
9  A  Coworkers  Coworkers
10  Q  It wasn't anybody in management was it?
11  A  No
12  Q  Do you remember who those coworkers were?
13  A  I just explained to you again and again some of
14  those -- this has been four years ago, sir  When I leave a job like
15  that, I don't remember too many peoples' names on the job  But I
16  know I could come up with at least about four or five names if I sit
17  and think about this.
18  Q  Do you know who made the decision to terminate your
19  employment?
20  A  Probably her, Mary McGrew
21  Q  I don't want you to guess  Do you know?
22  A  I know it was her because Dennis told me it was good that
23  I got my job back  He was glad that I didn't have liquor in me and
24  everything  He was happy about it  And that's why I know there was

**Page 47**

1  more than something else to it, because my boss knew I didn't smoke
2  or drink or nothing like that  He knew this
3  Q  You are talking about Dennis?
4  A  Yes  But they have to go along with her because they
5  thought they would lose their job, too
6  Q  How do you know that?
7  A  Because I've been working with them three years and we
8  know that -- when guys tends to get together six, seven, eight guys,
9  they're going to talk about something and what's going on  And
10  everybody that talked, they hate her  They hate her  Here
11  she come  Here she come  There she is  She will do this  She
12  don't like this  She fired him  She got rid of him  She did this
13  They don't like her  That's why  I did too good of a job for them
14  I was number one man out there on everything  But like I say, she
15  went by what somebody said  I had a couple of peoples didn't like
16  me, a lot of peoples because of what I do and didn't want to see me
17  working  And she shouldn't have never believed them
18  Q  Tell me about that
19  A  Well, number one, I am a landlord  We own property
20  That's number one  I have a limousine  I used to have -- I think
21  it was -- they was just -- they thought I didn't have to work  They
22  didn't want me to work because I was owning houses and things like
23  this
24  Q  What people are you talking about?

**Page 48**

1  A  I'll tell you what happened  I got laid off  I got laid
2  off back in 2002, I think  I went to get unemployment checks, to
3  sign up  They wrote a letter to the unemployment office, told them
4  that I own my own limo business and I got apartment houses  Why
5  should I get unemployment?  The unemployment peoples told me they
6  can't do that  Her name was signed on the paper  She's the one
7  that sent it out  She didn't want me to get unemployment
8  Q  You are talking about Mary McGrew?
9  A  Yes, she did  She stopped me a couple years -- and I got
10  proof at the unemployment office from a couple of peoples that
11  worked there that she did not want me to have unemployment because I
12  own apartment houses and own the limousine service  And I got -- a
13  paper came  They gave me a copy which I don't have  It will take
14  me $100 to find this paper  They have the record they said, but
15  they couldn't give it to me unless it was do by the judge  This
16  woman did not want me working for them for some reason because she
17  tried to stop me from getting unemployment  Every year I tried to
18  get it before I got laid off in the wintertime
19  Q  So is it your belief that some of your coworkers were
20  jealous of you because you owned property and you owned a limo?
21  A  Something was said because she's the one that sent the
22  letter to the unemployment office
23  Q  And "she" is Mary?
24  A  Stating what I own and what I had

**Page 49**

1  Q  And when you say "she," you are talking about Mary?
2  A  Mary McGrew
3  Q  Just to sum it up, you were laid off --
4  A  Yes
5  Q  -- between seasons?
6  A  Uh-huh
7  Q  You applied for unemployment?
8  A  Yes
9  Q  And then Mary McGrew wrote a letter to Unemployment
10  saying you shouldn't get unemployment because you own property and a
11  limousine?
12  A  They got a letter  They gave me a letter (sic) of it
13  And I went back to try to get that letter  They told me I couldn't
14  get that letter unless it was do by a judge  And that proves to you
15  right there -- the unemployment people said my apartment
16  houses -- my houses don't interfere with my job and my unemployment.
17  So they stated I should receive my unemployment and which I did
18  She tried to stop that  She tried to stop this last unemployment
19  when this happened  Unemployment told her she was wrong for
20  dismissing me because that was hearsay  So we have to pay this man
21  This man didn't do anything  That's hearsay  They said, Go get the
22  tape, you know  You know, here you got a guy that I got him the
23  job  He was just scared because they just bought a trailer  He
24  didn't know what was going on

| | |
|---|---|
| 1    Q   Who is the "he" you are talking about? | 1    Shiley, Mary McGrew and Dave Schneider on August 24th, did |
| 2    A   Clinton Andrews   He said he was scared   He didn't know | 2    Ms. McGrew drive you to get a urine test? |
| 3    what was going on | 3    A   Yes, she did |
| 4    Q   Where does Mr. Andrews live? | 4    Q   What vehicle were you in on the way to get the urine |
| 5    A   He lives somewhere way out in the trailer park, out there | 5    test? |
| 6    in the boundary   He told me, he said, Hey, he said, I was on drugs, | 6    A   The Park District's vehicle |
| 7    and, I lied   And -- you know what I mean? He said, I'm sorry, you | 7    Q   Was anybody with you while you drove together? |
| 8    know   So, you know what I mean? And he said he will come and | 8    A   Clinton Andrews |
| 9    testify that he lied on me because he said he was in the truck | 9    Q   During the trip to the hospital, did she say that as long |
| 10   sleeping when I got back in the truck   So he said he couldn't have | 10   as you didn't have alcohol in your urine that you would not lose |
| 11   seen nothing   He said he went to bed late and he had his hand over | 11   your job? |
| 12   his head sleeping that when I went to use the bathroom. He | 12   A   That's what she said |
| 13   said -- he just said he had to keep his job   He didn't know what | 13   Q   Is that exactly what she said? |
| 14   was going on. That's what I tried to explain to her   Don't go by | 14   A   That's what she said |
| 15   what nobody say   Listen to me   I wasn't drinking   I don't drink | 15   Q   Did she tell you that if you did not have urine -- or, |
| 16   I didn't buy nobody no liquor | 16   sorry   Let me rephrase that   Did she tell you that if you did not |
| 17   Q   Let me go get Ms. McGrew | 17   have alcohol in your system that that would be something in your |
| 18   A   You know what I mean? | 18   favor? |
| 19      (Pause in proceedings.) | 19   A   On God |
| 20      (Ms. McGrew returned to the deposition room.) | 20      COURT REPORTER: What was that? |
| 21      MR. JAMES: Could you read that last piece back because I | 21      THE WITNESS: On God |
| 22   couldn't hear | 22   Q   Sir, I didn't understand your answer   What was that? |
| 23      COURT REPORTER: Sure   "Don't go by what nobody say | 23   A   She did |
| 24   Listen to me   I wasn't drinking   I don't drink   I didn't buy | 24   Q   Well, I need to understand, sir   If you could look at me |
| Page 50 | Page 52 |

| | |
|---|---|
| 1    nobody no liquor " | 1    and talk to me |
| 2    Q   You filed a charge with the EEOC approximately seven | 2    A   On God   That means yes   On oath that means yes |
| 3    months after your employment was terminated, correct? | 3    Q   Does Mr. Andrews have a telephone? |
| 4    A   Yes, sir | 4    A   Yes, he do |
| 5    Q   The EEOC did not find in your favor, did it? | 5    Q   What is his telephone number? |
| 6    A   I don't remember   I think I had to go somewhere else   I | 6    A   I don't know it, sir, by heart |
| 7    don't remember quite that long now | 7    Q   Is it a telephone number that's listed? |
| 8    Q   Mr. Posey. I'm going to refer you back to Exhibit 1, and | 8    A   Sir, I really don't know   I never asked him   I don't |
| 9    I'm going to refer to the page where it says page 2 at the top and | 9    know if it's listed or not, but I know -- I don't believe it's in |
| 10   then it has the numeral II at the bottom   If you look at paragraph | 10   the phone book |
| 11   4 it asks, "What was the final result of your charge?"   Do you see | 11   Q   Do you see him every week? |
| 12   that? Do you see what I'm referring to, Mr. Posey?   I'm pointing to | 12   A   Maybe twice a week every week, maybe |
| 13   it | 13   Q   Where do you see him? |
| 14   A   I read it, uh-huh | 14   A   Over to the house |
| 15   Q   It's written that, "The charges were unable to determine | 15   Q   He comes over to your house? |
| 16   whether I was dismissed due to my race," correct? | 16   A   Sure |
| 17   A   Well, it read here correct | 17   Q   Are you two friends? |
| 18   Q   Your wife wrote that down? | 18   A   Sure |
| 19   A   Correct | 19   Q   Even though he lied about you? |
| 20   Q   Is that what you told her to write? | 20   A   Sure |
| 21   A   Yes | 21   Q   How long have you been friends? |
| 22   Q   Was that the EEOC's finding? | 22   A   We have been -- I met him when I was working at Jumer's |
| 23   A   Correct | 23   Hotel back in 1997, somewhere around in there   So you can think |
| 24   Q   Thank you, Mr. Posey   After your meeting with Dennis | 24   from 1997 to now |
| Page 51 | Page 53 |

**Page 54**

| | |
|---|---|
| 1 | Q  Does he have a family? |
| 2 | A  Sure |
| 3 | Q  Do your families get together socially? |
| 4 | A  No  We don't associate with people  We stick to |
| 5 | ourselves  That's the way we do with family |
| 6 | Q  Would you agree that an employer could legitimately |
| 7 | conclude that an employee who bought alcohol in a public place on |
| 8 | company time and wearing what looked like a company uniform and |
| 9 | using company transportation was not meeting the employer's |
| 10 | expectations? |
| 11 | A  I don't understand your question, sir |
| 12 | Q  Okay  Do you think that it is possible in this case |
| 13 | that -- well, strike that  I don't know how to make it make sense |
| 14 | Are you aware of any Park District employees who have |
| 15 | bought alcohol on Park District time and where the Park District |
| 16 | knew about this but did not fire them? |
| 17 | A  No, sir |
| 18 | Q  Why do you believe you were discriminated against based |
| 19 | on your race? |
| 20 | A  I can't answer that question right now |
| 21 | Q  Why can't you answer it? |
| 22 | A  I have lots of reasons, but I don't want to give you a |
| 23 | special reason right at this minute, my definite reason  But I |
| 24 | believe I was  And -- |

**Page 55**

| | |
|---|---|
| 1 | Q  Well, I need to know why you believe that, and I'm |
| 2 | entitled to know that now |
| 3 | A  I just explained to you earlier she did not like me |
| 4 | Okay? |
| 5 | Q  Did she tell you she didn't like you? |
| 6 | A  She didn't have to  You could look at her face and tell |
| 7 | Q  So when she would look at you, you got the impression she |
| 8 | didn't like you? |
| 9 | A  She have always |
| 10 | Q  Was your -- and, again, I couldn't hear you clearly |
| 11 | A  She have always looked at me funny |
| 12 | Q  Okay  Can you describe for me how she was looking at |
| 13 | you? |
| 14 | A  Looked at me like I wasn't nothing  And one of the guys |
| 15 | on the job said, You are something  You are getting this park taken |
| 16 | care of. |
| 17 | Q  What was it about her expression that made it appear to |
| 18 | you she was looking at you like you were nothing? |
| 19 | A  She rolled her eyes at you |
| 20 | Q  Anything else? |
| 21 | A  That's it |
| 22 | Q  What were the circumstances when she would roll her eyes |
| 23 | at you? |
| 24 | A  Nothing  Just walk by and roll her eyes at you |

**Page 56**

| | |
|---|---|
| 1 | Q  What do you mean by "roll her eyes"? |
| 2 | A  Roll her eyes  You know, just roll them  You know what |
| 3 | rolling eyes mean?  You know what they mean |
| 4 | Q  Sir, but what's important is what you mean when you say |
| 5 | it |
| 6 | A  I just told you what I mean  I said she rolled her eyes |
| 7 | What do you want me to say?  Turn her head the other way |
| 8 | Q  Okay  So meaning her eyes would move around in her head? |
| 9 | Her eyeballs would change positions? |
| 10 | A  No  They would go up and down |
| 11 | Q  Okay  Do you know whether someone called Mary McGrew on |
| 12 | the telephone on August 24th, 2004, to complain that she had seen a |
| 13 | park district employee buying alcohol? |
| 14 | A  I don't know  I heard some rumors said my cousin might |
| 15 | have did it  He was fired by her, too  So my cousin might have did |
| 16 | it, or just some rumors I heard, you know, playing a joke, you know |
| 17 | Q  Did you ever ask your cousin about that? |
| 18 | A  No  I asked one of my cousins  She said she asked him |
| 19 | So that's how I got to him maybe is when I asked her she asked him |
| 20 | Q  Which cousin is it that there is a rumor he called the |
| 21 | District to say that? |
| 22 | A  One of the cousins I used to work with on the job was |
| 23 | George Doris  And -- |
| 24 | Q  How do you spell that last name? |

**Page 57**

| | |
|---|---|
| 1 | A  D-o-r-- I think it's r-i-s  Maybe two R's or one R in |
| 2 | his last name. |
| 3 | Q  Where did you hear that rumor that he might have called |
| 4 | and made this report? |
| 5 | A  When it -- about the next day it happened, I had a |
| 6 | friend's cousin told me, you know |
| 7 | Q  Is that cousin a man or woman? |
| 8 | A  Woman |
| 9 | Q  But you have never asked Doris about it? |
| 10 | A  We don't talk. |
| 11 | Q  Where does Doris live? |
| 12 | A  Don't care. |
| 13 | Q  Do you know where she lives? |
| 14 | A  Doris, him  George. |
| 15 | Q  I apologize  I'm confused. |
| 16 | A  I had a woman cousin told me that another cousin could |
| 17 | have had called on me and told a lie on me. |
| 18 | Q  Okay  Just so I can get it straight |
| 19 | A  Okay |
| 20 | Q  The woman cousin, what's her name? |
| 21 | A  JoAnn |
| 22 | Q  JoAnn what? |
| 23 | A  She was married -- Howard |
| 24 | Q  Howard? |

**Page 58**

1   A   Yeah   She was married so --
2   Q   Where does Ms Howard live?
3   A   She live over there on State Street
4   Q   In Urbana?
5   A   Champaign  I don't know exactly the address
6   Q   Okay  I apologize  I just don't remember  Was JoAnn
7   her name?
8   A   JoAnn
9   Q   JoAnn  Which cousin was it JoAnn said might have made
10  the call?
11  A   She said it was my cousin, but that was her nephew
12  Q   Okay  What's the nephew's name?
13  A   His name is George Doris
14  Q   George Doris
15  A   Yeah
16  Q   Where does George live?
17  A   Sir, I don't know
18  Q   Okay  If you don't know, you don't know  Okay
19      If you were to win this lawsuit, how much money do you
20  think the Park District owes you?
21  A   The only thing I want is what I lost, my wages and stuff,
22  and that's all  I don't want the job back because if I did get the
23  job back there, it wouldn't make -- it wouldn't last
24  Q   So can you tell me how much you think the Park District

**Page 59**

1   owes you?
2   A   They -- whatever -- the years I was off from the
3   day -- this is what December?  So I wouldn't be working in December
4   From October -- probably the middle of October from 2006 all the way
5   back to 2003 so whenever they got rid of me  I just want my lost
6   wages back  And overtime, I don't care about the overtime because
7   the overtime she probably didn't put that in your notes  I was
8   working 15, 17 hours Saturday and Sunday
9   Q   Is that in 2004?
10  A   Of 2003, '2 and '1
11  Q   How about 2004?
12  A   I don't think I worked in 2004 or whatever date  She
13  just terminated me
14  Q   You were terminated in August of 2004, correct?
15  A   That's it, yeah
16  Q   Did you work the same kind of overtime in 2004?
17  A   Each year I did  Not the four weekends -- I did a
18  weekend  He did a weekend  He did a weekend  I did a weekend  We
19  substitute  And then sometimes we have to work the same weeks still
20  on events and stuff like that, but --
21  Q   Earlier we talked about this document that you were kind
22  enough to bring with you from the Department of Employment Security
23  The handwriting on this document, is that your handwriting?
24  A   Yes

**Page 60**

1   Q   And all the jobs that you said that you looked for you
2   did, in fact, look for all those jobs?
3   A   Yeah  All over
4   Q   And all the statements on this piece of paper are true?
5   A   Yes  I was going out looking
6   Q   You are still looking for seasonal work?
7   A   Yeah  I'm doing a -- studying for truck driving now  I
8   have been doing this and been all over, man  Then I had a job over
9   in Urbana at the school  And they dismissed me because of this job
10  Q   Have you had any employment since you lost your job at
11  the Park District?
12  A   Urbana High School  I was over there working, driving
13  trucks, delivering lunches and stuff
14  Q   How long did you have that job?
15  A   Three weeks until they found out about the Park District
16  Q   How did they find out about it?
17  A   I don't lie  I put what happened on the paper, you know,
18  put down the truth  I don't have to lie to them
19  Q   So what did you put down on the paper?
20  A   They terminated me because they said I went and bought
21  some liquor
22  Q   What did you write on the paper?  That's what I'm asking
23  you  Did you write down that you were fired?
24  A   Terminated means fired, yeah

**Page 61**

1   Q   Did you write down that you were fired for buying liquor?
2   A   I wrote it on the paper
3   Q   Okay  Sir  I just want to make sure I understand
4   A   I just told you twice  I wrote it down when I go fill an
5   application out  I don't lie  I tell the truth  I tell the truth  I
6   tell the truth come out better  I told the truth  You put down the
7   truth  People don't want to hire you when you lie  If they do hire
8   you, you work for two or three weeks, then they find out and then
9   they fire you because you lied
10  Q   I just want to make sure I've got it straight  So when
11  you would apply for jobs, you would write down that you were fired
12  from the Park District --
13  A   Yeah
14  Q   Let me finish the question
15  A   Go ahead
16  Q   So when you would apply for jobs, you would write down on
17  the job application that you were fired for buying alcohol on the
18  job?
19  A   It wasn't cookies
20  Q   Sir, if you could just answer the question
21  A   I'm trying to tell you, yeah  I told you every time I
22  fill out an application I put down I got terminated
23  Q   Did you say why?
24  A   For buying alcohol on the job

16 (Pages 58 to 61)

| | |
|---|---|
| 1 | Q. Okay. Thank you. |
| 2 | A. I ain't going to tell them a lie and say it was for |
| 3 | something else. |
| 4 | (Pause in proceedings.) |
| 5 | Q. What is your highest level of education? |
| 6 | A. Twelfth. Went to Parkland. |
| 7 | Q. I'm sorry? |
| 8 | A. Parkland College in the twelfth grade. |
| 9 | Q. You went to college? |
| 10 | A. Yes, I did. |
| 11 | Q. Parkland College? |
| 12 | A. Yes, I did. |
| 13 | Q. Where is that? |
| 14 | A. Champaign. |
| 15 | Q. How many years of that college did you complete? |
| 16 | A. I didn't go no whole year because I was -- I didn't go a |
| 17 | whole year. |
| 18 | Q. Okay. Did you go for a semester? |
| 19 | A. Half a semester. |
| 20 | Q. Prior to working for the Park District, what jobs did you |
| 21 | hold? |
| 22 | A. Before I worked at the Park District? |
| 23 | Q. Yes. |
| 24 | A. I worked at Illinois Central Gulf about nine years, |

Page 62

| | |
|---|---|
| 1 | machine operator, bus driver, foreman, laborer. |
| 2 | Q. Can I stop you for one minute? |
| 3 | A. Yes. |
| 4 | Q. Illinois Central -- |
| 5 | A. Gulf. |
| 6 | Q. G-u-l-f? |
| 7 | A. Railroad. Uh-huh. |
| 8 | Q. Where is that company located? |
| 9 | A. Right here in Champaign. |
| 10 | Q. Okay. What other employment did you have before you went |
| 11 | to work for the Park District? |
| 12 | A. Jumer's Hotel. Worked there from about '97, '8, '9 to |
| 13 | 2001 until the airport lost the contract in the -- they lost the |
| 14 | contract for them. Jumer's Hotel, I was a limo driver for |
| 15 | them and worked the front desk. |
| 16 | Q. I'm not familiar with that hotel. How do you spell that? |
| 17 | A. It used to be called Jumer's Hotel. |
| 18 | Q. Was it the Jumer Lodge or something like that? |
| 19 | A. Yes. Uh-huh. |
| 20 | Q. J-u-m-e-r? |
| 21 | A. Yes. Uh-huh. |
| 22 | Q. I'm going back in my memory here. I used to drive past |
| 23 | that. Was it shaped like a castle or something? |
| 24 | A. It is. Still is. |

Page 63

| | |
|---|---|
| 1 | Q. Where is that located? |
| 2 | A. You probably can see it if you look back over this way. |
| 3 | It's over in Urbana. As a matter of fact, it's right in the back of |
| 4 | us. |
| 5 | Q. Okay. So you worked there as a limo drive? |
| 6 | A. Uh-huh. And the front desk. |
| 7 | Q. Did you own the limousine that you would drive when you |
| 8 | worked there? |
| 9 | A. Now I do, but I didn't at first. They gave it to me for |
| 10 | being a good employee. |
| 11 | Q. Do you still own the limousine? |
| 12 | A. Yes, I do. |
| 13 | Q. What's the year and model? |
| 14 | A. It's a '90 Cadillac Brougham. |
| 15 | Q. Stretch limo? |
| 16 | A. Yes. |
| 17 | Q. Do you use that limo to make money now? |
| 18 | A. No, I don't. I didn't really use it to make money at |
| 19 | all. I just used it for family, for weddings and taking them to the |
| 20 | riverboat and funerals for our families and stuff like that; that's |
| 21 | the only way I used it. |
| 22 | Q. Okay. I think it was your testimony that you own some |
| 23 | properties; is that correct? |
| 24 | A. Sure. |

Page 64

| | |
|---|---|
| 1 | Q. Do you own those properties by yourself, or do you -- |
| 2 | A. Me and my wife. |
| 3 | Q. How many properties do you own? |
| 4 | A. I don't know. About half -- eight or nine, half a dozen, |
| 5 | somewhere around in there. I would have to look in my files and see |
| 6 | what I got. I don't know what I got. I get them and they go. I |
| 7 | sell them and I gets them. So I don't know. |
| 8 | Q. What kind of properties are they? Are they -- |
| 9 | A. Duplexes, apartment houses, you know, stuff like that. |
| 10 | Q. Can you estimate what the -- let me finish my question. |
| 11 | please. Can you estimate for me approximately what the value is of |
| 12 | the properties that you currently own? |
| 13 | A. All I own? |
| 14 | Q. Yes, sir. |
| 15 | A. No. I never put that down. |
| 16 | Q. Well, could you tell me approximately what you think they |
| 17 | would be worth? If you were going to sell them -- |
| 18 | A. If I sell everything? |
| 19 | Q. Yes. |
| 20 | A. Everything. If I sell them -- if I wanted to sell |
| 21 | everything and get out of this town, a little over a million. |
| 22 | Q. Other than the home that you live in and these other |
| 23 | properties that you own, do you rent them out to people? |
| 24 | A. Federal government section eight, some of them. It |

Page 65

17 (Pages 62 to 65)

1  depends. And the other ones I rent out to families. I got families
2  in duplexes, in both duplexes. And apartment houses I got four
3  units. I got peoples in them staying and other houses. I got my
4  daughters in one house and son, you know.
5    Q  Who manages all these rental properties for you?
6    A  Me and my wife.
7    Q  How many hours a week does that take you?
8    A  It depends. You put the right peoples in there, you
9  don't have to worry about doing too much work on them. But if they
10  tore up something, they move out, it depends what you have to do to
11  get them back up to date.
12    Q  Can you tell me on average how much time a week you spend
13  working on your rental properties?
14    A  It depends, because mostly now I have been studying so it
15  depends. It depends. I can't really say. It depends. Whatever I
16  want to do. It depends. If I want to do something for eight hours;
17  if I want to do something for six hours; if I want to do something
18  for two hours, it depends what needs to be done. It depends. When
19  the time comes, you know, work goes slow.
20    Q  You are currently studying to be a truck driver?
21    A  Well, I was taking a test for a truck driver.
22    Q  What sort of a test, a CDL test?
23    A  Yeah. CDL test.
24    Q  Did you go to school for that?

Page 66

1    A  I went to school back in the '80s, but now I'm doing the
2  training on my own.
3    Q  Did you take the CDL test yet?
4    A  Yes, I did.
5    Q  When?
6    A  Took it this month.
7    Q  Do you know if you passed or not?
8    A  Well, on the air brakes -- you know, passed on the air
9  brakes or something like that. On the other test, I didn't pass
10  because I didn't have all the questions -- I mean all the questions
11  figured out, and I have to study again. So I have to wait until
12  January the 10th to go back and test again. So I was kind of moving
13  a little bit too fast.
14    Q  Okay. Sir, I think I'm almost done.
15    (Pause in proceedings.)
16    Q  Is there anything that you have to say to support the
17  claims in your lawsuit that you haven't told me about already?
18    A  You know, the only thing I want -- I just want to know
19  who told this lie on me. And that's the only thing I really, really
20  want to find out, who lied on me on this lawsuit. The job mean more
21  to me than the money. I just -- I liked -- when I was working, I
22  liked cleaning up the parks and keeping them nice. I just want to
23  know who told that lie on me. It seems like every time I got a job
24  somebody tends to say something bad about me for some reason. I

Page 67

1  guess.
2    Q  When you say you want to know who told the lie on you,
3  are you referring to you want to know who made that call to Mary
4  McGrew?
5    A  I want to know -- yeah, who did this, something like this
6  to me. You know, like I say, when I heard it was a cousin and then
7  I heard it was another cousin, then I heard it was a friend, then I
8  heard it was this, I don't want to hear that no more. Like the
9  unemployment officer say. That's hearsay. I want to see it.
10    Q  Do you dispute that someone called Mary McGrew and told
11  her that she saw a Park District employee buying alcohol that day?
12    A  Sir, that's not the first time people called on me on
13  that job and said that I did this and did this and did this. People
14  call about people on the jobs all the time that they are doing this,
15  doing something, doing this, doing this, doing this. People do this
16  all the time.
17    Q  Okay. Let's back up for a minute. Do you dispute that
18  someone called Mary McGrew that day to say that they had seen a Park
19  District employee buying alcohol?
20    A  I don't quite understand what you mean by "dispute." Why
21  don't you explain yourself a little better than that.
22    Q  Do you know whether that's true or not that somebody
23  called Mary McGrew --
24    A  I can't say because I don't -- I can't say that. I don't

Page 68

1  know. I ain't gonna lie like that and say "yes" or "no." I don't
2  know.
3    Q  Fair enough.
4    A  Yeah.
5    Q  Do you know of any other times when someone has called
6  and complained that a Park District employee was buying alcohol on
7  company time?
8    A  When we're working like that on the Park District, we
9  don't get into stuff like that. We've got our own -- we've got our
10  own -- if I'm with somebody, we're going to try ourself. We don't
11  care what nobody else do on the job as long as we get our work done.
12    Q  So you don't know?
13    A  Don't know.
14    Q  Okay. Fair enough.
15    A  And don't care, you know.
16    Q  Have you now told me everything that you have to say on
17  your behalf regarding the claims in your lawsuit? Is there anything
18  else you want to add?
19    A  I just wonder if me and you can get together with Clinton
20  Andrews and kind -- you know what I mean -- just sit back about
21  30 minutes and see if we can just find out what the real situation
22  was. Who talked him into this or why did he do this. I want me and
23  you and him to get together and have a little conference. You know
24  what I mean? And set up a date or something and find out, because

Page 69

18 (Pages 66 to 69)

the way me and him been talking, he started coming out with the
truth now. And he, you know, kind of hate, you know -- I think he
was kind of like muzzled (sic) in the head about this whole thing.

Q   He hates that he told that lie about you?

A   If you can just e-mail me or something. And then we can
just get together sometime, me. you and Clinton and just have a
talk, or maybe we meet somewhere. As a matter of fact, we might
meet at Jumer's Hotel over there. That's a good spot. We can go
over there and talk.

Q   Let me just back up for a second.

A   Yeah.

Q   Okay. When you say that Mr. Andrews kind of hates -- and
I couldn't make out the rest of it -- does he hate the fact that he
told this story about you?

A   Yes. And like I was sitting down and I asked him, you
know. Why you -- Did you do some stuff like this? Or, Did you do
this for real?

He said, Posey, man. maybe I was just talking too damn
much. I don't know what I was doing, Posey. I just -- I just -- I
was scared. I didn't know what the hell was going on. I was
knocked out in the truck asleep. You know I was

That's how we talk. You know what I mean?

Q   Okay

A   He said. I didn't want to lose my job.

Page 70

I said, Why would you -- you know, for $8.50, don't lie

Q   Would you be willing to set up a meeting with you and me
and Mr --

A   Sure. Man. sure

Q   Let me finish, please

A   Yeah

Q   Would you be willing to set up a meeting with you and me
and Mr. Andrews?

A   Yes, sir

Q   I appreciate that

A   Yes, sir

Q   I know I already asked this question twice. but I just
want to make sure that it's clear because you did answer. I want to
make sure that I have it all before we are done. You have now told
me everything that you have to say about your claims in this case,
true?

A   Yes, sir

Q   Okay. Can I have just a minute to check, please, because
I think I'm done.

(Pause in proceedings.)

A   I've got one more question. If I really want to be kind
of -- I had run over my foot with the garbage truck and I didn't
want to -- do you know what I mean? And it's causing me problems
right now because I didn't open my mouth about it. Do you know what

Page 71

I mean? But that's the way I am. If something didn't hurt then,
I'm not going to try to report it. I don't look to try to get no
free money or something from nobody. You know what I mean? The
second day of work the truck ran over my foot.

Q   Was that in 2001?

A   Yeah. I mean. I didn't go back and, you know, try to say
this and this or this or try to get no money because that happened.
You know, money don't mean nothing to me because if me and my wife
need money or something, we can always try to borrow some money off
a home if we want to.

Q   And you own a lot of property?

A   And we can sell a home if we wanted to, you know, but I
just don't lie, you know

Q   Did you break any bones when your foot got run over?

A   I fractured a bone real bad, and I've got to have an
operation on it after Christmas, but, you know

Q   All right. Well, Mr. Posey, unless there is anything
else that you want to tell me --

A   No, sir

Q   -- about the claims in your lawsuit, then I'm done with
my questions.

A   Thank you, sir

Q   And thank you. I appreciate it

DEPOSITION CONCLUDED AT 11:47 A.M

Page 72

STATE OF ILLINOIS )
                   ) SS
COUNTY OF PEORIA )

CERTIFICATE

I, Gale G. Everhart, CSR-RPR, a Notary Public
duly commissioned and qualified in and for the State of Illinois. do
hereby certify that, pursuant to notice, there came before me on the
15th day of December, A.D. 2006, at 201 South Vine Street, Room 350,
Urbana, Illinois. the following named person, to wit:

JOSEPH E. POSEY, SR.

the plaintiff herein, called by the defendant, who was by me first
duly sworn to testify to the truth and nothing but the truth of his
knowledge touching and concerning the matters in controversy in this
case, and that he was thereupon carefully examined upon his oath and
his examination immediately reduced to shorthand by means of
stenotype and thereafter converted to typewriting using
computer-aided translation by me

I ALSO CERTIFY that the deposition is a true record of
the testimony given by the witness, and that the necessity of
calling the court reporter at time of trial for the purpose of
authenticating said transcript was waived

I FURTHER CERTIFY that I am neither attorney or counsel
for. nor related to or employed by. any of the parties to the action
in which this deposition is taken, and. further. that I am not a
relative or employee of any attorney or counsel employed by the

Page 73

19 (Pages 70 to 73)

1  parties hereto or financially interested in the action
2        IN WITNESS WHEREOF, I have hereunto set my hand and
3  affixed my notarial seal at Peoria, Illinois, this 1st day of
4  January, A.D. 2007
5
6
7
8  _____
          Gale G. Everhart, CSR-RPR
9          Illinois License No. 084-004217
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 74

1  JOSEPH E. POSEY, SR.,
2      Plaintiff,
3      vs          Case No. 06-2114
4  CHAMPAIGN PARK DISTRICT,
5      Defendant
6
7      I hereby certify that I have read the foregoing
   transcript of my deposition given on 12/15/06, consisting of pages 1
8  through 72, inclusive, and I do again subscribe and make oath that
   the same is a true, correct, and complete transcript of my
9  deposition so given as aforesaid.
10      Please check one:
11      _____ I have submitted errata sheet(s)
12      _____ No corrections were noted
13
14  _____
          JOSEPH E. POSEY, SR.
15
16  SUBSCRIBED AND SWORN TO
   before me this _____ day
17  Of _____, A.D. 2007
18
19
20  _____
   Notary Public
21
22
23
24

Page 75

1        WITNESS ERRATA SHEET
2  JOSEPH E. POSEY, SR.,
3      Plaintiff,
4      vs          Case No. 06-2114
5  CHAMPAIGN PARK DISTRICT,
6      Defendant
7  Deposition of JOSEPH E. POSEY, SR., 12/15/06
8      I wish to make the following changes for the following
   reasons:
9  Page  Line
10  ____ ____ CHANGE: _____
11      REASON: _____
12  ____ ____ CHANGE: _____
13      REASON: _____
14  ____ ____ CHANGE: _____
15      REASON: _____
16  ____ ____ CHANGE: _____
17      REASON: _____
18  ____ ____ CHANGE: _____
19      REASON: _____
20  ____ ____ CHANGE: _____
21      REASON: _____
22
23  (Signed)_____
24

Page 76

20 (Pages 74 to 76)

**E-FILED**
Monday, 16 April, 2007  03:57:32 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

**E-FILED**
Tuesday, 20 June, 2006  11:54:26 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Joseph Ervin Posey Sr.

_____

_____

_____

_____
        Plaintiff(s)

                                           Case No: 06-2114

        vs.

Champaign Park District

_____

_____

_____

_____

_____
        Defendant(s)

PRO SE COMPLAINT AGAINST EMPLOYMENT DISCRIMINATION, UNDER TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§ 2000e-5

I.    PREVIOUS PROCEEDINGS BEFORE THE EQUAL EMPLOYMENT
      OPPORTUNITIES COMMISSION (EEOC)

      A.  Have you filed a charge before the federal Equal Employment
      Opportunities Commission (EEOC) relating to this claim of employment
      discrimination?

      (X)  YES

      ( )  NO

      B    If your answer is YES, describe the EEOC proceeding:

           1.  Parties to the previous EEOC proceeding:

                Petitioner (s) Joseph Ervin Posey Sr.

                _____

                _____

Page 2

Respondent (s) _Champaign Park District_

_____

_____

2. Location of EEOC office that handled your charge _U.S. Equal Employment Opportunity Commission Chicago District Office_

3. Docket or case number of your charge: _____

4. Disposition (what was the final result of your charge): _____

_The charges were unable to determine whether I was dismissed due to my race._

_____

5. Has EEOC written you a right-to-sue letter (telling you that you have the right to sue in a United States District Court if you are dissatisfied with the disposition of your charge)?

(X̸) YES

( ) NO

6. Date of filing charge before EEOC: _3 - 31 - 06_

7. Date of disposition by EEOC: _____

C. Attach copies of all documents you possess relating to the EEOC proceeding, ESPECIALLY YOUR RIGHT-TO-SUE LETTER.

II. PREVIOUS LOCAL, STATE OR FEDERAL PROCEEDINGS OTHER THAN EEOC

A. Have you begun other legal proceedings before state or local courts or agencies, or a federal court (but NOT the EEOC) relating to your claim of employment discrimination?

( ) YES

(X̸) NO

2

Page 3

B.  If your answer is YES, describe each legal proceeding:

    1.  Parties to the previous legal proceeding:
       Plaintiff(s) or petitioner(s) _____

       _____

       _____

       Defendant(s) or respondent(s) _____

       _____

       _____

    2.  Name of court or agency: _____

       _____

       _____

    3.  Docket or case number: _____

    4.  Name of the judge or hearing officer: _____

       _____

    5.  Disposition (for example: Was the case dismissed?
       Who won?  Was there an appeal?  Is the appeal pending
       or final? _____

       _____

       _____

       _____

       _____

    6.  Date of beginning previous proceeding:_____

    7.  Date of disposition of proceeding:_____

NOTE:  If there was more than one previous legal proceeding, excluding an EEOC
proceeding, describe them on separate sheets of paper.  Follow the outline above, label
the sheets clearly, and attach them to this pro se complaint.

3

Page 4

C.    Have you attached separate sheets regarding previous state, local or federal legal proceedings (other than EEOC)?

( )  YES

( )  NO


III.    PARTIES TO YOUR PRO SE COMPLAINT OF EMPLOYMENT DISCRIMINATION

A.    Plaintiff(s)

1.  Your full name  Joseph Ervin Posey Sr.

_____

2.  Your address  117 E. Roper

Champaign, IL. 61820

3.  Names and addresses of other plaintiffs, if any (You should name other plaintiffs only if they were petitioners with you in a previous EEOC proceeding, or else if EEOC began a previous proceeding on behalf of you and them): _____

_____

_____

_____

(Use a separate sheet if necessary; label it clearly if so)

B.    Have you attached a separate sheet naming other plaintiffs?

( )  YES

(X)  NO

C.    Defendant (s) (You should name here the first-named respondent, or else its successor, in the previous EEOC proceeding brought by you or on your behalf):

1.  Full name (individual or firm):  Champaign Park District

_____

4

Page 5

2. Business address: 706 Kenwood Rd, Champaign, IL, 61820

3. Job position (if individual) _____

_____

4. Status as an entity (if defendant is a business firm):

( ) Corporation

( ) Partnership

( ) Sole Proprietorship

( ) Other _____

(If you do not know this information, and you cannot find out by reasonable means, ask the defendant for it. If the defendant will not tell you, leave this section blank.)

5. Names, business addresses, and job position or entity status of other defendants, if any (you should name additional defendants only if they were named as respondents in a previous EEOC proceeding brought by you or on your behalf): _____

_____

_____

_____

_____
(Use a separate sheet if necessary; label it clearly if so)

D.   Have you attached a separate sheet naming other defendants?

( ) YES

(X) NO

5

Page 6

IV.    STATEMENT OF YOUR CLAIM OF EMPLOYMENT DISCRIMINATION

A.  Were you:
      ( ) Not hired?
      (X) Discharged?
      ( ) Suspended?
      ( ) Demoted?
      ( ) Denied Promotion?
      ( ) Denied Wage Increases?
      ( ) Other (please specify) _____

_____

B.    State here as briefly, concisely and clearly as possible the essential facts of your claim. Take time to organize your statement; you may use numbered paragraphs if you find it helpful. Include precisely how each defendant in this action is involved. Include the names of other persons involved who are not defendants; give dates and place. Concentrate on describing as clearly and simply as possible the employment practice you allege to be illegal, and how it discriminated against you. IT IS NOT NECESSARY TO MAKE LEGAL ARGUMENTS OR CITE ANY CASES OR STATUTES. IN MOST CIRCUMSTANCES, THIS ONLY MAKES THE CLAIM OF A LAYMAN MORE DIFFICULT TO UNDERSTAND. AS MUCH AS POSSIBLE, LET THE FACTS SPEAK FOR THEMSELVES.

At 8:00 a.m. on Aug. 24, 04 Dennis Shiley, Mary McGrew and David Schneider witnessed Clint Andrews and I stopping at the Circle K on Neil Street at 8:30a.m to buy a Chicago Tribune. I was approached by someone outside the store. He gave me money to buy alcohol for him. I purchased the alcohol and gave it to the person as I left the store. As Mary McGrew was driving to Christie Clinic to get a urine test. Ms McGrew stated that as long I did not have any alcohol in my urine I would not lose my job. I did not have any alcohol in my system. I was still discharged.

DO NOT FEEL COMPELLED TO USE ALL THE SPACE.

Page 7

V.    RELIEF YOU REQUEST

Check below what you want the court to do for you.  You may make as many checks as you like.

(X) Should you prevail in this lawsuit, award you back pay.

(V) Should you prevail in this lawsuit, reinstate you in
    your old position.

(V) Should you prevail in this lawsuit, award you certain
    costs of suit (but not attorneys fees).

(  ) Other _____

_____

_____

_____

Signed this ____6____ day of ___June_____, 20_06_.

_____Joseph E Posey Sr_____

(Signature of Plaintiff or Plaintiffs)

ADDRESS: _117 E. Roper_____

_Champaign, IL. 61820_____

PHONE NO.: _217- 355-9311_

7

EEOC Form 5 (5/01)

E-FILED
Tuesday, 20 June, 2006 11:54:55 AM
Clerk, U.S. District Court, ILCD

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:

- [ ] FEP
- [X] EEOC

Agency(ies) Charge No(s):

210-2005-03998

Illinois Department Of Human Rights
*State or local Agency*

and EEOC

| | |
|---|---|
| Name *(Indicate Mr., Ms., Mrs.)* Mr. Ervin Posey, Sr.    Joseph Ervin Posey SR | Home Phone No. *(Incl Area Code)* (217) 355-9311 |
| | Date of Birth 10-21-54 |

Street Address
117 East Roper Champaign, IL 61820

City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name CHAMPAIGN PARK DISTRICT | No. Employees, Members Unknown | Phone No. *(Include Area Code)* (217) 398-2566 |
|---|---|---|

Street Address
706 Kenwood Road, Champaign, IL 61820

City, State and ZIP Code

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address

City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es))*

- [X] RACE
- [ ] COLOR
- [ ] SEX
- [ ] RELIGION
- [ ] NATIONAL ORIGIN
- [ ] RETALIATION
- [ ] AGE
- [ ] DISABILITY
- [ ] OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 08-24-2004    Latest: 08-24-2004

- [ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was employed at Respondent in July 2001. I worked as a Landscaper. I was discharged on August 24, 2004.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended

APR 11 2005

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief SIGNATURE OF COMPLAINANT |
| 04-06-05
Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  Joseph E. Posey, Sr.
117 East Roper
Champaign, IL 61820

From:  Chicago District Office - 440
500 West Madison St
Suite 2800
Chicago, IL 60661

CERTIFIED MAIL: 7099 3400 0014 4055 3743

☐  On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 210-2005-03998 | Sarronda Harris,<br>Investigator | (312) 886-9320 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words. you waited too long after the date(s) of the alleged discrimination to file your charge

☐  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences. or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐  While reasonable efforts were made to locate you. we were not able to do so

☐  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged

☒  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form )*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you   You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost  (The time limit for filing suit based on a state claim may be different )

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*John P. Rowe eH*                          *March 31, 2006*

**John P. Rowe,**
**District Director**

*(Date Mailed)*

Enclosures(s)

cc:    **CHAMPAIGN PARK DISTRICT**

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Joseph E. Posey, Sr.<br>117 East Roper<br>Champaign, IL 61820 | From: | Chicago District Office - 440<br>500 West Madison St<br>Suite 2800<br>Chicago, IL 60661 |
|---|---|---|---|

CERTIFIED MAIL: 7099 3400 0014 4055 3743

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No | EEOC Representative | Telephone No |
|---|---|---|
| 210-2005-03998 | Sarronda Harris,<br>Investigator | (312) 886-9320 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

*John P. Rowe*          *March 31, 2006*

**John P. Rowe,**          (Date Mailed)
**District Director**

cc:    **CHAMPAIGN PARK DISTRICT**



**Discover the fun!**

August 24, 2004

Joseph Posey
117 E. Roper
Champaign, IL 61820

Dear Joe:

This letter is to inform you of your termination from employment with the Champaign Park District effectively immediately.

At 10 a.m. today with Dennis Shiley, Mary McGrew, and myself as witnesses you admitted that you stopped at the Circle K on Neil Street across from the Post Office at approximately 8:30 a.m. to buy a Chicago Tribune. You admit you were approached outside the store by an acquaintance that was "barred out" from the store. The acquaintance gave you some money to purchase alcohol for him. You agree that you purchased the alcohol and gave it directly the person as you left the store. You do not deny you were in District uniform, on District time, and driving a District vehicle when this incident occurred

Your actions put you in direct violation of District policy. See Personnel Manual section 8-2, #4 and #14, and Appendix A, Alcohol and Drug Abuse Policy. Therefore, effective today, your employment with the District is terminated.

Sincerely,

David Schneider
Maintenance Supervisor

CC: Posey Personnel File

Champaign Park District
706 Kenwood Road
Champaign, Illinois 61821-4112
217.398.2550 Phone
217.355.8421 Fax
www.champaignparkdistrict.com

Park Commissioners
James A. Barham
Newton H. Dodds
Alvin S. Griggs
Joseph A. Petry
Morgan C. Powell

Officers
Guy C. Hall, *Secretary/Attorney*
Gary Wackerlin, *Treasurer*
Bobbie H. Herakovich, *Executive Director*





**CHAMPAIGN PARK DISTRICT**

**Discover the fun!**

Champaign Park District
706 Kenwood Road
Champaign, IL 61821-4112

217.398.2550 – Phone
217.355.8421 – Fax
champark@cu-online.com
www.champaignparkdistrict.com

This communication and any files transmitted with it may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you receive this communication in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.

# Fax Form

DATE: 1-19-05   TIME: 10¹⁰

TO:
Name: Greg
Company: Unemployment Consultants
Fax: 847-670-0596

FROM: Mary McGrew

TOTAL PAGES (including cover): 15

MESSAGE:
Greg - 3 sign offs on policy review)
One for each summer he
worked with us. Mary

---

If you are dismissed you will receive written notice of the reasons for your dismissal including effective date and time of dismissal. Your supervisor or designee will meet with you, explain the reasons for your dismissal, and offer you the opportunity to respond. You are required to sign the written notice of your dismissal indicating your receipt of the notice and understanding of the reason for the dismissal. If you refuse to sign, another supervisor may be asked to witness your refusal. A copy of the notice will be placed in your personnel file. You may further respond to those charges, if any, through the formal review procedure outlined below.

**8-2   EXAMPLES OF REASONS FOR DISCIPLINARY ACTION**

You may be warned, suspended, and/or dismissed whenever it is determined, in the Park District's sole discretion, to be in its best interests. Nevertheless, listed below are some examples of reasons for disciplinary action. This list, however, does not constitute an exhaustive list of all of the acts that may subject you to disciplinary action including discharge and does not change the employment-at-will relationship between the employee and the Park District. Instead, the following list sets forth some of the more typical cases that arise in the course of an employment relationship. They include but are not limited to:

1. Failure to adhere to Park District policies and/or procedures including without limitation safety policies, ordinances and procedures.
2. Absence from duty without permission, habitual tardiness, excessive absenteeism, or misrepresentation of material facts relating to the use of leave.
3. Extending breaks or lunches and/or not taking breaks or lunches at scheduled times.

Adopted by the Champaign Park District
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

64



4.    Leaving job during working hours without permission.

5.    Failure to obey any lawful official rule, regulation or order, or failure to obey any proper direction made or given by your supervisor(s).

6.    Inability or unwillingness to take orders from supervisor(s).

7.    Uncooperative, hostile or discourteous attitude or conduct toward your supervisor(s), the Board, co-workers or members of the public or threatening or striking any person who is in or on Park District property or participating in Park District activities.

8.    Being wasteful of or the willful destruction of Park District supplies, materials, vehicles, equipment, tools, working time or other Park District property.

9.    Failure to wear uniform or safety equipment (e.g., safety shoes, glasses, goggles and/or face shield) as required by this Manual and/or department manuals, rules and/or procedures or the failure to wear appropriate clothing for duties as required by this Manual or department manual, rules and/or procedures.

10.    Endangering one's safety and/or the safety of others because of failure to act properly and safely in the performance of job duties.

11.    Failure to follow any federal, state, local or Park District law, rule or regulation while on duty or while in or on Park District property or engaging in criminal activity while on duty or while in or on Park District property.

12.    Failing to report an accident or known hazardous conditions to your immediate supervisor.

13.    Gambling or fighting while on duty.

14.    Being under the influence or possession of intoxicants or illegal drugs while on duty or on Park District property or failing to notify the Park District that you are taking legal drugs when such notice is required.

15.    Theft or misappropriation or the careless, negligent or improper use of funds or property belonging to the Park District, fellow employees or the public.

16.    Possession of weapons in or on Park District property or while on duty.

17.    Felony conviction.

18.    Incompetent, inefficient or negligent performance of duties; inability or failure to perform duties properly.

19.    Failure to maintain valid drivers license or other license or certification which may be required for your position or as provided in this Manual.

20.    Smoking in restricted areas.

21.    Harassment of other employees or members of the public.

22.    Dishonesty; lying to Park District personnel or falsifying or providing misleading information on forms, records or reports provided to or on behalf of the Park District including without limitation accident reports, employment applications/resumes, financial reports, reimbursement reports and departmental reports.

23.    Time card or any work record violations.

24.    Unauthorized possession, use or copying of any records that are the property of the Park District.

25.    Sleeping on duty.

26.    Violation of employee policies, rules or guidelines or engaging in any conduct determined by the Park District in its sole discretion not to be in its best interests.

27.    Any violation of policies or procedures regarding the privacy of individualy identifiable health information (or protected health information), as mandated by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and as defined by the U.S. Department of Health and Human Services, pursuant to regulations thereunder, as amended from time to time.

**3    REVIEW OF DISCIPLINARY ACTION OTHER THAN DISMISSAL**

Adopted by the Champaign Park District                   65
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

③

**WORKPLACE INSPECTIONS**

To safeguard the property and personal safety of our employees and the Park District, the Park District reserves the right to inspect any packages, parcels, purses, handbags, gym bags, briefcases, lunch boxes, or any other possessions or articles carried to and from Park District property by employees and all other persons leaving and entering the Park District's premises.

The Park District reserves the right to inspect an employee's office, desk, files, lockers or other area or article on Park District premises. As noted above, all lockers, offices, desks, telephones, computers, files and so forth, are the property of the Park District and are issued for the use of employees only during their employment with the Park District.

Inspections may be conducted at any time at the discretion of the Park District. From time to time, employees in the performance of their duties will experience a situation where damage will be done to their personal property (i.e., glasses, shirt or blouse), through no fault on their part. In these cases, the District will reimburse the cost of repairs or replacement for the property when it is determined by the Department Head and Director of Finance there was no carelessness or negligence on the part of the employee. The District will not reimburse in those cases where proper procedures were not followed or there was carelessness on the part of the staff member.

Employees working on Park District premises or entering or leaving the premises who refuse to cooperate in an inspection, as well as employees who after the inspection are believed to be in possession of unauthorized Park District property, confidential material, stolen property, weapons, alcohol, or illicit drugs, will be subject to disciplinary action, up to and including discharge.

## 1-18 ALCOHOL AND DRUG ABUSE

The Park District has implemented an Alcohol and Drug Abuse Policy in response to overwhelming evidence that alcohol and drug abuse has a detrimental impact on employees' health, job performance, safety, and efficiency. Since Park District employees operate, supervise and maintain parks, facilities, programs and equipment for use by members of the public and perform services that may have a direct effect on the health and safety of members of the public and fellow employees, the Park District wishes to maximize the health and safety of its patrons and employees.

This policy also expresses the Park District's desire to satisfy the requirements of the federal and state Drug Free Workplace Acts (41 U.S.C.A. § 701 *et seq.* and 30 ILCS 580/1 *et seq.*). In accordance with these statutes and concerns, the Park District has resolved to maintain a drug free workplace.

The purpose of this policy is to inform employees of the Park District's investigation, treatment and disciplinary policy relating to alcohol and drugs. As such, **all** Park District employees will abide by its terms. As with all policies in this Manual, this policy is subject to periodic addition, modification, or deletion.

This policy does not replace any of the provisions or requirements of the Park District's Controlled Substance and Alcohol Testing Policy for positions that require a Commercial Drivers License (CDL). Park District employees who operate Park District commercial motor vehicles and possess a commercial drivers license have special responsibilities necessitated by the fact

Adopted by the Champaign Park District     15
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003



that they operate vehicles that require additional skill and attentiveness over that of non-commercial motor vehicles. As part of its continuing commitment to safety and to comply with federal law, the Park District has established a controlled substance and alcohol testing policy for Park District positions that require a commercial drivers license ("CDL Testing Policy – See Appendix B"). Both the Park District and the federal government recognize that it is important to establish programs to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles. The CDL Testing Policy is in addition to and supplements and complements rather than supersedes all other Park District policies, rules, procedures, and practices, including without limitation this Alcohol and Drug Abuse Policy. However, for persons to whom the CDL Testing Policy applies, in the event of any conflict between any of the provisions of the CDL Testing Policy and the provisions of any other Park District policy, rule, procedure, or practice, the provisions of the CDL Testing Policy will control.

*Please review the comprehensive Alcohol and Drug Abuse Policy in Appendix A.*

## 1-19   MODIFIED DUTY PROGRAM

The Park District is committed to providing employees with available and reasonable opportunities to maintain career and employment status and benefits, and to maximize the Park District's ability to provide its services offered to the public. To that end, we have developed a Modified Duty Program for employees who have sustained injuries or illnesses arising out of and in the course of their employment with the Park District ("work-related injury").

The purpose of the Modified Duty Program is to provide a temporary modified work assignment, when feasible, available and applicable. The feasibility of modified duty will be determined on a case-by-case basis, taking several factors into consideration, and is the sole discretion of the Park District. These factors include, but are not limited to, the attitude and aptitude of the employee, the specific physical or mental limitations, the essential functions of the temporary job assignment, the work environment and the ability of the Park District to provide accommodation. Modified duty may not be available for certain positions. Noncompliance or failure to cooperate with the Modified Duty Program may affect your workers compensation benefits and result in possible disciplinary action, up to and including dismissal.

*Please see the entire Modified Duty Program in Appendix C.*

Adopted by the Champaign Park District
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

16



## ALCOHOL AND DRUG ABUSE POLICY

### PURPOSE

The Champaign Park District has implemented this policy in response to overwhelming evidence that alcohol and drug abuse has a detrimental impact on employees' health, job performance, safety, and efficiency. Since Park District employees operate, supervise and maintain parks, facilities, programs, and equipment for use by members of the public and perform services that may have a direct effect on the health and safety of members of the public and fellow employees, the Park District wishes to assure the health and safety of its patrons and employees.

This policy also expresses the Park District's desire to satisfy the requirements of the federal and state Drug Free Workplace Acts (41 U.S.C.A. § 701 et seq. and 30 ILCS 580/1 et seq.). In accordance with these statutes and concerns, the Park District has resolved to maintain a drug free workplace.

The purpose of this policy is to inform employees of the Park District's investigation, treatment and disciplinary policy relating to alcohol and drugs. As such, **all** Park District employees will abide by its terms. As with all policies in this Manual, this policy is subject to periodic addition, modification, or deletion.

This policy does not replace any of the provisions or requirements of the Park District's Controlled Substance and Alcohol Testing Policy for positions that require a Commercial Driver's License (CDL). See Appendix B.

Park District employees who operate Park District commercial motor vehicles and possess a commercial driver's license have special responsibilities necessitated by the fact that they operate vehicles that require additional skill and attentiveness over that of non-commercial motor vehicles. As part of its continuing commitment to safety and to comply with federal law, the Park District has established a controlled substance and alcohol testing policy for Park District positions that require a commercial driver's license ("CDL Testing Policy"). Both the Park District and the federal government recognize that it is important to establish programs to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles. The CDL Testing Policy is in addition to and supplements and complements rather than supersedes all other Park District policies, rules, procedures, and practices, including without limitation this Alcohol and Drug Abuse Policy. However, for persons to whom the CDL Testing Policy applies, in the event of any conflict between any of the provisions of the CDL Testing Policy and the provisions of any other Park District policy, rule, procedure, or practice, the provisions of the CDL Testing Policy will control.

### ACTS PROHIBITED

The unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance, including cannabis and alcohol, is prohibited on Park District Property or while acting on behalf of the Park District.

### DEFINITIONS

For purposes of this Policy, the following definitions apply:



A

1. **"Alcohol"** means any substance containing any form of alcohol, including but not limited to: ethanol, methanol, propanol and isopropanol.

2. **"Cannabis"** is defined as provided in the Cannabis Control Act (720 ILCS 550/1 *et seq.*) which provisions are specifically incorporated in this Policy by reference.

3. **"Controlled Substance"** means a controlled substance in schedules I through V of section 812 of Title 21 of the United States Code, which provisions are specifically incorporated in this Policy by reference.

4. **"Criminal Drug Statute"** means a criminal statute involving the manufacture, distribution, dispensation, possession, or use of any controlled substance or cannabis.

5. **"Executive Director"** is the Executive Director of Parks and Recreation of the Champaign Park District.

6. **"District Property"** means any building, park, gym, pool, office, common area, open space, vehicle, parking lot, or other area owned, leased, managed, used or controlled by the Park District. District Property also includes property used by Park District patrons while on Park District sponsored events or field trips or property of others when presence thereon by the Park District employee is related to employment with the Park District.

7. **"Drugs"** mean Legal Drugs and controlled substances, including cannabis.

8. **"Legal Drugs"** mean prescription drugs and over-the-counter drugs which have been obtained legally and are being used in the manner and for the purpose for which they were prescribed or manufactured.

9. **"Medical Facility"** means any physician, laboratory, clinic, hospital, or other similar entity.

10. **"Policy"** means this Alcohol and Drug Abuse Policy of the Champaign Park District.

11. **"Possess"** means to have either in or on an employee's person, personal effects, desk, files, or other similar area.

12. **"Public Safety Responsibility"** means a position in which the nature of an employee's duties is such that impaired perception, reaction time, or judgment may place a member or members of the public or other employees at risk of serious bodily harm, or is responsible for the administration or enforcement of alcohol/drug policies.

13. **"Under the Influence"** means that the employee is affected by alcohol or drugs in any determinable manner. A determination of being under the influence can be established by a professional opinion, a scientifically valid test, a layperson's opinion, or the statement of a witness.

## VOLUNTARY TREATMENT

It is the responsibility of each employee to seek assistance before alcohol or drug problems lead to disciplinary action. The Park District will not discipline an employee who voluntarily seeks treatment for a substance abuse problem if the employee is not in violation of the Park District's drug and alcohol policy or other rules of conduct. Seeking such assistance will not be a defense for violating the Park District's drug and alcohol policy, nor will it excuse or limit the employee's

B 

obligation to meet the Park District's policies, rules of conduct, and standards including, but not limited to, those regarding attendance, job performance, and safe and sober behavior on the job. Employees who suffer from alcohol or drug abuse are encouraged to consult voluntarily with Park District management and undergo appropriate medical treatment. Participation in such treatment will be at the employee's expense, although some of these expenses may be covered under the employee's group health plan. Please see the Human Resources Manager for details. Park District management will attempt to keep such voluntary discussions and medical treatment confidential in accordance with this Policy.

### SCREENING AND TESTING

The Park District may require employees whose job functions require them to operate or maintain vehicles or machinery, handle hazardous or toxic materials or substances of any kind, or have Public Safety Responsibility to be screened or tested on a random basis, or may require **any employee** to be screened or tested following a work place accident involving a possible violation of safety rules, during and after an employee's participation in an alcohol or drug counseling or rehabilitation program, or upon **reasonable suspicion** that the employee is under the influence of alcohol or drugs. The screening or testing will be conducted by a medical facility selected by the Park District at the Park District's expense. The screening or testing may require an analysis of the employee's breath, urine and/or blood or such similar substance as the medical facility may recommend. Employees who undergo alcohol or drug screening or testing will be given the opportunity, prior to the collection of a specimen or other testing, to disclose the use of legal drugs and to explain the circumstance of their use. If an initial test is positive, a second test will be conducted from the same sample. A confirmed positive drug and/or alcohol test may result in disciplinary action, up to and including discharge.

Each Park District employee is required to sign a consent form, a copy of which is included with this Policy, at the time this Policy is distributed to the employee. Prospective employees applying for positions that require a commercial driver's license will be required to sign a consent form prior to taking the pre-employment drug screening. Prospective employees for positions that require a pre-employment physical will be required to sign a consent form prior to taking the pre-employment physical.

Each employee and prospective employee may also be required to sign a separate consent form requested by the Medical Facility conducting the screening or testing. Refusal to sign any requested consent form will result in non-hire or disciplinary action up to and including dismissal, as deemed appropriate by the Park District, in its sole discretion, under the circumstances.

### TREATMENT

If the medical facility recommends treatment, the Park District may, depending on the circumstances as determined in the sole discretion of the Park District, give the employee one opportunity to undergo treatment offered by a clinic or trained professional mutually acceptable to the Park District and employee.

Participation in such treatment will be at the employee's expense. The employee must enter the treatment program within ten (10) days from the time of recommendation of treatment. The Park District may reinstate the employee provided that the employee submits a statement issued by the medical facility certifying successful completion of the treatment program, that the employee is released to return to work, and that the employee agrees to all conditions of reinstatement as determined by the Park District, which may include, but is not limited to, future alcohol and/or drug testing.

C

## USE OF LEGAL DRUGS

Any employee who operates or maintains a vehicle or machinery, handles hazardous materials or substances of any kind, or has public safety responsibility and who has taken a legal drug must report the use of such legal drug to their immediate supervisor if the legal drug may cause drowsiness or if it may alter judgment, perception or reaction time. The burden is on the employee to ascertain from the employee's doctor or pharmacist whether or not the legal drug may have such a potential side effect. The information will be retained by the Park District in a confidential manner and will be disclosed only to persons who need to know. The employee's immediate supervisor, after conferring with the department head or Executive Director, will decide whether or not the employee may safely continue to perform the job while using the legal drug. Failure to declare the use of such legal drugs may be cause for discipline up to and including dismissal

## NOTICE OF CONVICTIONS

Any employee who is convicted of violating any federal or state criminal drug statute must notify the Executive Director within five (5) days of such conviction. For purposes of this notice requirement, a conviction includes a finding of guilt, a no contest plea, and/or an imposition of sentence by any judicial body for any violation of a criminal statute involving the unlawful manufacture, distribution, sale, dispensation, possession or use of any controlled substance or cannabis. Failure to notify the Executive Director may subject the employee to disciplinary action, up to and including dismissal.

## DISCIPLINE/PENALTIES FOR VIOLATION

1. An employee who reports to work or is found during working hours to be or to have been under the influence of alcohol, controlled substances, or cannabis or who manufactures, possesses, uses, sells or dispenses alcohol, controlled substances, or cannabis while on District property or while acting on behalf of the Park District, is convicted of a drug related crime, causes financial or physical damage to the Park District property, its employees or patrons as the result of alcohol or drug abuse, or fails to report the use of legal drugs in accordance with this Policy, will be disciplined in accordance with the Disciplinary Action Section of the Park District's Personnel Policy Manual. In addition to or in the alternative, depending on the circumstances as determined by the Park District in its sole discretion, the Park District may require the employee to successfully complete an alcohol and/or drug abuse assistance or rehabilitation program approved for such purposes by the Park District and by a federal, state or local health law enforcement or other appropriate agency. An employee who participates in a treatment program will be expected to meet job performance standards and comply with all rules established by the Park District. Participation in a treatment program will not, in itself, protect the employee from disciplinary actions should job performance remain unsatisfactory.

2. In addition to the examples of misconduct that may subject an employee to disciplinary action contained in this Policy and the Manual, the Park District will discipline an employee up to and including dismissal for the following: (1) if the employee refuses to submit to diagnosis, testing or screening upon request of the Park District; (2) if the employee tampers in any way with the specimen given to the medical facility for purposes of alcohol or drug screening or testing; (3) if the medical facility recommends treatment and the employee refuses to undergo such treatment; (4) if, while undergoing treatment, the employee fails or refuses to follow the course of treatment; (5) if the employee, during the course of or following treatment, is again under the influence of alcohol or drugs in violation of this Policy; or, (6) if the employee fails to

D 

notify the Executive Director of a conviction for violating any federal or state Criminal Drug Statute in accordance with the "Notice of Conviction" section of this policy.

## PRE-EMPLOYMENT SCREENING

As a final prerequisite in the Park District's employment selection procedure, persons otherwise offered a full-time, labor intensive position with the Park District will be required to undertake a physical examination which may include a drug and alcohol screening test.

## INSPECTIONS

In order to assure that employees comply with the prohibition on manufacturing, distributing, dispensing, possessing, or using alcohol, controlled substances, or cannabis, employees may be subject to inspection as follows:

1.     Lockers, desks, files, vehicles, equipment and other containers and property owned or leased by the Park District and which an employee is permitted to use during employment with the Park District, are and remain the property of the Park District. Employees are not permitted to keep controlled substances, cannabis or alcohol in or on such property. Any such property reasonably suspected of having or holding such substances is subject to search by the Park District.

2.     Any refusal to submit to such an inspection will be treated as an act of insubordination and may result in disciplinary action, up to and including dismissal.

## RECORDS

The Park District will maintain medical records relating to alcohol or drug abuse, diagnosis, and treatment confidential and in a file separate from the regular personnel files. Access will be limited to those who need to know. The Park District will not disclose these records to persons outside the Park District without the employee's consent unless disclosure of the records is necessary for legal or insurance purposes.

E     (10)

## CONSENT TO DRUG AND/OR ALCOHOL SCREENING OR TESTING

I hereby voluntarily consent to submit to drug and/or alcohol screening or testing by a physician, clinic, laboratory or medical facility chosen by the Champaign Park District ("Park District") at the Park District's expense. I hereby consent to the physician, clinic, laboratory or medical facility taking and analyzing a sample or specimen of my breath, urine, saliva, blood and other similar substance. I also authorize the physician, clinic, laboratory or medical facility to disclose his, her or its findings, conclusions, and opinions regarding the drug and/or alcohol screening or testing to a Park District official or a designated representative.

I hereby further consent to Park District's contacting my physician or pharmacist to verify my reported use of legal drugs in accordance with the Park District's Alcohol and Drug Abuse Policy and authorize my physician or pharmacist to provide all information requested by the Park District regarding my use of such drugs, including without limitation the possible effects of such use on my performance of my job functions.

I also acknowledge receiving, reading and understanding the Park District's Alcohol and Drug Abuse Policy. I understand that, in accordance with this policy, failure to execute this document and submit to drug and/or alcohol screening or testing, or failure to report to the Park District the use of legal drugs as required by the policy, may result in non-hire or disciplinary action, up to and including termination.

Employee Name: _____
(Print)

Employee Signature: _____

Date: _____

Witness Signature: _____

F 



**Discover the fun!**

The employee who has signed their name below agrees that he/she has received training on the following Champaign Park District policies:

- **SEXUAL HARASSMENT**
- **DRUG FREE WORKPLACE**
- **BLOODBORNE PATHOGENS**
- **PERSONNEL POLICIES**
- **RIGHT-TO-KNOW**
- **VEHICLE USE**
- **EMERGENCY PROCEDURES**
- **WORKPLACE VIOLENCE**
- **LIFTING SAFETY**
- **STATEMENTS OF ADMISSION**
- **INCIDENT/ACCIDENT REPORTS**
- **SAFETY MANUAL**

He/She agrees that during their training they had an opportunity to ask questions after reviewing each policy with the human resources manager and/or risk manager. In addition, paper copies of each policy were available to each individual to take away and read.

Joe Posey                           4/26/04
Signature                           Date

Joe Posey
Name (print)

Champaign Park District
706 Kenwood Road
Champaign, Illinois 61821-4112
217.398.2550 Phone
217.355.8421 Fax
www.champaignparkdistrict.com

Park Commissioners
James A. Barham
Newton H. Dodds
Alvin S. Griggs
Joseph A. Petry
Morgan C. Powell

Officers
Guy C. Hall, *Secretary/Attorney*
Gary Wackerlin, *Treasurer*
Bobbie H. Herakovich, *Executive Director*

12



www.champaignparkdistrict.com

The employee who has signed their name below agrees that he/she has received training on the following Champaign Park District policies:

- **SEXUAL HARASSMENT**
- **DRUG FREE WORKPLACE**
- **BLOODBORNE PATHOGENS**
- **PERSONNEL POLICIES**
- **RIGHT-TO-KNOW**
- **VEHICLE USE**
- **EMERGENCY PROCEDURES**
- **WORKPLACE VIOLENCE**
- **LIFTING SAFETY**
- **STATEMENTS OF ADMISSION**
- **INCIDENT/ACCIDENT REPORTS**

He/She agrees that during their training they had an opportunity to ask questions after reviewing it with the human resources manager and/or risk manager.

_Joseph E. Posey SR_    _7/29/02_
Signature                    Date

_JOSEPH E. POSEY SR_
Name (print)

**Champaign Park District**
706 Kenwood Road
Champaign, Illinois 61821
217.398.2550 Phone
217.355.8421 Fax

**Park Commissioners**
Alvin S. Griggs, *President*
Midge Wallace, *Vice President*
James A. Barham
Newton H. Dodds
Morgan Powell

**Officers**
French L. Fraker, *Secretary-Attorney*
Gary Wackerlin, *Treasurer*
Bobbie H. Herakovich, *General Manager*



STATE OF ILLINOIS
DEPARTMENT OF EMPLOYMENT SECURITY
APPEALS DIVISION
DECISION

**APPEAL DOCKET** AR-5000430A                      **LOCAL OFFICE:** 036

**CLAIMANT:**                                      **EMPLOYER:** (APPELLANT)

    JOSEPH E. POSEY                            CHAMPAIGN PARK DISTRICT
    117 E. ROPER STREET                        % UNEMPLOYMENT CONSULTANTS
    CHAMPAIGN IL 61820                         PO BOX 728
                                               ARLINGTON HTS IL 61820-0728

| | | | |
|---|---|---|---|
| **SOCIAL SECURITY NUMBER:** | 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 | **DATE OF HEARING:** | 01/24/05 |
| **DATE OF APPEAL:** | 12/29/04 | **PLACE OF HEARING:** | SPRINGFIELD |
| **DATE OF RECONSIDERATION:** | 12/29/04 | **DATE OF MAILING:** | 01-27-05 |

**APPEARANCES/ISSUES/EMPLOYER STATUS:** The claimant and the employer appeared and testified at the hearing. The employer was represented by a service company. The issue is: Was the claimant discharged for misconduct connected with work as defined in Section 602A of the Illinois Unemployment Insurance Act? The employer is a party to this appeal.

**FINDINGS OF FACT:** The claimant worked for the employer for approximately two years. He was terminated for allegedly violating the alcohol/drug policy and rules which, among other things, prohibited employees from purchasing, possessing or consuming alcohol during work hours. The employer received an anonymous call that Claimant was seen purchasing alcohol in a convenience store during work hours. He was wearing a Park District uniform and driving its truck. When questioned by the employer, the claimant admitted that he stopped in the store to use the bathroom and purchase a newspaper but denied that he had purchased any alcohol. After being pressed several times, he stated that he had purchased some beer for an acquaintance of his who was "barred" from the store. A co-worker of the claimant's, who waited in the truck while he went into the store, confirmed that he did not have any alcoholic beverages in his possession when he left the store and got back in the truck. Both employees tested negative for alcohol in their systems. The claimant had not been warned previously about any similar violations of the rules.

**CONCLUSION:** Section 602A of "The Unemployment Insurance Act" provides, in part, that an individual shall be ineligible for benefits for the weeks in which he has been discharged for misconduct connected with his work and, thereafter, until he has become reemployed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks. The term "misconduct" means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit.

There was insufficient competent evidence to show that the claimant violated the alcohol policy and rules. His testimony concerning why he finally acquiesced and told the employer that he had purchased alcohol was plausible. He was coerced or mislead into admitting that he had done what was alleged. Had the employer presented testimony from someone who actually observed him purchasing alcohol while on duty, a different result on the misconduct issue would have been reached, however, absent such, the claimant's sworn testimony must be accepted as truthful. A referee must make his decision based on competent evidence in the record. Hearsay, while admissible, is not competent evidence, and it alone cannot form the basis for a decision to disqualify a claimant from receiving benefits. *Digest of Adjudication Precedents*, ABR-86-9483(Sept. 29, 1987), and ABR-85-6855(Feb. 26, 1986), MC 190 15. Additionally, the failure of a party to produce testimony or physical evidence within his control to produce creates a presumption that the evidence, if produced, would have been adverse to him. *Beery v. Breed*, 311 Ill. App. 469 (2nd Dist., 1941). Finally, the claimant's testimony was corroborated, at least in part, by

ILLINOIS DEPARTMENT OF HUMAN RIGHTS, 100 W. RANDOLPH ST. #10-100, CHICAGO, IL 60601

**WHAT THE DEPARTMENT CANNOT DO**

♦ DHR cannot investigate unfair employment actions such as: political affiliations, personality conflicts, sexual orientation, etc., unless such actions are alleged to be for one or more of the reasons (types of discrimination) listed above.

♦ DHR cannot investigate unfair union practices unless such claims involve one or more of the types of discrimination described above.

♦ DHR cannot investigate charges against the federal government. Such a charge can only be filed with the EEO office of the agency alleged to have discriminated.

● DHR cannot investigate employers with fewer than 15 employees, unless the type of discrimination is sexual harassment, retaliation, or handicap.

PLEASE PRINT LEGIBLY.   TODAY'S DATE: 03 - 05 - 05

1.  Your Name: (Mr)/Ms./Mrs.  Joseph Ervin Posey Sr.
    Address  117 East Roper                                Apt # —
    City  Champaign        State  IL        Zip  61820
    Home Phone Number   (217) 355-9311
    Day-Time Phone Number   (217) 390-0435  OR  390-1550

2.  The names of two persons who can contact you in the event this office is unable to locate you. Make sure their mailing addresses are different from your mailing address. Your charge could be dismissed if you do not provide this information and we are unable to locate you.

    A   Name: Mr./(Ms.)/Mrs.  Gwendolyn Posey
        Address  1309 North Champaign St        Apt # —
        City  Champaign        State  IL        Zip  61820
        Phone Number  (217) 351-7485

    B   Name: (Mr.)/Ms./Mrs.  Benny Williams
        Address  106 East Roper                Apt # 1
        City  Champaign        State  IL        Zip  61820
        Phone Number  (217) 369-8691

3.  Write out the full legal name of the Employer, Union, Employment Agency, etc.
    (i.e., the Respondent), that you believe discriminated against you in Illinois.
    Name in Full:  Champaign Park District
    Illinois Address:  706 Kenwood Road
    City  Champaign        State  IL        Zip  61820
    Phone Number  (217) 398-2564        County  Champaign

4.  If you were placed at Respondent by a temporary agency which paid your wages, provide the following information about this company:
    Name in Full:
    Illinois Address:
    City            State            Zip
    Phone Number  (   )              County

IDHR Employment Complaint Information Sheet        2

ILLINOIS DEPARTMENT OF HUMAN RIGHTS. 100 W. RANDOLPH ST. #10-100. CHICAGO. IL 60601

## ISSUE AND BASIS

8a.  Issue (harm):  Discharge _____ Date: _____

Basis (type of discrimination): _____ Racial _____

Reason given for harm by Respondent: ___ Violation of Company Policy ___

Who gave you this information (name/job title)? ___ David Schnieder ___

Explain why you feel you were discriminated against because of the basis identified above. How were others in your situation treated?  Include names and job titles

Mary McGrew-Herrin Kiser, Hr manager stated to
me that I would not be discharged if there was no
alcohol in my blood system. I took the blood test and it
came back neg on 8-24-04. I feel on this basis she fired
due to the fact that I am African American male.

## ISSUE AND BASIS

8b.  Issue (harm): _____ . ____ Date: _____

Basis (type of discrimination): _____

Reason given for harm by Respondent: _____

Who gave you this information (name/job title)? _____

Explain why you feel you were discriminated against because of the basis identified above  How were others in your situation treated?  Include names and job titles.

_____

_____

_____

_____

**Note:**     Use additional pages for any additional issues and bases.

9.   If you wrote **sexual harassment** in your answer to number 8 above, indicate the name and job title of the harasser:

_____

Do you want the harasser charged separately as an additional Respondent?          ____ Yes      ____ No
If yes. give the address and phone number of that person:

10   If you wrote **physical or mental handicap** in your answer to number 8 above, state your medically diagnosable handicap(s):

_____

Explain how the Respondent became aware of each handicap:

_____

State whether you requested any form of accommodation:

_____

What was the Respondent's response:

_____

If you do not have a handicap. but you believe the Respondent acted because it perceives you as handicapped. explain:

_____

IDHR Employment Complaint Information Sheet          4

ILLINOIS DEPARTMENT OF HUMAN RIGHTS, 100 W. RANDOLPH ST. #10-100, CHICAGO, IL 60601

| OFFICE USE ONLY | | | | | | |
|---|---|---|---|---|---|---|
| Control Number: | | | Date: | | Investigator: | |
| CIS Complete | Y | N | #6 15 empl in IL exc sh & hand | | Y | N |
| #3 RP in IL | Y | N | #8 D/H ≤ 180 | Y    N | | |
| #3 RP not fed | Y | N | Checked by: | | | |

5.  A.  Type of Respondent that you believe discriminated against you in Illinois:

_____ Private Company                          Government Agency (specify):

_____ Employment Agency                     _____ Federal

_____ Educational Institution                 _____ State
        _____ Public        _____ Private
                                                          _____ County
_____ Union
                                                          ☒ City

   B.  What is the nature of the business of the Respondent?

_____ Retail (specify) _____

☒ Government (specify) _____Park District_____

_____ Manufacturing (specify) _____

_____ Health Care (specify) _____

_____ Other (specify) _____

6.  Does the Respondent have a total of 15 or more people working in the State of Illinois?
    (Consider all locations)
    ✓ Yes                                    _____ No

    (approximate total number in IL     ? )

    Does the Respondent have a total of 15 or more people working in the United States?

    ✓ Yes                                    _____ No

7.  Does the Respondent named in question #3 now employ you?

    _____ Yes                               ✓ No

    If you have been employed by the Respondent named in question #3, provide the following information:

    Job Title _Landscaper_                    Date Hired _July – 2001_

    Were you on probation? _____ Yes          ☒ No

    Present or last salary _8.50_             Per _Hour_

    Department _Landscape_                    Supervisor _Dennis Stukey_

8.  In the spaces below, please indicate each issue (harm) and basis (type of discrimination) which you would like the Department to investigate.  Note: the bases (types of discrimination) which the Department can investigate are listed on the second page of this form.  Some common issues (harms) are:

    Failure to Hire          Discharge                     Demotion
    Layoff                   Harassment                    Failure to Promote
    Transfer                 Unequal Pay                   Failure to Recall
    Other (specify)          Job Eliminated                Warning
                             Failure to Accommodate        Suspension
                             (handicap and religion only)

    Please take your time and complete all the information requested for each issue and basis alleged, so that we can serve you better.  Fill in a separate section for each issue and basis.

IDHR Employment Complaint Information Sheet                3

ILLINOIS DEPARTMENT OF HUMAN RIGHTS, 100 W. RANDOLPH ST. #10-100, CHICAGO, IL 60601

11    If you wrote national origin or citizenship status in your answer to number 8 above, do you think the Federal Immigration Reform and Control Act of 1986 influenced your employer's actions? If so, explain:

12    If you wrote retaliation in your answer to number 8 above, state how you opposed unlawful discrimination (i.e., testified at a discrimination hearing, filed a prior discrimination claim, or complained about unlawful discrimination). Include dates, charge numbers, and/or the name or title of the person to whom you complained.

13    If there are witnesses that the Department should contact, who can support your claim of discrimination, state their names, addresses and phone numbers and the pertinent information each witness can provide

Name:    Clinton Andrews

Address:    IN. Kirkwood, Champaign, IL 61821

Phone No. (217) 598-9544

Information:    The claimant's testimony was corroborated by Clinton.

Name:

Address:

Phone No. (    )

Information:

Name:

Address:

Phone No. (    )

Information:

14.    Do you have any documents to support your claim of discrimination?
       X Yes    ___ No

15.    Have you tried to resolve your situation through a grievance procedure?
       X Yes    ___ No    If yes, with whom? Department of Employment Security Appeals Division

Briefly describe your actions and the results thus far: During a telephone interview Mrs. McGrew stated that I was fired due to the violation. The referee decided it was for Reasons other than misconduct.

16    Have you filed a previous charge against this employer with this Department?
       ___ Yes    X No    If yes, when?

Charge Number

17.    Have you filed a charge regarding this situation with any other Agency?    ___ Yes    X No

EEOC:    ___ Yes    X No    If yes, when?

OTHER:    Specify:

       ___ Yes    X No    If yes, when?

18.    PERSONAL DATA:

We need some information for statistical purposes. Please provide the following information:

Date of Birth    10 / 26 / 1954    Sex Male

IDHR Employment Complaint Information Sheet    5

ILLINOIS DEPARTMENT OF HUMAN RIGHTS. 100 W. RANDOLPH ST. #10-100. CHICAGO. IL 60601

Circle the category in the list below of national origin or ancestry with which you most strongly identify:

| | | |
|---|---|---|
| Greece = B | Liberia = R | U.S.A. = U |
| Haiti = T | Mexico = M | Vietnam = V |
| India = N | Middle East = L | Other African/Non-Arab = F |
| Ireland = I | Pakistan = K | Other East Asia = W |
| Italy = Y | Philippines = S | Other Eastern Europe = E |
| Japan = J | Poland = O | Other Hispanic = H |
| Korea = A | Puerto Rico = P | Other = Z* |
| *Specify: | | |

19. Please specify how you learned of our office  This information will be used to enable us to serve the  public better:

I certify that this information is true and correct to the best of my knowledge

I understand this information sheet is not a charge

Signature: _____    Date: 3-08-05

CIS-employment (1/02)

IDHR Employment Complaint Information Sheet        6



**CHRISTIE**

**Breath Alcohol Testing**
**Consent and Release Form**

*Occupational Health*
*Services Department*
217.366.1310

<u>CHRISTIE CLINIC ASSOCIATION</u>
Christie on Windsor
1801 West Windsor Road
Champaign, IL 61821
217.366.8000

---

*To be completed by Breath Alcohol Technician*

Employee name   JOSEPH POSE.J

SS#/Employee ID#   352 - 48 - 8114

Employer number   _____

Employer address   Champaign Park District
                   706 Kenwood Rd
                   Champaign, Ill 61821

*attn: Karla Shelton*
*398 2550*

*To be completed by Employee*

I certify that I am willingly submitting to breath alcohol testing for the purposes of complying with my employer's Drug Free Workplace Program. I consent to the release of these results to my employer only.

Joseph Posy SR          8/24/04
Employee signature              Date

CL Holdcraft, RN          8/24/04
Witness signature              Date

*Statement of Breath Alcohol Technician*

I certify that I have conducted breath alcohol testing on the above named individual in accordance with my certification, and that the results are as recorded:

Test # 0575   Test date and time          Results

011186   RBT IV   08/24/04  11:29 Am   .000

---

```
RBT
DATE 08-24-04
TEST NO  0575
     ID#
352488114
AS IV# 007224
SCREENING
G/210L    TIME
000        :29
```

CL Holdcraft, RN          8/24/04
Breath Alcohol Technician Signature          Date

---

1. Chart    2. Patient    3 Employer          4919 2/98

**E-FILED**
Monday, 16 April, 2007  03:58:13 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D



**Discover the fun!**

The employee who has signed their name below agrees that he/she has received training on the following Champaign Park District policies:

- **SEXUAL HARASSMENT**
- **DRUG FREE WORKPLACE**
- **BLOODBORNE PATHOGENS**
- **PERSONNEL POLICIES**
- **RIGHT-TO-KNOW**
- **VEHICLE USE**
- **EMERGENCY PROCEDURES**
- **WORKPLACE VIOLENCE**
- **LIFTING SAFETY**
- **STATEMENTS OF ADMISSION**
- **INCIDENT/ACCIDENT REPORTS**
- **SAFETY MANUAL**

He/She agrees that during their training they had an opportunity to ask questions after reviewing each policy with the human resources manager and/or risk manager. In addition, paper copies of each policy were available to each individual to take away and read.

_____     4/26/04
Signature                          Date

Joe Posey
Name (print)

Champaign Park District          Park Commissioners          Officers
706 Kenwood Road                 James A. Barham             Guy C. Hall. *Secretary/Attorney*
Champaign, Illinois 61821-4112   Newton H. Dodds             Gary Wackerlin. *Treasurer*
217.398.2550 Phone               Alvin S. Griggs             Bobbie H. Herakovich, *Executive Director*
217.355.8421 Fax                 Joseph A. Petry
www.champaignparkdistrict.com    Morgan C. Powell

**E-FILED**
Monday, 16 April, 2007  03:58:36 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

## 6-6    ACTING IN PARK DISTRICT'S INTERESTS

You are expected to act and conduct yourself at all times in the best interest of the Park District.

**E-FILED**
Monday, 16 April, 2007  03:58:48 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT F

**6-11    SOBRIETY AND SUBSTANCE ABUSE**

Employees are expected and required to report to work on time and in an appropriate mental and physical condition for work. To do so, employees must not have alcohol or illegal drugs in their system. Violators may be subject to disciplinary action, up to and including dismissal.

At no time during your service to the Park District should you be under the influence or in the possession of alcohol or illegal drugs during working hours. If you work on or near vehicles or machinery, handle hazardous materials or substances of any kind, or have public safety

Adopted by the Champaign Park District          51
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

**E-FILED**
Monday, 16 April, 2007  03:59:01 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT G

7-2    <u>GENERAL SAFETY POLICY AND RULES</u>

Safety while on the job is the responsibility of every Park District employee. With proper precautions, most accidents on the job can be prevented. It is every employee's responsibility to know and comply with all health and safety policies, rules and regulations, and to act in a safe manner. Carelessness, inattention, neglect and disregard for safety rules cause accidents. Therefore, you must at all times be careful, attentive, alert, and follow proper safety procedures. The Park District will not condone any breach of safety rules or regulations by employees. You are expected to be alert for safety hazards that may exist and could affect the general public or employees of the Park District. You are also responsible for reporting any unsafe equipment or condition to your immediate supervisor immediately upon your discovery of such condition. We must all work together to achieve a safe and healthy working environment. You should make certain that you do not create safety hazards and that safety hazards are eliminated.

It is the intent of the Park District to provide a safe working environment for you and a safe leisure environment for the public using our programs, facilities and parks. It is also the intent of the Park District to develop, implement and administer a safety and comprehensive loss control program. In all assignments, the health and safety of all persons should be the first consideration.

You are directed to make safety a matter of continuing and mutual concern, equal in importance with all other operational considerations. You should use your best efforts to ensure that work is done in a safe manner, inspections are conducted on a regular basis, hazards are confronted and removed and accidents are investigated as appropriate. We are confident that with your help this program will be successful and we expect your cooperation and support. Accordingly, all employees shall adhere to the following rules.
1. Horseplay and fighting will not be tolerated in the work place.
2. Possession of unauthorized firearms, alcoholic beverages, illegal drugs or unauthorized medically prescribed drugs will not be tolerated in the work place.
3. Your immediate supervisor must be informed if you are required to take medication during work hours which may cause drowsiness, alter judgment, perception or reaction time. Written medical evidence stating that the medication will not adversely affect your decision-making or physical ability may be required. Please refer to Section 6-11 and review the comprehensive Alcohol and Drug Abuse Policy in Appendix A
4. Your immediate supervisor must be notified of any permanent or temporary impairment that reduces your ability to perform in a safe manner or prevent or hinder your performance of the essential functions of your position.

Adopted by the Champaign Park District                    59
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

5.  Personal protective equipment must be used when potential hazards cannot be eliminated.
6.  Equipment is to be operated only by trained and authorized personnel.
7.  Periodic inspections of workstations may be conducted to identify potential hazards and to ensure that equipment or vehicles are in safe operating condition.
8.  Any potentially unsafe conditions or acts are to be reported immediately to your immediate supervisor.
9.  If there is any doubt about the safety of a work method, your immediate supervisor should be consulted before beginning work.
10. All accidents, near misses, injuries and property damage must be reported to your immediate supervisor, regardless of the severity of the injury or damage.
11. Failure to report an accident or known hazardous condition may be cause for disciplinary action up to and including dismissal.
12. All employees must follow recommended work procedures outlined for their job, department and/or facility.
13. Employees are responsible for maintaining an orderly environment. All tools and equipment must be stored in a designated place. Scrap and waste material are to be discarded in a designated refuse container.
14. Any smoke, fire or unusual odors must be reported promptly to your immediate supervisor.
15. If you create a potential slip or trip hazard, correct the hazard immediately or mark the area clearly before leaving it unattended.
16. Personnel shall use seat belts while operating Park District trucks and automobiles on public roadways in accordance with state law. Personnel shall use seat belts while operating vehicles which have rollover protection at all times.

17. Employees who operate vehicles must obey all driver safety instructions and comply with traffic signs, signals and markers and all applicable laws.
18. Employees who are authorized to drive are responsible for having a valid driver's license for the class of vehicle they operate. You must report revocation or suspension of your driver's license to your immediate supervisor.
19. All employees must know departmental rules regarding accident reporting, evacuation routes and fire department notification.
20. Departmental and facility rules and procedures specific to departmental operations must be followed by each employee in the department.
21. Employees must assist and cooperate with all safety investigations and inspections and assist in implementing safety procedures as required.

**E-FILED**
Monday, 16 April, 2007  03:59:19 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT H

**Appendix A**

## ALCOHOL AND DRUG ABUSE POLICY

**PURPOSE**
The Champaign Park District has implemented this policy in response to overwhelming evidence that alcohol and drug abuse has a detrimental impact on employees' health, job performance, safety, and efficiency. Since Park District employees operate, supervise and maintain parks, facilities, programs, and equipment for use by members of the public and perform services that may have a direct effect on the health and safety of members of the public and fellow employees, the Park District wishes to assure the health and safety of its patrons and employees

This policy also expresses the Park District's desire to satisfy the requirements of the federal and state Drug Free Workplace Acts (41 U.S.C.A. § 701 et seq. and 30 ILCS 580/1 et seq.). In accordance with these statutes and concerns, the Park District has resolved to maintain a drug free workplace.

The purpose of this policy is to inform employees of the Park District's investigation, treatment and disciplinary policy relating to alcohol and drugs. As such, **all** Park District employees will abide by its terms. As with all policies in this Manual, this policy is subject to periodic addition, modification, or deletion

This policy does not replace any of the provisions or requirements of the Park District's Controlled Substance and Alcohol Testing Policy for positions that require a Commercial Driver's License (CDL). See Appendix B.

Park District employees who operate Park District commercial motor vehicles and possess a commercial driver's license have special responsibilities necessitated by the fact that they operate vehicles that require additional skill and attentiveness over that of non-commercial motor vehicles. As part of its continuing commitment to safety and to comply with federal law, the Park District has established a controlled substance and alcohol testing policy for Park District positions that require a commercial driver's license ("CDL Testing Policy"). Both the Park District and the federal government recognize that it is important to establish programs to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles. The CDL Testing Policy is in addition to and supplements and complements rather than supersedes all other Park District policies, rules, procedures, and practices, including without limitation this Alcohol and Drug Abuse Policy. However, for persons to whom the CDL Testing Policy applies, in the event of any conflict between any of the provisions of the CDL Testing Policy and the provisions of any other Park District policy, rule, procedure, or practice, the provisions of the CDL Testing Policy will control.

**ACTS PROHIBITED**
The unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance, including cannabis and alcohol, is prohibited on Park District Property or while acting on behalf of the Park District.

**DEFINITIONS**
For purposes of this Policy, the following definitions apply:

A

1. **"Alcohol"** means any substance containing any form of alcohol, including but not limited to: ethanol, methanol, propanol and isopropanol.

2. **"Cannabis"** is defined as provided in the Cannabis Control Act (720 ILCS 550/1 *et seq*.) which provisions are specifically incorporated in this Policy by reference.

3. **"Controlled Substance"** means a controlled substance in schedules I through V of section 812 of Title 21 of the United States Code, which provisions are specifically incorporated in this Policy by reference.

4. **"Criminal Drug Statute"** means a criminal statute involving the manufacture, distribution, dispensation, possession, or use of any controlled substance or cannabis.

5. **"Executive Director"** is the Executive Director of Parks and Recreation of the Champaign Park District.

6. **"District Property"** means any building, park, gym, pool, office, common area, open space, vehicle, parking lot, or other area owned, leased, managed, used or controlled by the Park District.  District Property also includes property used by Park District patrons while on Park District sponsored events or field trips or property of others when presence thereon by the Park District employee is related to employment with the Park District.

7. **"Drugs"** mean Legal Drugs and controlled substances, including cannabis.

8. **"Legal Drugs"** mean prescription drugs and over-the-counter drugs which have been obtained legally and are being used in the manner and for the purpose for which they were prescribed or manufactured.

9. **"Medical Facility"** means any physician, laboratory, clinic, hospital, or other similar entity.

10. **"Policy"** means this Alcohol and Drug Abuse Policy of the Champaign Park District.

11. **"Possess"** means to have either in or on an employee's person, personal effects, desk, files, or other similar area.

12. **"Public Safety Responsibility"** means a position in which the nature of an employee's duties is such that impaired perception, reaction time, or judgment may place a member or members of the public or other employees at risk of serious bodily harm, or is responsible for the administration or enforcement of alcohol/drug policies.

13. **"Under the Influence"** means that the employee is affected by alcohol or drugs in any determinable manner. A determination of being under the influence can be established by a professional opinion, a scientifically valid test, a layperson's opinion, or the statement of a witness.

## VOLUNTARY TREATMENT
It is the responsibility of each employee to seek assistance before alcohol or drug problems lead to disciplinary action. The Park District will not discipline an employee who voluntarily seeks treatment for a substance abuse problem if the employee is not in violation of the Park District's drug and alcohol policy or other rules of conduct. Seeking such assistance will not be a defense for violating the Park District's drug and alcohol policy, nor will it excuse or limit the employee's

B

obligation to meet the Park District's policies, rules of conduct, and standards including, but not limited to, those regarding attendance, job performance, and safe and sober behavior on the job. Employees who suffer from alcohol or drug abuse are encouraged to consult voluntarily with Park District management and undergo appropriate medical treatment. Participation in such treatment will be at the employee's expense, although some of these expenses may be covered under the employee's group health plan. Please see the Human Resources Manager for details. Park District management will attempt to keep such voluntary discussions and medical treatment confidential in accordance with this Policy

## SCREENING AND TESTING

The Park District may require employees whose job functions require them to operate or maintain vehicles or machinery, handle hazardous or toxic materials or substances of any kind, or have Public Safety Responsibility to be screened or tested on a random basis, or may require **any employee** to be screened or tested following a work place accident involving a possible violation of safety rules, during and after an employee's participation in an alcohol or drug counseling or rehabilitation program, or upon **reasonable suspicion** that the employee is under the influence of alcohol or drugs. The screening or testing will be conducted by a medical facility selected by the Park District at the Park District's expense. The screening or testing may require an analysis of the employee's breath, urine and/or blood or such similar substance as the medical facility may recommend. Employees who undergo alcohol or drug screening or testing will be given the opportunity, prior to the collection of a specimen or other testing, to disclose the use of legal drugs and to explain the circumstance of their use. If an initial test is positive, a second test will be conducted from the same sample. A confirmed positive drug and/or alcohol test may result in disciplinary action, up to and including discharge.

Each Park District employee is required to sign a consent form, a copy of which is included with this Policy, at the time this Policy is distributed to the employee. Prospective employees applying for positions that require a commercial driver's license will be required to sign a consent form prior to taking the pre-employment drug screening. Prospective employees for positions that require a pre-employment physical will be required to sign a consent form prior to taking the pre-employment physical.

Each employee and prospective employee may also be required to sign a separate consent form requested by the Medical Facility conducting the screening or testing. Refusal to sign any requested consent form will result in non-hire or disciplinary action up to and including dismissal, as deemed appropriate by the Park District, in its sole discretion, under the circumstances.

## TREATMENT

If the medical facility recommends treatment, the Park District may, depending on the circumstances as determined in the sole discretion of the Park District, give the employee one opportunity to undergo treatment offered by a clinic or trained professional mutually acceptable to the Park District and employee.

Participation in such treatment will be at the employee's expense. The employee must enter the treatment program within ten (10) days from the time of recommendation of treatment. The Park District may reinstate the employee provided that the employee submits a statement issued by the medical facility certifying successful completion of the treatment program, that the employee is released to return to work, and that the employee agrees to all conditions of reinstatement as determined by the Park District, which may include, but is not limited to, future alcohol and/or drug testing.

C

**USE OF LEGAL DRUGS**
Any employee who operates or maintains a vehicle or machinery, handles hazardous materials or substances of any kind, or has public safety responsibility and who has taken a legal drug must report the use of such legal drug to their immediate supervisor if the legal drug may cause drowsiness or if it may alter judgment, perception or reaction time. The burden is on the employee to ascertain from the employee's doctor or pharmacist whether or not the legal drug may have such a potential side effect. The information will be retained by the Park District in a confidential manner and will be disclosed only to persons who need to know. The employee's immediate supervisor, after conferring with the department head or Executive Director, will decide whether or not the employee may safely continue to perform the job while using the legal drug. Failure to declare the use of such legal drugs may be cause for discipline up to and including dismissal.

**NOTICE OF CONVICTIONS**
Any employee who is convicted of violating any federal or state criminal drug statute must notify the Executive Director within five (5) days of such conviction. For purposes of this notice requirement, a conviction includes a finding of guilt, a no contest plea, and/or an imposition of sentence by any judicial body for any violation of a criminal statute involving the unlawful manufacture, distribution, sale, dispensation, possession or use of any controlled substance or cannabis. Failure to notify the Executive Director may subject the employee to disciplinary action, up to and including dismissal.

**DISCIPLINE/PENALTIES FOR VIOLATION**
1.      An employee who reports to work or is found during working hours to be or to have been under the influence of alcohol, controlled substances, or cannabis or who manufactures, possesses, uses, sells or dispenses alcohol, controlled substances, or cannabis while on District property or while acting on behalf of the Park District, is convicted of a drug related crime, causes financial or physical damage to the Park District property, its employees or patrons as the result of alcohol or drug abuse, or fails to report the use of legal drugs in accordance with this Policy, will be disciplined in accordance with the Disciplinary Action Section of the Park District's Personnel Policy Manual. In addition to or in the alternative, depending on the circumstances as determined by the Park District in its sole discretion, the Park District may require the employee to successfully complete an alcohol and/or drug abuse assistance or rehabilitation program approved for such purposes by the Park District and by a federal, state or local health law enforcement or other appropriate agency. An employee who participates in a treatment program will be expected to meet job performance standards and comply with all rules established by the Park District. Participation in a treatment program will not, in itself, protect the employee from disciplinary actions should job performance remain unsatisfactory.

2.      In addition to the examples of misconduct that may subject an employee to disciplinary action contained in this Policy and the Manual, the Park District will discipline an employee up to and including dismissal for the following: (1) if the employee refuses to submit to diagnosis, testing or screening upon request of the Park District; (2) if the employee tampers in any way with the specimen given to the medical facility for purposes of alcohol or drug screening or testing; (3) if the medical facility recommends treatment and the employee refuses to undergo such treatment; (4) if, while undergoing treatment, the employee fails or refuses to follow the course of treatment; (5) if the employee, during the course of or following treatment, is again under the influence of alcohol or drugs in violation of this Policy; or, (6) if the employee fails to

D

notify the Executive Director of a conviction for violating any federal or state Criminal Drug Statute in accordance with the "Notice of Conviction" section of this policy.

## PRE-EMPLOYMENT SCREENING

As a final prerequisite in the Park District's employment selection procedure, persons otherwise offered a full-time, labor intensive position with the Park District will be required to undertake a physical examination which may include a drug and alcohol screening test.

## INSPECTIONS

In order to assure that employees comply with the prohibition on manufacturing, distributing, dispensing, possessing, or using alcohol, controlled substances, or cannabis, employees may be subject to inspection as follows:

1.      Lockers, desks, files, vehicles, equipment and other containers and property owned or leased by the Park District and which an employee is permitted to use during employment with the Park District, are and remain the property of the Park District. Employees are not permitted to keep controlled substances, cannabis or alcohol in or on such property. Any such property reasonably suspected of having or holding such substances is subject to search by the Park District.

2       Any refusal to submit to such an inspection will be treated as an act of insubordination and may result in disciplinary action, up to and including dismissal.

## RECORDS

The Park District will maintain medical records relating to alcohol or drug abuse, diagnosis, and treatment confidential and in a file separate from the regular personnel files. Access will be limited to those who need to know. The Park District will not disclose these records to persons outside the Park District without the employee's consent unless disclosure of the records is necessary for legal or insurance purposes.

E

**E-FILED**
Monday, 16 April, 2007  03:59:30 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT I

**8-2**    <u>**EXAMPLES OF REASONS FOR DISCIPLINARY ACTION**</u>

You may be warned, suspended, and/or dismissed whenever it is determined, in the Park District's sole discretion, to be in its best interests. Nevertheless, listed below are some examples of reasons for disciplinary action. This list, however, does not constitute an exhaustive list of all of the acts that may subject you to disciplinary action including discharge and does not change the employment-at-will relationship between the employee and the Park District. Instead, the following list sets forth some of the more typical cases that arise in the course of an employment relationship. They include but are not limited to:

1.    Failure to adhere to Park District policies and/or procedures including without limitation safety policies, ordinances and procedures.
2.    Absence from duty without permission, habitual tardiness, excessive absenteeism, or misrepresentation of material facts relating to the use of leave.
3.    Extending breaks or lunches and/or not taking breaks or lunches at scheduled times.

Adopted by the Champaign Park District              64
Board of Commissioner on April 10, 2002
Revision adopted on September 10, 2003

4.    Leaving job during working hours without permission.

5.    Failure to obey any lawful official rule, regulation or order, or failure to obey any proper direction made or given by your supervisor(s).

6.    Inability or unwillingness to take orders from supervisor(s).

7.    Uncooperative, hostile or discourteous attitude or conduct toward your supervisor(s), the Board, co-workers or members of the public or threatening or striking any person who is in or on Park District property or participating in Park District activities.

8.    Being wasteful of or the willful destruction of Park District supplies, materials, vehicles, equipment, tools, working time or other Park District property.

9.    Failure to wear uniform or safety equipment (e.g., safety shoes, glasses, goggles and/or face shield) as required by this Manual and/or department manuals, rules and/or procedures or the failure to wear appropriate clothing for duties as required by this Manual or department manual, rules and/or procedures.

10.    Endangering one's safety and/or the safety of others because of failure to act properly and safely in the performance of job duties.

11.    Failure to follow any federal, state, local or Park District law, rule or regulation while on duty or while in or on Park District property or engaging in criminal activity while on duty or while in or on Park District property.

12.    Failing to report an accident or known hazardous conditions to your immediate supervisor.

13.    Gambling or fighting while on duty.

14.    Being under the influence or possession of intoxicants or illegal drugs while on duty or on Park District property or failing to notify the Park District that you are taking legal drugs when such notice is required.

15.    Theft or misappropriation or the careless, negligent or improper use of funds or property belonging to the Park District, fellow employees or the public.

16.    Possession of weapons in or on Park District property or while on duty.

17.    Felony conviction.

18.    Incompetent, inefficient or negligent performance of duties; inability or failure to perform duties properly.

19.    Failure to maintain valid drivers license or other license or certification which may be required for your position or as provided in this Manual.

20.    Smoking in restricted areas.

21.    Harassment of other employees or members of the public.

22.    Dishonesty; lying to Park District personnel or falsifying or providing misleading information on forms, records or reports provided to or on behalf of the Park District including without limitation accident reports, employment applications/resumes, financial reports, reimbursement reports and departmental reports.

23    Time card or any work record violations.

24    Unauthorized possession, use or copying of any records that are the property of the Park District.

25    Sleeping on duty

26.    Violation of employee policies, rules or guidelines or engaging in any conduct determined by the Park District in its sole discretion not to be in its best interests

27.    Any violation of policies or procedures regarding the privacy of individualy identifiable health information (or protected health information), as mandated by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and as defined by the U.S. Department of Health and Human Services, pursuant to regulations thereunder. as amended from time to time

**E-FILED**
Monday, 16 April, 2007  03:59:49 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT J



**Discover the fun!**

August 24, 2004

Joseph Posey
117 E. Roper
Champaign, IL 61820

Dear Joe.

This letter is to inform you of your termination from employment with the Champaign Park District effectively immediately.

At 10 a.m. today with Dennis Shiley, Mary McGrew, and myself as witnesses you admitted that you stopped at the Circle K on Neil Street across from the Post Office at approximately 8:30 a.m. to buy a Chicago Tribune. You admit you were approached outside the store by an acquaintance that was "barred out" from the store. The acquaintance gave you some money to purchase alcohol for him. You agree that you purchased the alcohol and gave it directly the person as you left the store. You do not deny that you were in District uniform, on District time, and driving a District vehicle when this incident occurred.

Your actions put you in direct violation of District policy. See Personnel Manual section 8-2, #4 and #14, and Appendix A, Alcohol and Drug Abuse Policy. Therefore, effective today, your employment with the District is terminated.

Sincerely,

David Schneider
Maintenance Supervisor

CC.    Posey Personnel File

**Champaign Park District**
706 Kenwood Road
Champaign, Illinois 61821-4112
217.398.2550 Phone
217.355.8421 Fax
www.champaignparkdistrict.com

**Park Commissioners**
James A. Barham
Newton H. Dodds
Alvin S. Griggs
Joseph A. Petry
Morgan C. Powell

**Officers**
Guy C. Hall, *Secretary/Attorney*
Gary Wackerlin, *Treasurer*
Bobbie H. Herakovich, *Executive Director*

**E-FILED**
Monday, 16 April, 2007  03:59:59 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT K

**8-4    REVIEW OF DISMISSAL**

The decision to dismiss you shall be final unless you request a review of your dismissal by submitting a written request to the Executive Director within five (5) working days from the date the action was taken. The Executive Director or a designee may meet with you and investigate the circumstances surrounding your dismissal. The Executive Director or the designee(s) should issue a written determination within ten (10) working days of receipt of your written request. The Executive Director's decision shall be final.

If you are a department head who has been dismissed, you may make a request to the President of the Board ("President") to have your dismissal reviewed by the Board. The Executive Director's decision to dismiss you shall be final unless you submit a written request for review of dismissal to the President within (5) working days from the date the action was taken. The President and the Board may meet with you and investigate the circumstances surrounding your dismissal. The President on behalf of the Board should issue a written determination within ten (10) working days of receipt of your written request. The Board's decision shall be final.

Nothing in this section 8-4 shall limit or restrict the Park District's right to dismiss an employee at any time, with or without cause.

**The Park District's failure to strictly adhere to the time limits or the procedure in this section 8-4 shall not affect the resolution of any disciplinary action.** This procedure will be followed to the extent that it is, in the Park District's sole discretion, practicable. The Park District reserves the right to proceed directly to the Executive Director's or the designee's review of an employee's dismissal.

**E-FILED**
Monday, 16 April, 2007  04:00:32 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT L

LEXSEE 1999 U.S. DIST. LEXIS 18630



Positive
As of: Apr 12, 2007

**DONTAE ALLEN, Plaintiff v. DOMINICK'S FINER FOODS, INC., Defendant.**

No. 98 C 3320

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 18630*

**November 24, 1999, Decided
November 26, 1999, Docketed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted. Judgment entered on favor of defendant and against plaintiff.

**COUNSEL:** DONTAE ALLEN, plaintiff, Pro se, Chicago, IL.

For DOMINICKS FINER FOODS, INC., defendant: John P. Lynch, Ian Howard Fisher, Latham & Watkins, Chicago, IL.

**JUDGES:** Elaine E. Bucklo, United States District Judge.

**OPINION BY:** Elaine E. Bucklo

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Dontae Allen alleges racial discrimination under *42 U.S.C. § 2000e-1 et seq.*, and in violation of *42 U.S.C. § 1981*. The defendant moves for summary judgment. For the following reasons, the motion is granted.

#### I. Background

Plaintiff Dontae Allen ("Mr. Allen") was hired by the defendant Dominick's Finer Foods ("Dominick's") in early 1989 as a utility clerk. He also held the position of stock clerk and was promoted to night crew chief within his first year of employment. Mr. Allen later voluntarily reverted to a clerk position. Plaintiff had no employment

contract and no set term of employment. On December 23, 1997, Mr. Allen purchased beer and cookies while working the night shift at Dominick's. The security guard, who was standing [*2] at the checkout counter, handed the bag to Mr. James Fulton, a minor and co-worker of Mr. Allen. The manager on site took the beer from Mr. Fulton, reported the incident to the store manager, and filed a report. On January 5, 1998, Mr. Allen was terminated. Defendant's stated reason for terminating Mr. Allen was because he purchased alcohol for a minor while at work.

Mr. Allen filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") on February 13, 1998 and received a right-to-sue letter on April 24, 1998. Plaintiff filed a complaint in this court on May 29, 1998 alleging race discrimination under Title VII, *42 U.S.C. § 2000e-1 et seq.*, and *42 U.S.C. § 1981* based on wrongful termination, retaliation, and harassment. The grounds for Mr. Allen's claims was a series of alleged racial slurs and incidents of harassment.

#### II. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Lexington Ins. Co. v. Rugg & Knopp, 165 F.3d 1087, 1090 (7th Cir. 1999)*. [*3] When considering a motion for summary judgment, the court may review the entire record, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. *Cornfield by Lewis v. School Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993)*. The party opposing the motion, however, must make a showing sufficient to

establish any essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Since Mr. Allen is proceeding *pro se*, I will also construe the allegations in his pleadings and the record liberally. *Haines v. Kerner, 404 U.S. 519, 520-1, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1994); Kincaid v. Vail, 969 F.2d 594, 598 (7th Cir. 1992).*

III. Title VII and § 1981 Claims concerning Mr. Allen's

Termination

Under Title VII, it is unlawful for an employer "to discharge any individual ... because of such individual's race." *42 U.S.C. § 2000e-2*(a)(1) (1988). *42 U.S.C. § 1981* protects unlawful discrimination in contractual relationships. n1 [*4] Mr. Allen asserts the same claims and set of facts for both cases, so I treat the two claims together since "although § 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne Indiana, 91 F.3d 922, 940 (7th Cir. 1996).*

> n1 It is an open question whether § 1981 applies in the employment at will context. *See, e.g., Riad v. 520 S. Michigan Avenue Associates Ltd., 78 F. Supp. 2d 748, 1999 U.S. Dist. LEXIS 14851, 1999 WL 754573 (N.D. Ill. 1999)*(acknowledging split of authority and holding that § 1981 protects at-will employees). Nonetheless, I do not need to decide this issue to decide this motion.

A.

A plaintiff may present direct or indirect evidence to demonstrate unlawful race discrimination. Direct evidence is that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Greenslade v. Chicago Sun-Times, Inc., 112 F.3d 853, 863 (7th Cir. 1997)* [*5] (internal citation omitted). Once the prima facie case has been made, "the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account." *Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997)*(internal citations omitted).

The direct "evidence" offered by Mr. Allen consists of his allegations that various employees directed racial slurs at him and in his presence. Mr. Allen cannot rest on his pleadings alone, and must do more than simply "show there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Aside from his EEOC complaint and his pleadings, the only direct evidence of discrimination in the record consists of Mr. Allen's deposition testimony offered as an exhibit by the defendant. *Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988)*(reliance on the pleadings alone is not sufficient to withstand summary judgment).

Although Mr. Allen alleges continual racial slurs over the course of [*6] his employment, he could only recall with specificity three incidents in which the defendant's employees directed racial epithets toward him. Two of these incidents involved employees who were subordinate to Mr. Allen and outside of the decision-making process. However, it is well settled that statements made by non-decision-makers are not probative of the decision-maker's intent. *Testerman v. EDS Technical Products Corp., 98 F.3d 297, 301 (7th Cir. 1996).* Therefore, I must reject plaintiff's attempt to use these statements as direct evidence of discrimination. *Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391 (7th Cir. 1997)*(rejecting low-level supervisor's statement as direct evidence of discrimination where supervisor had no influence over personnel decision).

Mr. Allen also claims that a Dominick's manager made racial slurs in front of another manager. Although the manager in question and the defendant deny the use of racial slurs, Mr. Allen himself acknowledges that the manager was reprimanded for yelling at Mr. Allen. In addition, "before seemingly stray remarks will qualify as direct evidence of discrimination, the plaintiff must show that [*7] the remarks 'were related to the employment decision in question.'" *Fuka v. Thomson Consumer Electronics, 82 F.3d 1397, 1403 (7th Cir. 1996).* This manager was not at the store the night of the incidents which led to Mr. Allen's termination, and Mr. Allen does not allege that he played any role in his discharge. Thus, Mr. Allen is unable to demonstrate a sufficient nexus between these remarks and his termination, and there is no evidence in the record linking the derogatory comments to his termination. In sum, Mr. Allen cannot establish direct evidence from which a reasonable juror could conclude that the impermissible factor of race played a role in his firing.

B.

In the absence of direct evidence, a plaintiff must abide by the formula for proving discrimination by circumstantial evidence first set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See also Yarbrough v. Tower Oldsmobile, Inc., 789 F.2d 508, 511 (7th Cir. 1986)*(the *McDonnell Douglas* burden-shifting scheme is

applicable to discrimination suits under § 1981) To establish a prima facie case of discriminatory discharge, [*8] Mr. Allen must present evidence that (1) he belongs to a protected class (in this case, a racial minority); (2) he was performing his job satisfactorily; (3) he suffered an adverse employment decision; and (4) the employer treated similarly-situated white employees more favorably. *Oates v. Discovery Zone, 116 F.3d 1161, 1171 (7th Cir. 1997)* Mr. Allen is African-American and belongs to a protected class; the defendant admits he performed satisfactorily; and he certainly suffered an adverse employment decision when he was fired.

Mr. Allen has failed to offer evidence that the defendant treated similarly-situated white employees more favorably. In fact, the only evidence in the record indicates identical treatment. The defendant's stated reason for firing Mr. Allen was because it believed he bought alcohol for a minor on company time. Mr. Fulton, the minor for whom it claims Mr. Allen purchased beer, is white and was fired for this incident as well. In analyzing an employment discrimination case, the "central question" is "whether the employer would have taken the same action had the employee been of a different race ... and everything else had remained the same." [*9] *Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996)*

Furthermore, even if Mr. Allen had established a prima facie case of race discrimination under the McDonnell Douglas test, he has nonetheless failed to present any evidence that Dominick's stated reasons for his discharge were pretextual, or that his termination was in any way motivated by race discrimination. *E E O C v. Our Lady of the Resurrection Med. Ctr., 77 F.3d 145, 149 (7th Cir. 1996).* Dominick's Employee Handbook prohibits the sale of alcohol to anyone under 21 and shopping during work hours "other than for lunches or snacks." (Def. Statement of Facts, Exh. L). Although Mr. Allen vehemently denies purchasing the alcohol for Mr. Fulton, a minor, he admits buying the beer on company time. In addition, the possession or use of alcohol at any time on company property is also prohibited, *(id.)*, so Mr. Allen could not have intended such purchase as a "snack" without violating another company policy.

The limited record demonstrates that Mr. Allen was fired due to Dominick's belief that he had purchased liquor for a minor. Although Mr. Allen denies that he purchased the beer [*10] for the minor, he concedes that he purchased the alcohol on company time and that Mr. Fulton had the bag of beer in his hand when the store manager approached Mr. Allen. He argues that the purchase of groceries on his break is at best a minor infraction. However, federal courts "will not second-guess an employer's policies that are facially legitimate" if they are not based on a prohibited factor. *Foster v.*

*Arthur Andersen LLP, 168 F.3d 1029, 1035 (7th Cir. 1999)*

Finally, despite shifting burdens of production in discrimination cases, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*(citation omitted). Mr. Allen has failed to carry his burden by producing evidence from which a rational fact finder could infer that Mr. Allen was treated differently due to his race or that the reasons offered by Dominick's for firing Mr. Allen were mere pretext.

IV. Harassment

Title VII provides redress for employees subject to a hostile work environment [*11] as the result of racial harassment by fellow employees. *See, e.g., Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673 (7th Cir. 1993)* To succeed on a hostile or abusive work environment claim, Mr. Allen must establish (1) hostile, abusive conduct that altered his conditions of employment; and (2) a negligent response by the defendant, his employer. *Saxton v. Am. Tel. and Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993)*

During his deposition, Mr. Allen testified that he was harassed every day from 1989 to 1997 and that he informed management about the behavior. However, Mr. Allen offers no other depositions, affidavits or other evidence to support his claims of continuous name-calling and racial stereotyping at work. Mr. Allen cannot base a harassment claim on general or conclusory allegations. *See Nazaire v. Trans World Airlines, Inc., 807 F.2d 1372, 1381 (7th Cir. 1986)*(vague allegations of discrimination without exact dates and without support in the evidence were too nebulous to raise a genuine issue of fact) Therefore, I can only consider the three incidents described in his deposition. This evidence is insufficient [*12] as a matter of law to support his claim because to be actionable, harassment must be severe and pervasive enough to create an objectively hostile or abusive work environment. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); Brooms v. Regal Tube Co., 881 F.2d 412, 420 (7th Cir. 1989).*

Nor is there evidence that Mr. Allen subjectively perceived his work environment to be hostile or abusive or that his terms or conditions of employment were harmed. *Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 (7th Cir. 1999).* Aside from his termination, Mr. Allen does not allege any other negative employment actions taken against him during his eight years of employment at Dominick's. Indeed, he admits that he was promoted shortly after being hired. Mr. Allen also

admits that *he* voluntarily requested a change in status to a job which paid slightly less. Prior to his discharge, Mr. Allen did not seem to suffer any adverse employment action arising from the discriminatory environment. Mr. Allen does not allege that he was formally disciplined or that the racial harassment affected his ability to do his **[\*13]** job. Mr. Allen never registered a formal complaint with his employer or union. *See Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1145 (7th Cir. 1997)*(rejecting plaintiff's claim that she subjectively experienced a hostile work environment, as the alleged harassment "was not troubling enough to [plaintiff] that she bothered to report it to any of her superiors, even though she was given ample opportunity to do so"); *King v. The Finish Line, 997 F. Supp. 987, 994 (N.D.Ill. 1998)*(granting summary judgment in favor of employer on hostile work environment claim, noting that plaintiff never complained of incidents until she quit). Since Mr. Allen has provided no evidence that he found his work environment so abusive as to alter the conditions of his employment, his harassment claim must fail.

V. Retaliation

To demonstrate a prima facie case of retaliation, Mr. Allen must establish: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse action; and (3) a causal link between the protected activity and the adverse action. *Essex v. United Parcel Serv., Inc., 111 F.3d 1304, 1309 (7th Cir. 1997)* (internal **[\*14]** citation omitted). Mr. Allen has not alleged that he engaged in any statutorily protected activity until *after* he was fired when he made a complaint to the EEOC. He did not avail himself of his employer's policies nor did he offer evidence that he complained to anyone at Dominick's about race discrimination or harassment in the nearly eight years he worked for the defendant. Therefore, Mr. Allen cannot show a causal link between his allegations and his discharge, so his retaliation claim, too, must fail.

Summary judgment is entered on all counts in favor of the defendant.

**ENTER ORDER:**

**Elaine E. Bucklo**

United States District Judge

Dated: November 24, 1999