E-FILED
Monday, 07 May, 2007  03:34:15 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

JOSEPH E. POSEY, SR.,              )
                                )
         Plaintiff,              )
                                )
        v.              )    Case No.: 06-2114
                                )
                                )
CHAMPAIGN PARK DISTRICT              )
                                )
        Defendant,              )
                                )

FILED
MAY 07 2007
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

**PLAINTIFF JOSEPH E. POSEY, SR. MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The issue this case is whether Defendant, Champaign Park District ("Defendant" or "Park District") terminated Joseph E. Posey Sr., ("Plaintiff") because of his race (African-American), when Plaintiff admitted to the Park District agent (Mary McGrew) that he purchased alcohol on company time, which violated Park District's work rules. Joseph E. Posey Sr., was coerce into admitting that he purchased the alcohol after Plaintiff was assured that he would not be terminated if his urine test was negative for alcohol. The urine test was proven to be negative but the Plaintiff was terminated the next working day.

For the reasons set forth below, Plaintiff is entitled to judgment as a matter of law.

## II.    **UNDISPUTED MATERIAL FACTS**

A.    **Background**

The Plaintiff was hired to work at Champaign Park District as a Seasonal

Landscaper, meaning a member o the Trash Collection Crew. (Posey Dep. Tr. 10-13. A

copy of the transcript of the deposition of Joseph E. Posey Sr. is attached to this

Memorandum as Exhibit B.)

The Trash Collection Crew is responsible for ensuring the effective maintenance

and appearance of the Park District parks by performing litter pickup and custodial care

(Posey Dep. Tr. 13.)

Plaintiff was terminated on August 24, 2004, because he was coerce into
admitting

that Plaintiff purchased alcohol while in a Park District uniform, on Park District time

and driving a Park District vehicle with a Park District logo on both sides and municipal

license plates on the front and back of the vehicle. (Posey Dep. Tr. 13, 59 Dep. Exh 1,

p. 6). A copy of Posey Deposition Exhibit 1 is attached to this Memorandum as Exhibit

C.)

Plaintiff's lawsuit against the District claims that he was terminated because of his

race (African-American). (Posey Dep. Tr. 13, 23; Posey Dep. Exh. 1, p.6.)

Plaintiff's lawsuit against the District claims that Mary McGrew who was acting

as the Park District agent stated that Plaintiff will be able to keep his employment as long

as there is no alcohol is in the Plaintiff's urine. (Posey Dep. Tr. 11 - 17 Dep. Exh 1, p. 6)

Plaintiff's lawsuit against the District claims that Mary McGrew (acting as an
agent

for the Park District) had coerce Plaintiff into admitting that he did in fact buy alcohol

(Posey Dep. Tr. 1-3, Dep. Exh. 1, p.6.)

**B.    The Circumstances Leading To Plaintiff's Termination**

On August 24, 2004, Plaintiff's shift began at 7:30 a.m., and his first scheduled break was at 10:00 a.m. (Posey Dep. Tr. 8, Dep. Exh 1, p.5.)

According to the Park District, a phone call was received from a woman who said she saw an individual in a Park District uniform purchasing alcohol at Circle K convenience store at approximately 8:30 a.m. that morning. (McGrew Aff. No. 6.)

The Circle K store is located approximately two blocks from one of the facilities where Plaintiff and his co-worker, Clinton Andrews ("Andrew"), also African-American, were scheduled to perform trash removal. (Posey Dep. Tr. 23.)

As a result, at about 9:30 a.m., the Park District radioed for Plaintiff and Andrews to come to the Park District's offices (Posey Dep. Tr. 24.)

When Plaintiff arrived at the Park District's offices, Plaintiff and Andrews met with David Schneider, Maintenance Supervisor and acting department head, Mary McGrew, Park District's Human Resources Manager, and Dennis Shiley, Plaintiff's and Andrews' immediate supervisor. (Posey Dep. Tr. 25.)

Plaintiff told the Park District at the meeting that and admitted in his Complaint that he stopped the garbage truck he was driving (which contained markings that identified the vehicle as belongings to the Park District) at the Circle K at approximately 8:30 a.m.(Posey Dep. Tr. 14-16; Posey Dep. Exh. 1 p. 4.)

This was during Plaintiff's work time. (Posey Dep. Tr. 13-14, 22.)

The Plaintiff stop at Circle K to use the restroom (Posey Dep. Tr. 13-14; Posey Dep. Exh. 1 p. 6.)

Plaintiff admitted that he admitted to buying alcohol after he was coerce by Mary McGrew (Park District acting agent. (Posey Dep. Tr. 1-3; Posey Dep. Exh. 1. p.6.)

## III.    CONCLUSION

The Park District allow Mary McGrew to act an agent when conducting Park District Human Resource Polices. Mary McGrew stated that the Plaintiff would be allow to retain employment if the urine test came back negative. The test proved that he did not have alcohol in the Plaintiff's system. The Park District failed to follow through with its obligations in continual employment upon passing the test. It therefore concluded that Mary McGrew was acting in a discriminatory manner towards the defendant. The Park District provided Mary McGrew with the power to make the decision to retain or terminated employment due to her position in the Park District. Mary McGrew made the statement of no alcohol then you may keep your. Therefore, the Plaintiff, Joseph E. Posey,

Sr. is entitled to summary judgment with respect to Plaintiff's race discrimination claim.

May 6, 2007                                      Respectfully submitted,

                                                 Joseph E. Posey, Sr.
                                                 117 East Roper
                                                 Champaign, IL. 61820
                                                 (217) 355-9311
                                                 (217) 390-1550
                                                 jeps1028@yahoo.com
                                                 Pro Se

## CERTIFICATE OF SERVICE

Joseph E. Posey, Sr., Pro Se, hereby certifies that he caused **Plaintiff's motion**

**for Summary Judgment, Memorandum in Support Of and supporting exhibits** in the

above-captioned matter to be filed with the Court through application of the Court's

electronic filing system and that he caused the above-mentioned documents to be served

on the party listed below, by placing the same in the U.S. Mail located at 117 East Roper,

Champaign, IL> 61820, postage prepaid, before the hour of 5:00 on this 7th day of May,

2007, addressed to:

s/Gregory R. James, Jr.
515 North State Street, Suite 2800
Chicago, Illinois 60610


Joseph E. Posey

## INDEX OF EXHIBITS

A.    Deposition of Joseph E. Posey

B.    Affidavit of Mary McGrew

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION


JOSEPH E. POSEY, SR.,         )
                              )
          Plaintiff,          )
                              )
     vs.                      )    Case No. 06-2114
                              )
CHAMPAIGN PARK DISTRICT,      )    Judge Michael P. McCuskey
                              )    Magistrate Judge David G. Bernthal
          Defendant.          )


THE DEPOSITION of JOSEPH E. POSEY, SR., the plaintiff herein,
called by the defendant for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure, taken before me,
Gale G. Everhart, CSR-RPR, a Notary Public in and for the State of
Illinois, at 201 South Vine Street, Room 350, in the City of Urbana,
County of Champaign, and State of Illinois, on the 15th day of
December, A.D. 2006, commencing at 10:00 a.m.


L.A. REPORTING
(800) 419-3376

## Page 2

APPEARANCES:
JOSEPH E. POSEY, SR.
117 East Roper
Champaign, Illinois 61820
   Pro Se

LANER, MUCHIN, DOMBROW, BECKER, LEVIN & TOMINBERG, LTD
BY: GREGORY R. JAMES JR., ESQUIRE
Attorney at Law
515 North State Street, Suite 2800
Chicago, Illinois 60610
(312) 467-9800
   On Behalf of the Defendant

ALSO PRESENT:

MARY McGREW
GWENETTA POSEY
   I N D E X
          Page
WITNESS:
JOSEPH E. POSEY, SR.
  Direct Examination by Mr James.   3

EXHIBITS:

POSEY NUMBER 1          13
  Copy of Complaint
POSEY NUMBER 2          35
  Park District Document
POSEY NUMBER 3          35
  Park District Policy
POSEY NUMBER 4          35
  Park District Policy
POSEY NUMBER 5          36
  General Safety Policy and Rules Document
POSEY NUMBER 6          36
  Alcohol and Drug Abuse Policy
POSEY NUMBER 7          36
  Examples of Reasons for Disciplinary Action
POSEY NUMBER 8          40
  8/24/04 Letter
POSEY NUMBER 9          42
  Review of Dismissal

      L.A. REPORTING
      (800) 419-3376

## Page 3

1        (Witness sworn )

2    MR JAMES: Mr Posey, hopefully you remember me My

3  name is Greg James and I represent the Champaign Park District in a

4  lawsuit that was filed against them  Let the record reflect that

5  this is the deposition of Mr Joseph Posey, Senior  It's being

6  taken pursuant to notice and the Federal Rules of Civil Procedure

7      JOSEPH E. POSEY, SR.

8  called as a witness, after being first duly sworn, was examined and

9  testified upon his oath as follows:

10      DIRECT EXAMINATION

11      BY MR JAMES:

12  Q  Mr Posey, what is your date of birth?

13  A  10/28/54

14  Q  What is your Social Security number?

15  A  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

16  Q  And your address?

17  A  117 East Roper, R-o-p-e-r

18  Q  Your current phone numbers?

19  A  217-355-9311

20  Q  Is that your home number?

21  A  Yes, sir.

22  Q  Do you also have a cell phone?

23  A  Yes, sir

24  Q  What is that?

## Page 4

1  A  217-390-1550.

2  Q  Mr Posey, please don't be insulted by this question  I

3  don't mean any offense. I ask this question at every deposition

4  that I go to  Are you taking any medications or anything that would

5  interfere with your ability to remember things or to testify?

6  A  No.

7  Q  Okay. Sometimes people are taking medications that

8  interferes with their memory

9  A  Well, I take medication, but it don't interfere with my

10  memory

11  Q  Okay. Perfect. Mr Posey, have you ever been deposed

12  before?

13  A  Yes

14  Q  How many times?

15  A  Probably one

16  Q  What kind of a case was it?

17  A  This was back in -- I think it was a car accident,

18  something like that, back in the early '90s, something like that, I

19  guess.

20  Q  Were you a witness in the case, or were you a party to

21  the lawsuit?

22  A  A party

23  Q  Were you the plaintiff in the case?  The person who filed

24  the lawsuit?

## Page 5

1  A  I'm the one that filed.

2  Q  I'm sorry?

3  A  I'm the one that filed the lawsuit

4  Q  Did that case go to trial?

5  A  No

6  Q  Did it settle?

7  A  Yes, it did

8  Q  Do you remember the name of the other side in the

9  lawsuit?

10  A  This was a teenager driving with a permit  I can't think

11  of her name. This was back, like I said, in the '90s.

12  Q  Where was the lawsuit pending?

13  A  Well, we just -- I filed it, and then they just settled

14  They made a settlement.

15  Q  Was it in the Champaign County Courthouse?

16  A  Champaign County Courthouse, yes

17  Q  I have some instructions for how all of us should conduct

18  ourselves at the deposition, and they are pretty standard.

19  A  Okay

20  Q  I'm going to be asking you questions about the facts

21  involved in the lawsuit that you filed in this case

22  A  Okay

23  Q  I'm kind of soft-spoken or at least I try to be. So if I

24  ask you a question and you don't hear it, if you tell me I'll repeat

**Page 6**

1  it  Okay?

2  A  Okay

3  Q  If I ask a question and it doesn't make sense, and that

4  is probably going to happen sometime today because even lawyers who

5  think they are really smart ask dumb questions sometimes, and they

6  ask questions that don't make sense  So if I ask a question and it

7  doesn't make sense, will you tell me so I can rephrase it?

8  A  Yes

9  Q  Also, as we go along, nobody is perfect  If you realize

10  that you have given an answer and it's not complete or you need to

11  correct it, just tell me and you will be permitted to correct your

12  answer  Okay?

13  A  Okay.

14  Q  If you need to take a break sometime today to stretch

15  your legs or to get a drink of water, use the restroom, something

16  like that, just let me know and we will take a break

17  A  Okay.

18  Q  The only time when it's really not permissible to take a

19  break is when there is a question that's still pending that hasn't

20  been answered yet  All right?

21  A  Okay

22  Q  If you don't know the answer to a question, just tell me

23  If you do answer a question, I'm going to assume that you understood

24  the question and you heard it and you have given me your best

**Page 7**

1  answer  Okay?

2  A  Okay

3  Q  The court reporter -- as you can probably tell there is

4  a tape recorder running, and the court reporter is trying to write

5  down everything that we say. So it's important for her sake that we

6  not talk at the same time  So I'm going to try to wait until you

7  finish your answer before I ask another question that way we are not

8  talking at the same time  And, also, as I ask my questions, very

9  often you are going to know exactly where I'm going and what the

10  next logical question is  If you can just let me finish it before

11  you start your answer, it will be a lot easier on the court

12  reporter.

13  A  (Witness nodded head up and down)

14  Q  Do you understand these instructions?

15  A  Yes

16  Q  And are they agreeable to you?

17  A  Yes

18  Q  Prior to coming here today, did you speak with anyone to

19  prepare for your deposition?

20  A  No

21  Q  Did you review any documents to prepare for your

22  deposition?

23  A  Yes. I did.

24  Q  You received a notice of deposition in the mail, right?

**Page 8**

1  A  Yes, I did

2  Q  And attached to the notice of deposition was a rider; is

3  that correct?

4  A  Right

5  Q  Did you bring with you any documents that are responsive

6  to that rider?

7  A  Yes, I did

8  Q  Can I see those documents?

9     (Pause in proceedings )

10  MRS POSEY:  You asked for -- I'm sorry  Never mind.

11  MR JAMES:  And I appreciate that, Mrs Posey  I know

12  that you will remember when we were in court last time the judge

13  reminded everybody that because you are not an attorney you have to

14  let your husband do the talking

15     If you could just hand to me whatever documents you

16  brought with you

17     (Pause in proceedings )

18  Q  Do you have extra copies of these, or are these the only

19  copies you have?

20  A  I have several copies, but not the same one

21  Q  Okay  So you don't have copies of these documents with

22  you today?  You just have the originals?

23  A  Which one are you talking about?  All of them or just the

24  one in your hand?

**Page 9**

1  Q  I guess I will take them one at a time so that it will be

2  clear

3  A  Okay.

4  Q  Because I don't think it's fair to ask you about a whole

5  group

6  A  That's okay

7     (Pause in proceedings )

8  A  That's it

9  Q  I'm just going to identify for the record what these are

10  One. I have a State of Illinois Department of Employment Security

11  Work Search record, which appears to be from March of '04; is that

12  correct?

13  A  Yes  It is both sides, too

14  Q  Mr. Posey, do you have any copies of this document with

15  you today or just this original?

16  A  Original

17  Q  Okay  After we are done with the deposition today, are

18  you willing to make a copy of this and mail it to me if I reimburse

19  you for your copying expenses?

20  A  Sure

21  Q  Also I have been handed what appears to be a tax return

22  for 2005 and some related tax documents  Sir, do you have copies of

23  those documents?

24  A  Yes

**Page 10**

1  Q  Do you have any extra copies?
2  A  No
3  Q  And also you have brought with you today and shared with
4  me tax returns from 2003, correct?
5  A  Yes
6  Q  Do you have 2004 tax returns?
7  A  No
8  Q  And then also you have brought with you a document in a
9  frame that says "Outstanding Employee Award" from October of 2003,
10  correct?
11  A  Yes
12  Q  And, Mr. Posey, for all of those documents that we have
13  just identified, as long as I reimburse you for whatever the copying
14  costs are, you will send me copies of those?
15  A  Sure.
16  Q  Can you try to do that within the next couple of weeks?
17  A  Yes, sir
18  Q  Thank you  Mr. Posey, when were you hired by the Park
19  District?
20  A  2001 of July 31st
21  Q  What were you hired to do?
22  A  My job position was landscaping mostly, you know, garbage
23  route and keeping the parks clean, planting trees, you know,
24  whatever, landscaping, you know.

**Page 11**

1  Q  Was that a seasonal position?
2  A  Yes  Uh-huh
3  Q  Which years did you work for the Park District as a
4  seasonal landscaping person?
5  A  We usually start out between March to October, somewhere
6  around there, October
7  Q  And which years did you work for the Park District?  You
8  worked there in 2001  What other seasons did you work?
9  A  2, '3.
10  Q  2002 and 2003?  Yes?
11  A  Yes
12  Q  And I apologize, I don't want to appear rude --
13  A  That's okay
14  Q  -- but you have to answer "yes" or "no."
15  A  I understand
16  Q  Because the court reporter can't interpret
17  A  Okay
18  Q  Who hired you to work at the Champaign Park District?
19  A  I was hired by Mary McGrew, probably, I guess
20  Q  You don't know?
21  A  Well, Champaign Park District hired me  But, you know,
22  she was the one that instructed us when we got hired.
23  Q  I probably better make this clear  Because you are
24  testifying under oath today --

**Page 12**

1  A  Uh-huh.
2  Q  -- it's important that you not guess at things, that you
3  give testimony.
4  A  That's not guessing, that's the truth.
5  Q  I understand  And I'm not saying it's untrue  You are
6  the one that said "I guess," that's why I'm saying this right now
7  If you are guessing about something, just tell us that you are
8  guessing so we know that.  But, otherwise, if you could stick to
9  what you know or what you believe
10  A  Okay  Champaign Park District hired me
11  Q  Do you know who the person was at the Champaign Park
12  District who made the decision to hire you?
13  A  Dennis Shiley.
14  Q  Shiley, S-h-i-l-e-y?
15  A  Yes, sir
16  Q  If I misstate your testimony as we go along, correct me
17  Okay?
18  A  Okay.
19  Q  Because you get to testify today. I don't  I think you
20  said that one of your duties when you worked as a seasonal employee
21  for the Park District was to work in landscaping, correct?
22  A  Yes
23  Q  And also duties that you would perform would be working
24  on a garbage route or a trash route; is that true?

**Page 13**

1  A  Yes
2  Q  And part of your duties when you would do that would be
3  to help to keep the parks clean, right?
4  A  Yes
5  Q  Can you describe for me what your duties and
6  responsibilities were when you worked on the garbage route?
7  A  Make sure all the garbage was taken up and make sure the
8  parks was cleaned up, all the paper and -- you know, nice and neat.
9  Q  Okay.  Mr. Posey, I am showing you what has been marked
10  as Defendant's Exhibit Number 1 for identification, and that
11  document is in front of you  This is a copy of the complaint that
12  you filed in this case, true?
13  A  Yes
14  Q  On August 24th, 2004, you were employed by the Park
15  District, true?
16  A  Repeat it
17  Q  On August 24th, 2004, you were an employee of the Park
18  District, true?
19  A  Yes, sir
20  Q  And that is also the last date that you worked at the
21  Park District, true?
22  A  Yes
23  Q  On August 24th, 2004, did your shift begin at 7:30 a m.?
24  A  Yes

**Page 14**

1  Q  And on that date and at that time you were working as a
2  seasonal landscaper assigned as a member of the trash collection
3  crew, true?
4  A  Yes
5  Q  Your first -- well, your coworker that day was it Clinton
6  Andrews?
7  A  Yes, sir
8  Q  Your first break that day was scheduled for 10 a m.
9  correct?
10  A  Yes
11  Q  Did you and Mr Andrews to do your duties that day were
12  you using a Park District vehicle?
13  A  Yes.
14  Q  Can you describe the vehicle for me?
15  A  It's green, a green garbage truck. It was green
16  Q  Okay Did it have markings on it?
17  A  Yes
18  Q  What kind of markings?
19  A  Champaign Park District was on the side of it, you know
20  Q  Was it on the doors of the vehicle or the sides of the
21  vehicle?
22  A  I can't remember
23  Q  Was it a clear marking so that people could see it?
24  A  I can't remember I haven't seen it for about three

**Page 15**

1  years so I don't remember
2  Q  Okay Could you turn to page 6 of your complaint?
3  A  (Witness complies )
4  Q  On page 6 of your complaint I know it says several
5  things, but there are just a few I want to talk to you about
6  A  Uh-huh
7  Q  It says that you and Clinton Andrews stopped at the
8  Circle K store on Neil Street, true?
9  A  Uh-huh
10  Q  Is that a "yes"?
11  A  Yes, sir
12  Q  And that was on August 24th, 2004, at 8:30 a m ?
13  A  About that time
14  Q  And your purpose in going there was to buy a newspaper?
15  A  Use the restroom, and I bought a newspaper
16  Q  So the reason that you went there was to use the
17  restroom?
18  A  Yes Uh-huh
19  Q  Did you travel to the Circle K store in the Park District
20  garbage truck?
21  A  Yes
22  Q  Did you go into the Circle K store?
23  A  Yes, sir Uh-huh
24  Q  Did Mr Andrews stay in the truck?

**Page 16**

1  A  Yes.
2  Q  Who was driving the truck that day?
3  A  I was
4  Q  So you parked the garbage truck close to the Circle K
5  store?
6  A  Right in front of the store
7  Q  Okay And what kind of store is the Circle K store?
8  A  It's a grocery store
9  Q  Is alcohol sold in that store?
10  A  Yes, it is
11  Q  As you were walking from the garbage truck to the Circle
12  K store, did you talk to anybody that you knew?
13  A  No, I didn't
14  Q  Did you run into anybody?
15  A  No, I didn't
16  Q  You didn't run into somebody who had --
17  A  No
18  Q  Stop Let me finish the question.
19  A  Go ahead
20  Q  You didn't run into somebody who asked you to buy alcohol
21  for them?
22  A  No, I didn't.
23  Q  Well, let's look at your complaint. It says, "I was
24  approached by someone outside the store He gave me money to buy

**Page 17**

1  alcohol for him " Do you see that?
2  A  Yes I see it
3  Q  Is that a true statement?
4  A  No It's not
5  Q  Who wrote this down in your complaint?
6  A  She wrote it down
7  Q  Your wife wrote this down?
8  A  No She wrote this down I told her what I wanted to
9  say, but this was what she had asked me that I had written down.
10  Q  We are talking about Exhibit 1 which is your lawsuit,
11  right?
12  A  I know it, yeah
13  Q  And who printed those words on page 6? Whose handwriting
14  is that on page 6?
15  A  This is what I had written down. Yeah, this.
16  Q  You wrote that down?
17  A  I had my wife write it down for me.
18  Q  Okay And she wrote down what you told her to write?
19  A  Yes, I did
20  Q  So where it says, "I was approached by someone outside
21  the store He gave me money to buy alcohol for him," that's false?
22  A  I was telling her what I told her
23  Q  You were telling --
24  A  My wife what I told her

**Page 18**

1  Q  When you say "her," who are you --

2  A  Mary McGrew

3  Q  Okay

4  A  Yeah.

5  (Pause in proceedings )

6  Q  Okay. So just to make sure I understand it, you told

7  your wife to write down what you had told to Mary --

8  A  Everything I had told --

9  Q  Sir, you have got to let me finish. And don't get mad at

10  me because that's not fair

11  A  I'm not mad at you. But I already explained to you once

12  You can't trick me into saying something else

13  Q  I'm not trying to trick you

14  A  Okay. I told you what I told her. That's what I told

15  her to write down

16  Q  Okay. But when you are saying, I told her and I told her

17  and you are pointing here in the deposition, when somebody reads the

18  transcript, they are not going to know who "her" is

19  A  Yes, sir. I wrote this down. My wife wrote this down.

20  Q  And I'm just trying to clarify. I'm not trying to trick

21  you or get you to change your answers. You testify to what you

22  believe is true.

23  All right. So you asked your wife to write down on page

24  6 of your complaint what you had said to Mary McGrew; is that

**Page 19**

1  correct?

2  A  Yes

3  Q  When you went into the Circle K store on August 24th,

4  2004, did you buy any alcohol?

5  A  No

6  Q  Did you tell anyone that you had bought alcohol when you

7  walked into the store?

8  A  No.

9  Q  You didn't tell Mary McGrew that you bought alcohol in

10  the store?

11  A  After she kept asking me over and over, and she didn't

12  believe me. I told her, Go for it. I told her, Yeah. She didn't

13  believe me the first time. I told her three times. She didn't

14  believe me. She kept asking me. She wanted to act stupid. I told

15  her, I bought it. If I got alcohol in my system. What happens? Do

16  I lose my job or do I stay here?

17  She said, You will stay here.

18  And I told her, Take me to the hospital.

19  Q  So just to be clear --

20  A  Yeah

21  Q  And, again. I'm not trying to trick you. Take your time

22  A  Okay

23  Q  You did tell Mary McGrew that you did buy alcohol in the

24  store, true?

**Page 20**

1  A  After she kept asking me several times and I gave her the

2  answer no. And she would not take that answer no. So I told her

3  yes

4  Q  All right. I just want to make sure --

5  A  I told her yes.

6  Q  You told her yes. Did you also tell her that you had

7  been approached by someone outside the store who gave you money to

8  buy alcohol?

9  A  Yes. I did tell her that.

10  Q  Who else was present when you told her that?

11  A  Clinton Andrews, Dennis Shiley and David --

12  Q  Schneider?

13  A  Yeah. Schneider.

14  Q  Is it true that the Circle K store is located

15  approximately two blocks from where you were collecting trash?

16  A  You have got several places around the store to collect

17  trash. I think, a couple of places. About -- less than about two

18  blocks to collect trash if I wanted to, yeah

19  Q  That wasn't a very good question. Let me try again

20  A  Okay. Try it again

21  Q  Just before you drove to the Circle K store --

22  A  Uh-huh

23  Q  -- where were you?

24  A  Traveling.

**Page 21**

1  Q  Okay. Which Park District facility were you at before

2  you went to the Circle K store? Were you in one of the parks

3  collecting trash before you drove to the Circle K?

4  A  Well, I pick up trash before I leave the building so, you

5  know, that's the first stop I do. I do the building all around,

6  surrounding it where the building is at first

7  Q  So which building did you leave to go to the Circle K

8  store? I'm just trying to figure out where you were before --

9  A  I might have stopped -- we usually stop at a couple of

10  places before we -- we do the job first. We might go and stop at

11  this place and this place, or we might stop and pick some paper up.

12  We might stop here and stop here. So it's hard to say where we had

13  stopped at before we stopped here. But I know once I got probably

14  close I had to use the bathroom, you know. We was going somewhere

15  to do something, pick up something. I can't remember where. We had

16  seen something the day before that we said. We will get it the next

17  day or something like this and something like that happened. I

18  don't remember where, but something we had seen. We always see

19  something when we are coming in to clock out we didn't get. We

20  might see some paper or some trash or a can turned over. We might

21  see something, and we are running late. We said, We will get it

22  tomorrow, something like that. So I don't really know where I was,

23  what building I was at. I might not have been in the building. I

24  might have been in the park picking up trash somewhere. I don't

**Page 22**

1   know
2     Q  You were on the clock for about an hour before you
3  stopped at the Circle K?
4     A  Yes  Uh-huh
5     Q  You've got to let me finish the question, please  Are
6  you okay?
7     A  Yeah  Go ahead
8     Q  During that hour, did you go to more than one park or
9  more than one facility to pick up trash?
10    A  I can't remember
11    Q  Okay  At the park facilities where you stopped before
12  you went to the Circle K store, were there bathroom facilities at
13  any of those?
14    A  No  I don't remember on that
15    Q  Did your duties take you past the Circle K store to go
16  from one park location to another park location?
17    A  Sir, I don't remember that, no  Three years ago that was
18  pretty long when we picked trash up at -- trash be all over the
19  parks and all over -- most of the parks we go to don't have
20  restrooms at, and, you know  So wherever we can use the restroom at
21  we will stop.  We are told we can stop and grab a sandwich if we
22  want to go for lunch or we can do this  We was told this before we
23  started the garbage route because we were on the garbage truck  So,
24  you know, by the garbage truck being nasty, well, we can usually

**Page 23**

1  stop and grab us a sandwich if we want to somewhere
2     MRS. POSEY:  Can we take a break?
3     MR. JAMES:  You can take a break, but I need to let you
4  know he is currently testifying under oath, and you are not allowed
5  to discuss his testimony with him while we are taking a break  Do
6  you understand?
7     MRS. POSEY:  Uh-huh
8     MR. JAMES:  You are not allowed to discuss this case with
9  him at all  He has to testify from his memory and his recollection
10  He cannot be coached
11     THE WITNESS:  Yes, sir
12     MR. JAMES:  Okay  Let's take a break
13     THE WITNESS:  Go ahead
14    Q  Is Clinton Andrews African American?
15    A  Yes, he is
16    Q  And you, sir, are African American, true?
17    A  Yes, sir
18    Q  While you were in the Circle K store, did you buy
19  anything?
20    A  Newspaper  I think I bought a newspaper, and I think it
21  was a Gatorade or something like that, orange juice, or something
22  like that  I don't remember  It was an orange drink or something
23    Q  In August 2003 was alcohol sold at the Circle K store?
24    A  Sold it every year  They sell it every day

**Page 24**

1    Q  On August 24th was there a way for the Park District to
2  communicate with you by radio?
3    A  Yes
4    Q  Was it a radio that was in your truck or a radio that you
5  carried?
6    A  One was in the truck and usually I carried one and
7  Clinton would carry one  It depends
8    Q  After you visited the Circle K store, where did you go
9  next?
10    A  Sir, I can't remember what park it was
11    Q  Okay.  After you left the Circle K store, did you get a
12  call on the radio to come and meet with anyone?
13    A  Yes
14    Q  Now we know that you were at the Circle K store at about
15  8:30  What time did you get the radio call?
16    A  I think I got the call around about 9:30
17    Q  Okay  And who called you on the radio?
18    A  I think it was my boss, Dennis Shiley
19    Q  What did he tell you?
20    A  He told a lie  And he said that they had some broken
21  glass out there at Centennial Park
22    Q  What else did he say during the radio call?
23    A  He wants us to come over and get it, clean it up
24    Q  What did you do then?

**Page 25**

1    A  Went over to the park where he was
2    Q  On that date was David Schneider the acting department
3  head for your department?
4    A  Yes, sir
5    Q  And was Mary McGrew the Park District's human resources
6  manager?
7    A  Yes, sir
8    Q  Was Dennis Shiley your and Clinton Andrews' supervisor
9  that day?
10    A  Yes, sir.
11    Q  At the meeting with David Schneider, Mary McGrew and
12  Dennis Shiley, was anyone else present?
13    A  Clinton Andrews.
14    Q  Did you tell them first at that meeting that you went
15  there to buy a newspaper?
16    A  I told them I had to use the restroom and then I bought a
17  newspaper  That's what I told them
18    Q  Okay.  You didn't say that you went there to buy a
19  newspaper?
20    A  And use the restroom, too
21    Q  At the meeting did you admit that you had bought alcohol
22  for someone at the Circle K store?
23    A  Yes  Uh-huh
24    Q  Did you also admit that you gave this alcohol to a person

| | |
|---|---|
| 1  who asked you to buy it for them? | 1  something, you know, to save his head  So it got back to me what |
| 2    A   Yes. | 2  happened, why he did this  But I sees (sic) this guy every weekend, |
| 3    Q   And is it true that Clinton Andrews, who stayed in the | 3  you know  So he told me, you know -- and said he would come and |
| 4  vehicle, told Mary McGrew, David Schneider and Dennis Shiley that | 4  testify that this happened  He knows that I didn't buy liquor, he |
| 5  when you left the Circle K store you gave a paper bag to a person | 5  said |
| 6  that you had bought alcohol for? | 6    Q   But Mr. Andrews did tell someone at the park district |
| 7    A   First time I heard this is when I seen it on the paper | 7  that you had bought liquor, right? |
| 8  when I got it in the mail. | 8    A   I don't know because I wasn't there  The day we had came |
| 9    Q   Do you know if that's true or not? | 9  back to the office. I had to turn my keys in the next day  And I |
| 10    A   That's not true | 10  don't know -- I didn't hear him tell nobody  But the people told |
| 11    Q   Do you know for a fact that that's not true? | 11  me, you know, that he was the one that probably said something about |
| 12    A   I know for a fact that's not true | 12  it |
| 13    Q   How do you know that? | 13    Q   Who said that he had made those statements about you? |
| 14    A   Well, because he told me -- as a matter of fact, he is my | 14    A   I got about -- probably about six or seven people that |
| 15  friend  I'm the one that got him the job, and we had talked about | 15  work on the job, you know, yeah  So -- |
| 16  it  And he told me -- he told me what happened  He told me he was | 16    Q   You were telling me how Mr  Andrews had to take a |
| 17  scared and he didn't want to lose his job and he had to say | 17  urinalysis test -- |
| 18  something | 18    A   Yes |
| 19    Q   And so did he say what he had actually said?  You said | 19    Q   -- and that he was nasty  Explain to me what you mean by |
| 20  that he had to say something -- | 20  that |
| 21    A   He told me that  He said he maybe said something wrong | 21    A   He had drugs in his system or something.  The guy said he |
| 22  But, you know, he said he was wrong for saying that  He told me | 22  had drugs in his system.  They took him to take a test  And it was |
| 23  this | 23  nasty, and they kept it under the table and they didn't say anything |
| 24    Q   What did he tell you he said? | 24  about it |
| *Page 26* | *Page 28* |

| | |
|---|---|
| 1    A   He told me when I questioned him that he telled (sic) | 1    Q   So he had a urinalysis test, and he was -- |
| 2  something about me buying some liquor  He said, I was scared, and I | 2    A   Yes |
| 3  said something  And this was about a couple of months ago, maybe | 3    Q   Let me finish the question  I let you finish your |
| 4  I didn't -- I had talked to him once about it, but I never | 4  answers  Let me finish the question  So Mr  Andrews had to urinate |
| 5  questioned him because he always said no  But like I say, when the | 5  into a bottle and then that test came back positive for drugs; is |
| 6  paper came in the mail and I seen his name on the paper, then I | 6  that right? |
| 7  questioned him about it then he told me what happened | 7    A   That's what was told me |
| 8    Q   Who did Mr  Andrews say that he had told that you bought | 8    Q   Who told you that? |
| 9  alcohol? | 9    A   I don't want his job jeopardized because that's the way |
| 10    A   There was about seven people sitting there when he said | 10  things work at the park district  If somebody say the wrong thing. |
| 11  this, about seven or eight peoples (sic) | 11  Mary would -- she wouldn't like it  So I don't want to make him |
| 12    Q   Who did Andrews say that he had made that statement to? | 12  lose their job. |
| 13  Did he say he told that to Mary McGrew? | 13    Q   I understand.  Nobody is going to be fired for giving |
| 14    A   He said that he had signed some papers.  That's all he | 14  truthful testimony. |
| 15  said.  That's what he told me  He said the reason why he signed | 15    A   I was. |
| 16  those papers he said because he took a drug test and was not | 16    Q   Sir, let me finish the questions |
| 17  supposed to take a drug test  He had took a drug test from Christie | 17    A   Go ahead |
| 18  Clinic, came back nasty  And they kept it under the table | 18    Q   No one is going to be fired for giving truthful testimony |
| 19  So he didn't want to lose his job  And I didn't know about this | 19  in a federal court case.  I give you my word as an officer of the |
| 20  until one of the guys on the job came back and told the truth  And | 20  court. |
| 21  he told me about this  Seasonal people. if we got drugs in our | 21    A   I'll give you and the judge the name, the names of the |
| 22  system, we are automatically fired  Alcohol or liquor, we are | 22  person, but not her because I don't want him to lose his job |
| 23  automatically fired  He told me he had took a test, and it was | 23    Q   If we have to, I will call the judge, and the judge is |
| 24  nasty  And they put it up under the table  So he had to do | 24  going to order you to tell me right now |
| *Page 27* | *Page 29* |

**Page 30**

1    A    Well, that's okay. You can say what you want to say, and
2    I can say what I want to say
3        MR. JAMES: Okay Mary, can you step out of the room
4    while he says this on the record?
5        (Whereupon, Ms McGrew left the deposition room.)
6    A    Because I don't want them to lose their job. Do you know
7    what I mean? You understand me, don't you?
8    Q    I understand
9    A    See, it can come back to me
10   Q    Mary McGrew is out of the room now Can you tell me who
11   it was that told you that Mr Andrews had a positive urinalysis
12   test?
13   A    One of the guys that been there for 20 years, over 20
14   years. His first name is Lester I can't think of his last name,
15   but his first name is Lester He's been there for 20 years. He
16   worked for the swimming pool park They got swimming pool parks and
17   everything I talked to him, and he told me about this
18   Q    Do you know Lester's last name?
19   A    She do, but I don't But like I say, she is the type of
20   person if things don't go her way --
21   Q    You are talking about Mary McGrew?
22   A    Yes If it don't go her way, she will get rid of him
23   And I know she will So what you need to do is you need to get the
24   records from Christie Clinic from that year -- from the year they

**Page 31**

1    discharged him for getting fired for drugs in his system again and
2    see how many times they took drugs out of his system
3    Q    Okay
4    A    I'm not the one that had nothing in my system at all
5        MR JAMES: Give me one minute I will bring Mary back
6    in
7        (Ms McGrew returned to the deposition room.)
8    Q    Why did you tell Mary McGrew that you had bought alcohol
9    when you were in the Circle K store that day?
10   A    Because she should have believed me the first three times
11   when I told her I didn't buy any She made me feel like I wasn't
12   nothing when she kept asking me So I said, Whatever you want to
13   think, if you think I bought it; I bought it I said, Now if you
14   want to test me for alcohol or whatever, go ahead and go for it I
15   said, If I got it in my system, do I lose my job? If I don't, do
16   whatever. That's what happened I didn't even drink
17   Q    When you met with Mary McGrew that day with Mr Shiley
18   and Mr Schneider present, tell me as best you can remember what was
19   said at that meeting.
20   A    When they called us over there, we pulled up. And we
21   seen them standing out there I said, Oh, Lord, I said, I wonder
22   what happened Somebody is going to say we did something She
23   don't understand The store we went to --
24   Q    Who is "she"?

**Page 32**

1    A    Mary McGrew The store we went to that's in the black
2    neighborhood, and that's where mostly all the blacks come and this
3    and this Peoples constantly, when you go to that store, beg you,
4    "Give me a quarter. Buy me a drink. Give me a dime." This is
5    every day with every people -- every customer coming in the store
6    When we got there, she thought that we were drinking.
7    Q    When you say "she," you are talking about Mary?
8    A    Thought that we was drinking because the way I was
9    bringing up the subject. I was saying, Well, what if I got some
10   liquor in my system; what would happen? Just saying -- look at
11   things to make her mad so she really thought that we was drinking
12   Garbage truck was searched No bottles were found No alcohol was
13   found She should have believed me. I don't know why she didn't
14   She didn't never like me no way, you know So she didn't believe me
15   those three times, I just told her anything she wanted to know. And
16   then when she found out the liquor wasn't in my system, my boss took
17   me home; Clinton rode back with her.
18        My boss is good He said, What happened? We got back to
19   the building I showed him the paper. He seen zero Dennis said,
20   Good. He said, Damn, good He said, I'm glad this didn't happen.
21        I said, I tried to tell her Dennis, but, hell, she didn't
22   want to listen to me I told her I didn't have any liquor in my
23   system or bought nothing
24        He said, Good. Next morning they called me told me to

**Page 33**

1    bring the keys back
2    Q    Was anything else said during those conversations besides
3    what you have already told me?
4    A    I had asked her, I said, Now if liquor is found in my
5    system, what would happen?
6        She said, Well. we would put this in your file, and you
7    will not lose your job and that will be it
8        I said, What if liquor is found in my system?
9        Well, we will have to terminate you. We would get rid of
10   you If liquor was in my system. I wouldn't have said nothing She
11   would have fired me But liquor was not in my system. She told me
12   this. She lied to me I tried to tell her the truth from the job;
13   she lied to me
14   Q    Your complaint says that, As Mary McGrew was driving to
15   Christie Clinic to get a urine test that she stated that as long as
16   you did not have any alcohol in your urine that you would not lose
17   your job?
18   A    She said it in front of Dennis, Clinton and David and me
19   out of her mouth in the parking lot Why would she go to take the
20   test?
21   Q    I think you said earlier that Mary McGrew never really
22   liked you?
23   A    She never did like me.
24   Q    Why do you believe that?

1    A    Because she told a lie on me one day  She said she
2  thought -- she said I was speeding in the park, about 30 in the
3  park  And that was a lie
4    Q    Do you have any other reason to believe that Mary McGrew
5  did not like you?
6    A    I just know that she never did like me, already knew it
7  I'm not the only one
8    Q    Besides what you have told me, do you have any other
9  reason to believe that Mary did not like you?
10    A    I don't know  I don't understand  I mean, I did the
11  job, I kept the park to the best that I could  But like I tried to
12  explain to her that I didn't do it, and she should have took my word
13  right then
14    Q    So just to sum up, when you met with Mr. Shiley and
15  Mr. Schneider and Ms. McGrew, Ms. McGrew asked you more than once
16  whether or not you had purchased the alcohol at the Circle K, true?
17    A    Yes  True  She asked me about three or four times then
18  she said, Well, if you like, we can go to the store and, you know,
19  get the tape and get the information from the store  I said,
20  Well -- you know, she asked me that  She told me that
21    Q    And initially you denied to Mary that you had bought
22  alcohol, but later you admitted that you did buy alcohol, true?
23    A    After I told her about three or four times I didn't buy
24  it and she kept asking me, I just finally went on and said yeah

Page 34

1    Q    While you were employed by the Park District, did you get
2  a copy of the Park District's Safety Policy and Rules?
3    A    Before I started, yes, I did
4    Q    I'm going to go to another exhibit for a minute
5        (Pause in proceedings )
6    Q    Showing you what has been marked as Exhibit Number 2
7  That's your signature on that document, correct?
8    A    Yes  Uh-huh
9    Q    And in this document you acknowledge that you had gotten
10  training on Park District policies including their personnel
11  policies and vehicle use, true?
12    A    True
13    Q    Mr. Posey, I'm going to show you what has been marked as
14  Exhibit Number 3  That is one of the Park District's policies,
15  correct?
16    A    I don't know  I haven't seen that policy in over four
17  years  Sir, I couldn't tell you if that's a policy or not  I can't
18  tell about this
19    Q    Okay  Fair enough  Mr. Posey, I am going to show you
20  what has been marked as Exhibit Number 4
21    A    Okay
22    Q    Can you take a look at that?  Have you seen that policy
23  before?
24    A    Okay  Yes

Page 35

1    Q    Mr. Posey, showing you what has been marked as Exhibit
2  Number 5  It says at the top 7-2, General Safety Policy and Rules.
3  Take a moment to look at the document.  Have you seen that policy
4  before?
5    A    I don't remember this, sir  Like I said, a couple of
6  them I might remember, but some of these I can't remember these
7  because that's been a long time.
8    Q    Understood
9    A    Yeah  So --
10    Q    Mr. Posey, showing you what has been marked as Exhibit
11  Number 6  If you could take a minute just to look at that  Do you
12  remember seeing this policy while you were employed at the Park
13  District?
14    A    No, sir
15    Q    You just don't remember?
16    A    No  I don't remember seeing it
17        (Pause in proceedings )
18    Q    Mr. Posey, showing you what has been marked as Exhibit
19  Number 7, policy 8-2  Do you remember seeing this policy while you
20  were employed at the Park District?
21    A    No.
22    Q    You don't remember one way or the other?
23    A    No
24        (Pause in proceedings )

Page 36

1    Q    Mr. Posey, you just wrote a note to your wife  What note
2  did you write to her?
3    A    Do you want to see it?
4    Q    If you could, just tell me what it says
5        (Pause in proceedings )
6    A    This is just a scribble, I wrote it  You can see it if
7  you like  I don't ask you what you are writing down when you write
8  something on there  So why should I show you what I write down?  I
9  don't think that's fair
10        (Pause in proceedings )
11    A    I can't look at your copies  I don't think you should
12  look at my copies  I didn't take nothing from him and look at it
13  Did I, Ma'am?  You can't take my copy over here  I might have
14  something about you I don't want you to see.
15    Q    Okay  Whenever you are done, let me know.
16    A    Yeah  I don't have to show you what I wrote down on
17  here, sir  The judge will tell you that  This is my copy  If you
18  want me to tell you what I said, I said I would tell you  I told
19  you to ask and I would tell you what I said  Just ask me, and I
20  will tell you what I said  I haven't asked you nothing you have
21  written down in your files  That's not none of my business  So you
22  shouldn't have the right to ask me what I have written down in my
23  files  This is my file
24    Q    I'm going to wait until you are done speaking so I don't

Page 37

1  interrupt you  Are you done?
2    A    I let her to know what was going on so the judge will
3  know what you did  You cannot look at my -- what I'm writing down
4  That's not fair.  I don't think that's fair
5    Q    Whenever you are done let me know because I don't want to
6  interrupt you
7    A    Well, are you done asking me what I'm writing down?
8    Q    No  I'm not  I'm going to wait for you to finish
9    A    Okay.  I'm finished
10    Q    Okay  I want the record to reflect that during the
11  deposition his spouse has been taking notes on a yellow legal pad,
12  that within the last couple of minutes Mr. Posey wrote on the pad
13  and then passed it back to his wife  Then I asked Mr. Posey what he
14  had written  And he didn't answer  Instead he said --
15    A    She scribbled it out  Do you want me to tell you what I
16  have written down?  "I got to shit "  Now I have to shit  Do you
17  want me to tell you in front of her?  That's what I had written
18  down
19    Q    Where is that written down?  I don't see it
20    A    She scribbled it out  That's why she started laughing
21  and scribbled it out like that  She did that and scribbled it out
22    Q    Do you want to take a break so you can use the restroom?
23    A    Thank you
24    Q    I'm just asking, sir.  I'm not being rude to you.

Page 38

1    A    Well, I want to let her know --
2    Q    Wait a minute.  I'm not being rude to you
3    A    You was being nosy.
4    Q    And I would appreciate it --
5    A    You was being nosy.
6    Q    Sir, you are on a tape recorder so don't think that this
7  is not something that can't be heard
8    A    You are wrong for going in my records.  You can't go in
9  my records like that  That's wrong.
10    Q    Sir, the notes you write during this deposition --
11    A    I have to use the restroom.
12    Q    And we are going to stop so you can use the restroom.
13    A    You said if I have to be excused, wait until the sentence
14  is over and then ask you  That's exactly what you said.
15    Q    Let's take a break so you can use the restroom, and I
16  will show you where it is.
17        (Whereupon, a recess was taken in the proceedings
18        at 10:52 a.m.)
19        (Back on the record at 10:55 a.m.)
20    Q    I want to wait until -- here comes Mary now  I just want
21  to repeat for the record that I am asking that during this
22  deposition that you not consult with your wife or discuss your
23  testimony or this case in any way
24    A    Sir, I only discussed when I had to use the restroom.

Page 39

1  That wasn't concerning the case  I'm sure you didn't want me to use
2  the restroom in here.
3    Q    No  I didn't.
4    A    I didn't want to use it on myself.
5    Q    Sir, nobody asked you to
6        Mr. Posey, I'm going to show you what has been marked as
7  Exhibit Number 8.  Have you seen that document before?
8        (Pause in proceedings.)
9    A    On this I didn't have a uniform  I remember that, but I
10  didn't have a uniform on  I didn't have a uniform
11    Q    On August 24th, 2004, when you went into the Circle K
12  store, were you wearing any kind of a uniform?
13    A    No, sir
14    Q    Were you wearing any kind of clothing that would identify
15  you as an employee of the Park District?
16    A    No.  I didn't have a Park District shirt on or a uniform
17    Q    Ordinarily when you worked at the Park District, did you
18  wear some sort of Park District uniform?
19    A    Just a T-shirt
20    Q    Did the T-shirt identify you as an employee of the Park
21  District?
22    A    Up in the left-hand corner
23    Q    What did it say?
24    A    Champaign Park District.

Page 40

1    Q    Why didn't you have a uniform shirt on that day?
2    A    We didn't have no power on in our house, and she didn't
3  have any clean shirts for me.  So I just threw on a shirt and put a
4  jacket over it.
5    Q    Are you absolutely certain that you did not have a
6  uniform shirt on that day?
7    A    I don't think I had a shirt on that day
8    Q    You don't remember for sure, do you?
9    A    I know I didn't
10    Q    Well, sir, you said, I don't think I did, and then you
11  said, I don't know.
12    A    I told you from the first, I said I didn't have a shirt
13  on.  I said we didn't have any power in our house then -- I
14  remember -- on the weekend.  And we didn't have any clean shirts
15  that day with me so I just slipped on, you know, a shirt that looked
16  like I had put on a green shirt.  I had a green shirt on and a
17  jacket.
18    Q    Was it the same color as the Park District --
19    A    Same color
20    Q    Let me finish the question  The shirt you were wearing
21  was the same color as the Champaign Park District shirt?
22    A    Yes
23    Q    And you were wearing a jacket over it?
24    A    I just had a jacket on like this (indicating.)

Page 41

11 (Pages 38 to 41)

1  Q.  Okay.  And so the jacket would have covered up where the
2  logo was; is that correct?
3  A.  Yes, sir.
4  Q.  So somebody just looking at you wearing the green shirt
5  and the jacket, they could reasonably believe it was a Park District
6  shirt, true?
7  A.  On the job they wouldn't know it.  They would think it
8  would be if they know the colors.
9  Q.  Okay.  And the reason you wore the green shirt is so that
10 it would look like a Park District --
11 A.  Yeah.
12 Q.  -- shirt, true?
13 A.  True.
14 Q.  That letter that I marked as Exhibit 8, that letter was
15 sent to you, correct?
16 A.  Correct.
17 Q.  I'm going to show you what has been marked as Exhibit
18 Number 9 where it says 8-4, Review of Dismissal.  While you were an
19 employee of the Park District, there was a policy that permitted you
20 to have your dismissal reviewed if you wanted it reviewed, correct?
21 A.  I didn't hear anything about that.
22 Q.  So you don't remember seeing this policy?
23 A.  Not this one.
24 Q.  You don't remember all the policies that were contained

Page 42

1  in the District's handbook, do you?
2  A.  No, sir.
3  Q.  So you can't say under oath whether this policy was in
4  the handbook or not, correct?
5  A.  I cannot say yes or no.
6  Q.  All right.  You did not ask the Park District to review
7  your dismissal, did you?
8  A.  No.  I did not.
9  Q.  At the time that your employment was terminated by the
10 Park District, you did not claim that your termination was based on
11 your race, did you?
12 A.  I thought it was.
13 Q.  You thought it was, but you didn't claim that to the Park
14 District, did you?
15 A.  Yes, I did.
16 Q.  Who did you tell that to?
17 A.  Maybe four or five peoples that worked there.
18 Q.  Who?
19 A.  The names?
20 Q.  Yes.
21 A.  I don't know a lot of those guys' last names.  A lot of
22 them who I worked with I didn't know their first names.
23 Q.  Can you identify for me any of the people that you told
24 that you thought you were fired because of your race?

Page 43

1  A.  Yeah.  I could identify them if I see them, yeah.
2  Q.  Can you tell me today any of their names, first or last?
3  A.  Clinton Andrews.  You know, I just said this earlier, and
4  I don't think you got the message when I told you this.  I don't
5  want to jeopardize nobody else's job on this by giving names so they
6  can lose their jobs or get rolled up or get messed with because this
7  tends to be going on on the job now I was told.  I don't want to get
8  nobody fired.  Okay?  Because I don't want nobody coming to me
9  threatening me and my family.  Okay?  So that's why --
10 Q.  And I'm going to tell you again that I am an officer of
11 the court and that I'm not allowed to break the law.  I would be
12 putting my law license in jeopardy.  This court that we were in
13 front of won't allow me to break the law.  And I am telling you that
14 I would not allow anyone to be terminated for giving truthful
15 testimony in a federal court case.  Mary, can you excuse us for a
16 minute, please?
17 A.  Now let me tell you something.
18 Q.  Let's wait until Mary is gone.
19 A.  Okay.
20       (Whereupon, Ms. McGrew left the deposition room.)
21 Q.  Go ahead, sir.
22 A.  Now let me tell you something.  You can stand out there
23 and whisper to her and tell her this and this, but I'm not going to
24 give you these peoples' names in front of her so she can fire them

Page 44

1  or be on them or they come looking for me because you ain't the one
2  that live here.  You live in Chicago.  You don't live in Champaign.
3  You ain't the one to protect me from getting killed.  So I'm not
4  going to give somebody -- their names to her so I can get myself
5  killed because they lost their job because she fired them.
6  Q.  Are you done?
7  A.  Yes, sir.
8  Q.  Okay.  Mary McGrew is not in this room now.  Will you
9  tell me the names of anyone that you have told that you think you
10 were fired because of your race?
11 A.  I told -- sir, it can be -- I told maybe 50 peoples.  At
12 least 50, 60 peoples.
13 Q.  Okay.  Let's narrow it down then.  Can you tell me the
14 names of anybody at the Park District or who works for the Park
15 District that you believe you were fired because of your race?
16 A.  Yes.  I don't know their names, but one of the guys used
17 to drive the buses.  His name was -- he had a case, too.  It got
18 dismissed because of her, I guess.  His name was -- what
19 was -- what's his name?  I can't think of his name.  But he came by
20 the house a couple of times and told me about this.  And we talked
21 about the same thing because he had a suit on them, too.  They
22 dismissed it or something.  I can't think of his name.  Clinton
23 Andrews and Jeff Kenzris (phonetic).  What was his name?  Sir, I
24 have to just sit and -- some of these peoples, like I say, I worked

Page 45

**Page 46**

1  with  And I just can't think of their names because I don't know
2  their names. But I'm sure I can -- if I sit down and take a little
3  time and see these peoples on the streets or see them again this
4  weekend, I can get their names and write it down and e-mail you or
5  fax you or something  But as far as their names, I had two or three
6  guys on the Park District said, you know, because of my race and
7  this and this
8     Q    Were those coworkers of yours that said that?
9     A    Coworkers  Coworkers
10    Q    It wasn't anybody in management was it?
11    A    No
12    Q    Do you remember who those coworkers were?
13    A    I just explained to you again and again some of
14  those -- this has been four years ago, sir  When I leave a job like
15  that, I don't remember too many peoples' names on the job  But I
16  know I could come up with at least about four or five names if I sit
17  and think about this.
18    Q    Do you know who made the decision to terminate your
19  employment?
20    A    Probably her, Mary McGrew
21    Q    I don't want you to guess  Do you know?
22    A    I know it was her because Dennis told me it was good that
23  I got my job back  He was glad that I didn't have liquor in me and
24  everything. He was happy about it. And that's why I know there was

**Page 47**

1  more than something else to it, because my boss knew I didn't smoke
2  or drink or nothing like that  He knew this
3     Q    You are talking about Dennis?
4     A    Yes  But they have to go along with her because they
5  thought they would lose their job, too
6     Q    How do you know that?
7     A    Because I've been working with them three years and we
8  know that -- when guys tends to get together six, seven, eight guys,
9  they're going to talk about something and what's going on  And
10  everybody that talked, they don't like her  They hate her  Here
11  she come  Here she come  There she is  She will do this  She
12  don't like this  She fired him  She got rid of him. She did this
13  They don't like her  That's why  I did too good of a job for them
14  I was number one man out there on everything  But like I say, she
15  went by what somebody said  I had a couple of peoples didn't like
16  me, a lot of peoples because of what I do and didn't want to see me
17  working  And she shouldn't have never believed them
18    Q    Tell me about that.
19    A    Well, number one, I am a landlord  We own property
20  That's number one  I have a limousine  I used to have -- I think
21  it was -- they was just -- they thought I didn't have to work. They
22  didn't want me to work because I was owning houses and things like
23  this
24    Q    What people are you talking about?

**Page 48**

1     A    I'll tell you what happened  I got laid off. I got laid
2  off back in 2002, I think  I went to get unemployment checks, to
3  sign up  They wrote a letter to the unemployment office, told them
4  that I own my own limo business and I got apartment houses  Why
5  should I get unemployment?  The unemployment peoples told me they
6  can't do that  Her name was signed on the paper  She's the one
7  that sent it out  She didn't want me to get unemployment
8     Q    You are talking about Mary McGrew?
9     A    Yes, she did  She stopped me a couple years -- and I got
10  proof at the unemployment office from a couple of peoples that
11  worked there that she did not want me to have unemployment because I
12  own apartment houses and own the limousine service  And I got -- a
13  paper came  They gave me a copy which I don't have  It will take
14  me $100 to find this paper  They have the record they said, but
15  they couldn't give it to me unless it was do by the judge. This
16  woman did not want me working for them for some reason because she
17  tried to stop me from getting unemployment. Every year I tried to
18  get it before I got laid off in the wintertime
19    Q    So is it your belief that some of your coworkers were
20  jealous of you because you owned property and you owned a limo?
21    A    Something was said because she's the one that sent the
22  letter to the unemployment office
23    Q    And "she" is Mary?
24    A    Stating what I own and what I had

**Page 49**

1     Q    And when you say "she," you are talking about Mary?
2     A    Mary McGrew
3     Q    Just to sum it up, you were laid off --
4     A    Yes
5     Q    -- between seasons?
6     A    Uh-huh.
7     Q    You applied for unemployment?
8     A    Yes
9     Q    And then Mary McGrew wrote a letter to Unemployment
10  saying you shouldn't get unemployment because you own property and a
11  limousine?
12    A    They got a letter  They gave me a letter (sic) of it
13  And I went back to try to get that letter  They told me I couldn't
14  get that letter unless it was do by a judge.  And that proves you
15  right there -- the unemployment people said my apartment
16  houses -- my houses don't interfere with my job and my unemployment.
17  So they stated I should receive my unemployment and which I did
18  She tried to stop that  She tried to stop this last unemployment
19  when this happened  Unemployment told her she was wrong for
20  dismissing me because that was hearsay.  So we have to pay this man.
21  This man didn't do anything  That's hearsay  They said, Go get the
22  tape, you know  You know, here you got a guy that I got him the
23  job  He was just scared because they just bought a trailer  He
24  didn't know what was going on

**Page 50**

1    Q    Who is the "he" you are talking about?
2    A    Clinton Andrews  He said he was scared.  He didn't know
3    what was going on
4    Q    Where does Mr. Andrews live?
5    A    He lives somewhere way out in the trailer park, out there
6    in the boundary  He told me, he said, Hey, he said, I was on drugs,
7    and, I lied  And -- you know what I mean?  He said, I'm sorry, you
8    know  So, you know what I mean?  And he said he will come and
9    testify that he lied on me because he said he was in the truck
10    sleeping when I got back in the truck  So he said he couldn't have
11    seen nothing  He said he went to bed late and he had his hand over
12    his head sleeping like that when I went to use the bathroom.  He
13    said -- he just said he had to keep his job.  You know what
14    was going on.  That's what I tried to explain to her  Don't go by
15    what nobody say  Listen to me.  I wasn't drinking  I don't drink.
16    I didn't buy nobody no liquor
17    Q    Let me go get Ms McGrew
18    A    You know what I mean?
19        (Pause in proceedings.)
20        (Ms McGrew returned to the deposition room.)
21    MR JAMES:  Could you read that last piece back because I
22    couldn't hear
23    COURT REPORTER:  Sure  "Don't go by what nobody say
24    Listen to me  I wasn't drinking  I don't drink  I didn't buy

**Page 51**

1    nobody no liquor "
2    Q    You filed a charge with the EEOC approximately seven
3    months after your employment was terminated, correct?
4    A    Yes, sir
5    Q    The EEOC did not find in your favor, did it?
6    A    I don't remember  I think I had to go somewhere else  I
7    don't remember quite that long now
8    Q    Mr Posey, I'm going to refer you back to Exhibit 1, and
9    I'm going to refer to the page where it says page 2 at the top and
10    then it has the numeral II at the bottom.  If you look at paragraph
11    4 it asks, "What was the final result of your charge?"  Do you see
12    that?  Do you see what I'm referring to, Mr Posey?  I'm pointing to
13    it
14    A    I read it, uh-huh
15    Q    It's written that, "The charges were unable to determine
16    whether I was dismissed due to my race," correct?
17    A    Well, it read here correct
18    Q    Your wife wrote that down?
19    A    Correct.
20    Q    Is that what you told her to write?
21    A    Yes
22    Q    Was that the EEOC's finding?
23    A    Correct
24    Q    Thank you, Mr Posey  After your meeting with Dennis

**Page 52**

1    Shiley, Mary McGrew and Dave Schneider on August 24th, did
2    Ms. McGrew drive you to get a urine test?
3    A    Yes, she did.
4    Q    What vehicle were you in on the way to get the urine
5    test?
6    A    The Park District's vehicle
7    Q    Was anybody with you while you drove together?
8    A    Clinton Andrews
9    Q    During the trip to the hospital, did she say that as long
10    as you didn't have alcohol in your urine that you would not lose
11    your job?
12    A    That's what she said
13    Q    Is that exactly what she said?
14    A    That's what she said.
15    Q    Did she tell you that if you did not have urine -- or,
16    sorry  Let me rephrase that  Did she tell you that if you did not
17    have alcohol in your system that that would be something in your
18    favor?
19    A    On God
20    COURT REPORTER:  What was that?
21    THE WITNESS:  On God
22    Q    Sir, I didn't understand your answer  What was that?
23    A    She did.
24    Q    Well, I need to understand, sir  If you could look at me

**Page 53**

1    and talk to me
2    A    On God  That means yes.  On oath that means yes.
3    Q    Does Mr. Andrews have a telephone?
4    A    Yes, he do
5    Q    What is his telephone number?
6    A    I don't know it, sir, by heart
7    Q    Is it a telephone number that's listed?
8    A    Sir, I really don't know  I never asked him  I don't
9    know if it's listed or not, but I know -- I don't believe it's in
10    the phone book
11    Q    Do you see him every week?
12    A    Maybe twice a week every week, maybe
13    Q    Where do you see him?
14    A    Over to the house
15    Q    He comes over to your house?
16    A    Sure
17    Q    Are you two friends?
18    A    Sure
19    Q    Even though he lied about you?
20    A    Sure.
21    Q    How long have you been friends?
22    A    We have been -- I met him when I was working at Jumer's
23    Hotel back in 1997, somewhere around in there  So you can think
24    from 1997 to now

**Page 54**

1　Q　Does he have a family?

2　A　Sure.

3　Q　Do your families get together socially?

4　A　No. We don't associate with people. We stick to

5　ourselves. That's the way we do with family.

6　Q　Would you agree that an employer could legitimately

7　conclude that an employee who bought alcohol in a public place on

8　company time and wearing what looked like a company uniform and

9　using company transportation was not meeting the employer's

10　expectations?

11　A　I don't understand your question, sir.

12　Q　Okay. Do you think that it is possible in this case

13　that -- well, strike that. I don't know how to make it make sense

14　　　Are you aware of any Park District employees who have

15　bought alcohol on Park District time and where the Park District

16　knew about this but did not fire them?

17　A　No, sir.

18　Q　Why do you believe you were discriminated against based

19　on your race?

20　A　I can't answer that question right now.

21　Q　Why can't you answer it?

22　A　I have lots of reasons, but I don't want to give you a

23　special reason right at this minute, my definite reason. But I

24　believe I was. And --

**Page 55**

1　Q　Well, I need to know why you believe that, and I'm

2　entitled to know that now.

3　A　I just explained to you earlier she did not like me.

4　Okay?

5　Q　Did she tell you she didn't like you?

6　A　She didn't have to. You could look at her face and tell.

7　Q　So when she would look at you, you got the impression she

8　didn't like you?

9　A　She have always.

10　Q　Was your -- and, again, I couldn't hear you clearly.

11　A　She have always looked at me funny.

12　Q　Okay. Can you describe for me how she was looking at

13　you?

14　A　Looked at me like I wasn't nothing. And one of the guys

15　on the job said, You are something. You are getting this park taken

16　care of.

17　Q　What was it about her expression that made it appear to

18　you she was looking at you like you were nothing?

19　A　She rolled her eyes at you.

20　Q　Anything else?

21　A　That's it.

22　Q　What were the circumstances when she would roll her eyes

23　at you?

24　A　Nothing. Just walk by and roll her eyes at you.

**Page 56**

1　Q　What do you mean by "roll her eyes"?

2　A　Roll her eyes. You know, just roll them. You know what

3　rolling eyes mean? You know what they mean.

4　Q　Sir, but what's important is what you mean when you say

5　it.

6　A　I just told you what I mean. I said she rolled her eyes.

7　What do you want me to say? Turn her head the other way.

8　Q　Okay. So meaning her eyes would move around in her head?

9　Her eyeballs would change positions?

10　A　No. They would go up and down.

11　Q　Okay. Do you know whether someone called Mary McGrew on

12　the telephone on August 24th, 2004, to complain that she had seen a

13　park district employee buying alcohol?

14　A　I don't know. I heard some rumors said my cousin might

15　have did it. He was fired by her, too. So my cousin might have did

16　it, or just some rumors I heard, you know, playing a joke, you know.

17　Q　Did you ever ask your cousin about that?

18　A　No. I asked one of my cousins. She said she asked him.

19　So that's how I got to him maybe is when I asked her she asked him.

20　Q　Which cousin is it that there is a rumor he called the

21　District to say that?

22　A　One of the cousins I used to work with on the job was

23　George Doris. And --

24　Q　How do you spell that last name?

**Page 57**

1　A　D-o-r-- I think it's r-i-s. Maybe two R's or one R in

2　his last name.

3　Q　Where did you hear that rumor that he might have called

4　and made this report?

5　A　When it -- about the next day it happened, I had a

6　friend's cousin told me, you know.

7　Q　Is that cousin a man or woman?

8　A　Woman.

9　Q　But you have never asked Doris about it?

10　A　We don't talk.

11　Q　Where does Doris live?

12　A　Don't care.

13　Q　Do you know where she lives?

14　A　Doris, him. George.

15　Q　I apologize. I'm confused.

16　A　I had a woman cousin told me that another cousin could

17　have had called on me and told a lie on me.

18　Q　Okay. Just so I can get it straight.

19　A　Okay.

20　Q　The woman cousin, what's her name?

21　A　JoAnn.

22　Q　JoAnn what?

23　A　She was married -- Howard.

24　Q　Howard?

**Page 58**

1  A  Yeah  She was married so --
2  Q  Where does Ms. Howard live?
3  A  She live over there on State Street
4  Q  In Urbana?
5  A  Champaign  I don't know exactly the address
6  Q  Okay  I apologize  I just don't remember  Was JoAnn
7  her name?
8  A  JoAnn.
9  Q  JoAnn  Which cousin was it JoAnn said might have made
10  the call?
11  A  She said it was my cousin, but that was her nephew
12  Q  Okay  What's the nephew's name?
13  A  His name is George Doris
14  Q  George Doris.
15  A  Yeah
16  Q  Where does George live?
17  A  Sir, I don't know
18  Q  Okay  If you don't know, you don't know  Okay
19     If you want to win this lawsuit, how much money do you
20  think that the Park District owes you?
21  A  The only thing I want is what I lost, my wages and stuff,
22  and that's all  I don't want the job back because if I did get the
23  job back there, it wouldn't make -- it wouldn't last
24  Q  So can you tell me how much you think the Park District

**Page 59**

1  owes you?
2  A  They -- whatever -- the years I was off from the
3  day -- this is what December?  So I wouldn't be working in December.
4  From October -- probably the middle of October from 2006 all the way
5  back to 2003 or whenever they got rid of me.  I just want my lost
6  wages back  And overtime, I don't care about the overtime because
7  the overtime she probably didn't put that in your notes  I was
8  working 15, 17 hours Saturday and Sunday
9  Q  Is that in 2004?
10  A  Of 2003, '2 and '1
11  Q  How about 2004?
12  A  I don't think I worked in 2004 or whatever date  She
13  just terminated me
14  Q  You were terminated in August of 2004, correct?
15  A  That's it, yeah
16  Q  Did you work the same kind of overtime in 2004?
17  A  Each year I did  Not the four weekends -- I did a
18  weekend  He did a weekend  He did a weekend  I did a weekend  We
19  substitute  And then sometimes we have to work the same weeks still
20  on events and stuff like that, but --
21  Q  Earlier we talked about this document that you were kind
22  enough to bring with you from the Department of Employment Security
23  The handwriting on this document, is that your handwriting?
24  A  Yes.

**Page 60**

1  Q  And all the jobs that you said that you looked for you
2  did, in fact, look for all those jobs?
3  A  Yeah  All over
4  Q  And all the statements on this piece of paper are true?
5  A  Yes  I was going out looking.
6  Q  You are still looking for seasonal work?
7  A  Yeah  I'm doing a -- studying for truck driving now  I
8  have been doing this and been all over, man  Then I had a job over
9  in Urbana at the school.  And they dismissed me because of this job
10  Q  Have you had any employment since you lost your job at
11  the Park District?
12  A  Urbana High School  I was over there working, driving
13  trucks, delivering lunches and stuff.
14  Q  How long did you have that job?
15  A  Three weeks until they found out about the Park District
16  Q  How did they find out about it?
17  A  I don't lie  I put what happened on the paper, you know,
18  put down the truth  I don't have to lie to them
19  Q  So what did you put down on the paper?
20  A  They terminated me because they said I went and bought
21  some liquor
22  Q  What did you write on the paper?  That's what I'm asking
23  you  Did you write down that you were fired?
24  A  Terminated means fired, yeah

**Page 61**

1  Q  Did you write down that you were fired for buying liquor?
2  A  I wrote it on the paper
3  Q  Okay  Sir  I just want to make sure I understand
4  A  I just told you twice  I wrote it down when I go fill an
5  application out. I don't lie  I don't lie  I tell the truth  I
6  tell them come out better  I told the truth  You put down the
7  truth  People don't want to hire you when you lie  If they do hire
8  you, you work for two or three weeks, then they find out and then
9  they fire you because you lied
10  Q  I just want to make sure I've got it straight  So when
11  you would apply for jobs, you would write down that you were fired
12  from the Park District --
13  A  Yeah
14  Q  Let me finish the question
15  A  Go ahead
16  Q  So when you would apply for jobs, you would write down on
17  the job application that you were fired for buying alcohol on the
18  job?
19  A  It wasn't cookies
20  Q  Sir, if you could just answer the question
21  A  I'm trying to tell you, yeah  I told you every time I
22  fill out an application I put down I got terminated
23  Q  Did you say why?
24  A  For buying alcohol on the job.

| | |
|---|---|
| 1 Q. Okay. Thank you. | 1 Q. Where is that located? |
| 2 A. I ain't going to tell them a lie and say it was for | 2 A. You probably can see it if you look back over this way. |
| 3 something else. | 3 It's over in Urbana. As a matter of fact, it's right in the back of |
| 4 (Pause in proceedings.) | 4 us. |
| 5 Q. What is your highest level of education? | 5 Q. Okay. So you worked there as a limo drive? |
| 6 A. Twelfth. Went to Parkland. | 6 A. Uh-huh. And the front desk. |
| 7 Q. I'm sorry? | 7 Q. Did you own the limousine that you would drive when you |
| 8 A. Parkland College in the twelfth grade. | 8 worked there? |
| 9 Q. You went to college? | 9 A. Now I do, but I didn't at first. They gave it to me for |
| 10 A. Yes, I did. | 10 being a good employee. |
| 11 Q. Parkland College? | 11 Q. Do you still own the limousine? |
| 12 A. Yes, I did. | 12 A. Yes, I do. |
| 13 Q. Where is that? | 13 Q. What's the year and model? |
| 14 A. Champaign. | 14 A. It's a '90 Cadillac Brougham. |
| 15 Q. How many years of that college did you complete? | 15 Q. Stretch limo? |
| 16 A. I didn't go no whole year because I was -- I didn't go a | 16 A. Yes. |
| 17 whole year. | 17 Q. Do you use that limo to make money now? |
| 18 Q. Okay. Did you go for a semester? | 18 A. No, I don't. I didn't really use it to make money at |
| 19 A. Half a semester. | 19 all. I just used it for family, for weddings and taking them to the |
| 20 Q. Prior to working for the Park District, what jobs did you | 20 riverboat and funerals for our families and stuff like that; that's |
| 21 hold? | 21 the only way I used it. |
| 22 A. Before I worked at the Park District? | 22 Q. Okay. I think it was your testimony that you own some |
| 23 Q. Yes. | 23 properties; is that correct? |
| 24 A. I worked at Illinois Central Gulf about nine years, | 24 A. Sure. |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 machine operator, bus driver, foreman, laborer. | 1 Q. Do you own those properties by yourself, or do you -- |
| 2 Q. Can I stop you for one minute? | 2 A. Me and my wife. |
| 3 A. Yes. | 3 Q. How many properties do you own? |
| 4 Q. Illinois Central -- | 4 A. I don't know. About half -- eight or nine, half a dozen, |
| 5 A. Gulf. | 5 somewhere around in there. I would have to look in my files and see |
| 6 Q. G-u-l-f? | 6 what I got. I don't know what I got. I get them and they go. I |
| 7 A. Railroad. Uh-huh. | 7 sell them and I gets them. So I don't know. |
| 8 Q. Where is that company located? | 8 Q. What kind of properties are they? Are they -- |
| 9 A. Right here in Champaign. | 9 A. Duplexes, apartment houses, you know, stuff like that. |
| 10 Q. Okay. What other employment did you have before you went | 10 Q. Can you estimate what the -- let me finish my question, |
| 11 to work for the Park District? | 11 please. Can you estimate for me approximately what the value is of |
| 12 A. Jumer's Hotel. Worked there from about '97, '8, '9 to | 12 the properties that you currently own? |
| 13 2001 until the airport lost the contract in the -- they lost the | 13 A. All I own? |
| 14 contract for the airport. Jumer's Hotel, I was a limo driver for | 14 A. Yes, sir. |
| 15 them and worked the front desk. | 15 A. No. I never put that down. |
| 16 Q. I'm not familiar with that hotel. How do you spell that? | 16 Q. Well, could you tell me approximately what you think they |
| 17 A. It used to be called Jumer's Hotel. | 17 would be worth? If you were going to sell them -- |
| 18 Q. Was it the Jumer Lodge or something like that? | 18 A. If I sell everything? |
| 19 A. Yes. Uh-huh. | 19 Q. Yes. |
| 20 Q. J-u-m-e-r? | 20 A. Everything. If I sell them -- if I wanted to sell |
| 21 A. Yes. Uh-huh. | 21 everything and get out of this town, a little over a million. |
| 22 Q. I'm going back in my memory here. I used to drive past | 22 Q. Other than the home that you live in and these other |
| 23 that. Was it shaped like a castle or something? | 23 properties that you own, do you rent them out to people? |
| 24 A. It is. Still is. | 24 A. Federal government section eight, some of them. It |
| Page 63 | Page 65 |

17 (Pages 62 to 65)

**Page 66**

1  depends. And the other ones I rent out to families. I got families
2  in duplexes, in both duplexes. And apartment houses I got four
3  units. I got peoples in them staying and other houses. I got my
4  daughters in one house and son, you know.
5  Q  Who manages all these rental properties for you?
6  A  Me and my wife.
7  Q  How many hours a week does that take you?
8  A  It depends. You put the right peoples in there, you
9  don't have to worry about doing too much work on them. But if they
10  tore up something, they move out, it depends what you have to do to
11  get them back up to date.
12  Q  Can you tell me on average how much time a week you spend
13  working on your rental properties?
14  A  It depends, because mostly now I have been studying so it
15  depends. It depends. I can't really say. It depends. Whatever I
16  want to do. It depends. If I want to do something for eight hours;
17  if I want to do something for six hours; if I want to do something
18  for two hours, it depends what needs to be done. It depends. When
19  the time comes, you know, work goes slow.
20  Q  You are currently studying to be a truck driver?
21  A  Well, I was taking a test for a truck driver.
22  Q  What sort of a test, a CDL test?
23  A  Yeah. CDL test.
24  Q  Did you go to school for that?

**Page 67**

1  A  I went to school back in the '80s, but now I'm doing the
2  training on my own.
3  Q  Did you take the CDL test yet?
4  A  Yes, I did.
5  Q  When?
6  A  Took it this month.
7  Q  Do you know if you passed or not?
8  A  Well, on the air brakes -- you know, passed on the air
9  brakes or something like that. On the other test, I didn't pass
10  because I didn't have all the questions -- I mean all the questions
11  figured out, and I have to study again. So I have to wait until
12  January the 10th to go back and test again. So I was kind of moving
13  a little bit too fast.
14  Q  Okay. Sir, I think I'm almost done.
15  (Pause in proceedings.)
16  Q  Is there anything that you have to say to support the
17  claims in your lawsuit that you haven't told me about already?
18  A  You know, the only thing I want -- I just want to know
19  who told this lie on me. And that's the only thing I really, really
20  want to find out, who lied on me on this lawsuit. The job mean more
21  to me than the money. I just -- I liked -- when I was working, I
22  liked cleaning up the parks and keeping them nice. I just want to
23  know who told that lie on me. It seems like every time I got a job
24  somebody tends to say something bad about me for some reason, I

**Page 68**

1  guess.
2  Q  When you say you want to know who told the lie on you,
3  are you referring to you want to know who made that call to Mary
4  McGrew?
5  A  I want to know -- yeah, who did this, something like this
6  to me. You know, like I say, when I heard it was a cousin and then
7  I heard it was another cousin, then I heard it was a friend, then I
8  heard it was this, I don't want to hear that no more. Like the
9  unemployment officer say. That's hearsay. I want to see it.
10  Q  Do you dispute that someone called Mary McGrew and told
11  her that she saw a Park District employee buying alcohol that day?
12  A  Sir, that's not the first time people called on me on
13  that job and said that I did this and did this and did this. People
14  call about people on the jobs all the time that they are doing this,
15  doing something, doing this, doing this, doing this. People do this
16  all the time.
17  Q  Okay. Let's back up for a minute. Do you dispute that
18  someone called Mary McGrew that day to say that they had seen a Park
19  District employee buying alcohol?
20  A  I don't quite understand what you mean by "dispute." Why
21  don't you explain yourself a little better than that.
22  Q  Do you know whether that's true or not that somebody
23  called Mary McGrew --
24  A  I can't say because I don't -- I can't say that. I don't

**Page 69**

1  know. I ain't gonna lie like that and say "yes" or "no." I don't
2  know.
3  Q  Fair enough.
4  A  Yeah.
5  Q  Do you know of any other times when someone has called
6  and complained that a Park District employee was buying alcohol on
7  company time?
8  A  When we're working like that on the Park District, we
9  don't get into stuff like that. We've got our own -- we've got our
10  own -- if I'm with somebody, we're going to try ourself. We don't
11  care what nobody else do on the job as long as we get our work done.
12  Q  So you don't know?
13  A  Don't know.
14  Q  Okay. Fair enough.
15  A  And don't care, you know.
16  Q  Have you now told me everything that you have to say on
17  your behalf regarding the claims in your lawsuit? Is there anything
18  else you want to add?
19  A  I just wonder if me and you can get together with Clinton
20  Andrews and kind of -- you know what I mean -- just sit back about
21  30 minutes and see if we can just find out what the real situation
22  was. Who talked him into this or why did he do this. I want me and
23  you and him to get together and have a little conference. You know
24  what I mean? And set up a date or something and find out, because

**Page 70**

1  the way me and him been talking, he started coming out with the
2  truth now. And he, you know, kind of hate, you know -- I think he
3  was kind of like mazzled (sic) in the head about this whole thing.
4  Q   He hates that he told you that lie about you?
5  A   If you can just e-mail me or something. And then we can
6  just get together sometime, me, you and Clinton and just have a
7  talk, or maybe we can meet somewhere. As a matter of fact, we might
8  meet at Jumer's Hotel over there. That's a good spot. We can go
9  over there and talk.
10  Q   Let me just back up for a second.
11  A   Yeah.
12  Q   Okay. When you say that Mr. Andrews kind of hates -- and
13  I couldn't make out the rest of it -- does he hate the fact that he
14  told this story about you?
15  A   Yes. And like I was sitting down and I asked him, you
16  know, Why you -- Did you do some stuff like this? Or, Did you do
17  this for real?
18      He said, Posey, man, maybe I was just talking too damn
19  much. I don't know what I was doing, Posey. I just -- I just -- I
20  was scared. I didn't know what the hell was going on. I was
21  knocked out in the truck asleep. You know I was
22      That's how we talk. You know what I mean?
23  Q   Okay
24  A   He said, I didn't want to lose my job.

**Page 71**

1      I said, Why would you -- you know, for $8.50, don't lie.
2  Q   Would you be willing to set up a meeting with you and me
3  and Mr --
4  A   Sure. Man, sure.
5  Q   Let me finish, please.
6  A   Yeah
7  Q   Would you be willing to set up a meeting with you and me
8  and Mr. Andrews?
9  A   Yes, sir
10  Q   I appreciate that.
11  A   Yes, sir
12  Q   I know I already asked this question twice, but I just
13  want to make sure that it's clear because you did answer. I want to
14  make sure that I have it all before we are done. You have now told
15  me everything that you have to say about your claims in this case,
16  true?
17  A   Yes, sir
18  Q   Okay. Can I have just a minute to check, please, because
19  I think I'm done.
20      (Pause in proceedings )
21  A   I've got one more question. If I really want to be kind
22  of -- I had run over my foot with the garbage truck and I didn't
23  want to -- do you know what I mean? And it's causing me problems
24  right now because I didn't open my mouth about it. Do you know what

**Page 72**

1  I mean? But that's the way I am. If something didn't hurt then,
2  I'm not going to try to report it. I don't look to try to get no
3  free money or something from nobody. You know what I mean? The
4  second day of work the truck ran over my foot.
5  Q   Was that in 2001?
6  A   Yeah. I mean, I didn't go back and, you know, try to say
7  this and this or this or try to get no money because that happened.
8  You know, money don't mean nothing to me because if me and my wife
9  need money or something, we can always try to borrow some money off
10  a home if we want to.
11  Q   And you own a lot of property?
12  A   And we can sell a home if we wanted to, you know, but I
13  just don't lie, you know.
14  Q   Did you break any bones when your foot got run over?
15  A   I fractured a bone real bad, and I've got to have an
16  operation on it after Christmas, but, you know.
17  Q   All right. Well, Mr. Posey, unless there is anything
18  else that you want to tell me --
19  A   No, sir.
20  Q   -- about the claims in your lawsuit, then I'm done with
21  my questions.
22  A   Thank you, sir
23  Q   And thank you. I appreciate it
24      DEPOSITION CONCLUDED AT 11:47 A M

**Page 73**

1  STATE OF ILLINOIS )
                     ) SS
2  COUNTY OF PEORIA )
3              CERTIFICATE
4      I, Gale G. Everhart, CSR-RPR, a Notary Public
5  duly commissioned and qualified in and for the State of Illinois, do
6  hereby certify that, pursuant to notice, there came before me on the
7  15th day of December, A D. 2006, at 201 South Vine Street, Room 350,
8  Urbana, Illinois, the following named person, to wit:
9          JOSEPH E POSEY, SR .
10  the plaintiff herein, called by the defendant, who was by me first
11  duly sworn to testify to the truth and nothing but the truth of his
12  knowledge touching and concerning the matters in controversy in this
13  case, and that he was thereupon carefully examined upon his oath and
14  his examination immediately reduced to shorthand by means of
15  stenotype and thereafter converted to typewriting using
16  computer-aided translation by me
17      I ALSO CERTIFY that the deposition is a true record of
18  the testimony given by the witness, and that the necessity of
19  calling the court reporter at time of trial for the purpose of
20  authenticating said transcript was waived
21      I FURTHER CERTIFY that I am neither attorney or counsel
22  for, nor related to or employed by, any of the parties to the action
23  in which this deposition is taken, and, further, that I am not a
24  relative or employee of any attorney or counsel employed by the

19 (Pages 70 to 73)

1  parties hereto or financially interested in the action
2      IN WITNESS WHEREOF, I have hereunto set my hand and
3  affixed my notarial seal at Peoria, Illinois, this 1st day of
4  January, A.D. 2007
5
6
7
8  _____
        Gale G. Everhart, CSR-RPR
9       Illinois License No. 084-004217
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 74**

---

1          WITNESS ERRATA SHEET
2  JOSEPH E. POSEY, SR.,
3      Plaintiff,
4      vs          Case No. 06-2114
5  CHAMPAIGN PARK DISTRICT,
6      Defendant
7  Deposition of JOSEPH E. POSEY, SR., 12/15/06
8      I wish to make the following changes for the following
   reasons:
9  Page  Line
10  ____ ____ CHANGE: _____
11      REASON: _____
12  ____ ____ CHANGE: _____
13      REASON: _____
14  ____ ____ CHANGE: _____
15      REASON: _____
16  ____ ____ CHANGE: _____
17      REASON: _____
18  ____ ____ CHANGE: _____
19      REASON: _____
20  ____ ____ CHANGE: _____
21      REASON: _____
22
23  (Signed)_____
24

**Page 76**

---

1  JOSEPH E. POSEY, SR.,
2      Plaintiff,
3      vs          Case No. 06-2114
4  CHAMPAIGN PARK DISTRICT,
5      Defendant
6
7      I hereby certify that I have read the foregoing
   transcript of my deposition given on 12/15/06, consisting of pages 1
8  through 72, inclusive, and I do again subscribe and make oath that
   the same is a true, correct, and complete transcript of my
9  deposition so given as aforesaid.
10      Please check one:
11      _____ I have submitted errata sheet(s)
12      _____ No corrections were noted
13
14  _____
          JOSEPH E. POSEY, SR.
15
16  SUBSCRIBED AND SWORN TO
   before me this _____ day
17  of _____, A.D. 2007
18
19
20  _____
   Notary Public
21
22
23
24

**Page 75**

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

|  |  |  |
|---|---|---|
| JOSEPH E. POSEY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 06-2114 |
| | ) | |
| CHAMPAIGN PARK DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF MARY MCGREW

I, Mary McGrew, upon oath, state as follows:

1.     I am the Champaign Park District's Human Resources Manager.

2.     I have been employed by the Park District since January 3, 2001 and have been the Human Resources Manager since January 3, 2001.

3.     The Park District is a unit of local government which provides numerous high-quality recreational opportunities to the public.

4.     The Park District's Trash Collection Crew is responsible for ensuring the effective maintenance and appearance of the Park District's parks by performing litter pickup and custodial care.

5.     Plaintiff Joseph E. Posey, Sr. was terminated on August 24, 2004 because he admitted that he purchased alcohol while in a Park District uniform, on Park District time and driving a Park District vehicle with a Park District logo on both sides and municipal license plates on the front and back of the vehicle.

6.     On August 24, 2004, the Park District received a phone call from a woman who said she saw an individual in a Park District uniform purchase alcohol at a Circle K convenience store at approximately 8:30 a.m. that morning.

2:06-cv-02114-MPM-DGB    # 17-3    Page 3 of 5
APR-12-2007   16:58        LANER MUCHIN                    312 467 9479     P.003/005
04/12/07   THU 16:55 FAX 217 355 8421        CHAMPAIGN PARK DIST              ☒003

7.    The woman said she called because it bothered her that a Park District employee had bought liquor so early in the morning.

8.    The Circle K store is located approximately two blocks from one of the facilities where Plaintiff and his co-worker Clinton Andrews were scheduled to perform trash removal.

9.    As a result, the Park District radioed for Plaintiff and Andrews to come to the Park District's offices.

10.    When Plaintiff and Andrews arrived at the Park District's offices, they met with David Schneider, Maintenance Supervisor and acting department head, Dennis Shiley, Plaintiff's and Andrews' immediate supervisor, and me.

11.    Schneider was an acting department head on August 24, 2004 because Plaintiff's regular department head was on vacation.

12.    Plaintiff said that he stopped the garbage truck he was driving at the Circle K (which contained markings that identified the vehicle as belonging to the Park District) at approximately 8:30 a.m.

13.    Plaintiff admitted at the meeting that he was approached by someone outside the store who gave him money to buy alcohol.

14.    Plaintiff admitted that he bought alcohol for an acquaintance who was not allowed to enter the Circle K.

15.    Plaintiff admitted that he gave the alcohol to the individual once he exited the store.

16.    Andrews, who stayed in the vehicle, corroborated the fact that Plaintiff exited the Circle K and gave a paper bag to the individual sitting outside of the store.

17.    Plaintiff's actions directly violated several Park District policies.

2

18.    The Park District's Personnel Manual, which Plaintiff received, requires employees to act and conduct themselves at all times in the best interests of the Park District.

19    The Manual essentially states in several separate places that possession of alcohol during work time is prohibited.

20.    For example, the Alcohol and Drug Abuse policy states, "The unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance, including cannabis and alcohol, is prohibited on Park District property or while acting on behalf of the Park District.

21.    The Manual's work rules further warn that employees may be terminated if they possess intoxicants while on duty or on Park District property.

22.    Additionally, the rules notify employees that they may be terminated for leaving the job during working hours without permission.

23.    Based on Plaintiff's conduct which violated the above-mentioned policies and rules and which hurt the Park District's image in the eyes of the public, Schneider made the decision to terminate Plaintiff after consulting with Shiley and me.

24.    Shiley is also the individual who hired Plaintiff.

25.    The Park District did not terminate Andrews because he did not go into the store and was never in possession of the alcohol.

26.    When informed of his termination, Plaintiff did not complain to anyone in management that the decision was based on his race.

27.    Further, although I informed Plaintiff of the appeal procedure contained in the Personnel Manual to contest his discharge, Plaintiff failed to request such a review.

3

NOV-22-2007 TUE 16:59    INNER MUCHING    312 467 9479    P.005/005
04/12/07  THU 16:56 FAX 217 355 8421    CHAMPAIGN PARK DIST    ☒005

28.    There is no documented evidence of any employee caught purchasing alcohol on work time before.

29.    The Park District treated Plaintiff the same way it treats all employees who commit serious misconduct -- the employee is terminated, regardless of race.

30.    Only several months after Plaintiff was discharged, the Park District terminated Bill Staley (white) on January 24, 2005 for the repeated failure to perform his job properly.

31.    Specifically, Staley displayed a negative and uncaring attitude toward other employees (e.g., failing to fix maintenance issues brought to his attention until specifically asked to by his supervisor) and toward the public (e.g., offending a member of the public by not addressing his complaint promptly, thus showing a lack of concern for this issue).

32.    This misconduct resembles Plaintiff's misconduct in that both caused a member of the public to view an employee of the Park District in a negative light.

33.    On March 31, 2006, the EEOC issued Plaintiff a "Dismissal and Notice of Rights" on his EEOC Charge, which stated that the EEOC was closing its file because it was "unable to conclude that the information obtained establishes violations of the statutes."

Further Affiant Sayeth Naught.

*Mary M. McGrew*

Mary McGrew

Subscribed and sworn to before me
this _12th_ day of April, 2007.

*Thomas E. Gilbert*
Notary Public

> OFFICIAL SEAL
> THOMAS E GILBERT
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:11/28/09

4

TOTAL P.005